[redacted]

# In the United States Court of Federal Claims
**Bid Protest**

| | |
|---|---|
| THE SUDDATH COMPANIES,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No.<br>Judge |

## COMPLAINT

Plaintiff, The Suddath Companies ("Suddath"), by and through its counsel, brings this bid protest action against the United States of America, acting through the United States Transportation Command ("TRANSCOM" or the "Agency") in the United States Department of Defense ("DOD"), seeks declaratory judgment and injunctive relief, and in support alleges the following:

## I. PRELIMINARY STATEMENT

1. TRANSCOM's non-competitive cardinal change to the Global Household Good Relocation Contract ("GHC") was a violation of law and regulation, including the Competition in Contracting Act of 1984 ("CICA") and related federal acquisition regulations. GHC is a new management system for moving household goods of U.S. military and Coast Guard personnel and family members. TRANSCOM's actual requirement for household goods moving services are vastly different from what was stated in the solicitation against which all offerors had to compete. These include: the enlarged period for full implementation of the GHC to at least 34 months, nearly four times the length set out in the solicitation; halting transition of house hold goods moves



[redacted]

[redacted]

for one year and a half, which was unstated in the solicitation; and an additional $60 million to both fund part of the materially extended implementation period and the cooperative development and implementation of a mobile application for the awardee, which were not part of the solicitation—the solicitation required offerors to propose and provide a working application. Despite this fundamental departure from the requirements upon which the GHC competitive procurement was conducted, TRANSCOM failed to hold a competition among offerors capable of meeting these materially different needs choosing instead to affect cardinal changes to the contract, giving the awardee a windfall of additional time and money before beginning minimal transition. Such conduct is illegal. This Court should direct the Agency to conduct a procurement in which capable offerors are given adequate opportunity to compete for the Agency's materially changed requirements.

## II. PARTIES

2. Plaintiff Suddath is a Florida for-profit corporation organized under the laws of the State of Florida with its principal place of business at 815 South Main Street, Jacksonville, FL 32207. Declaration of [redacted] ([redacted] Decl.") at ¶ 2. Suddath began its operations in Jacksonville, Florida, in 1919 as a moving company and has since grown into a close to $900 million global transportation, relocation management, specialized logistics, and workplace services company, serving 180 countries. *Id.* at ¶ 3. Each year, Suddath's military division, which maintains roughly 240 dedicated employees, moves more than 33,000 military families all around the nation and globe, leveraging many locations and a global partner network. *Id.* at ¶ 4.

3. Defendant is the United States, acting by and through TRANSCOM, located at 508 Scott Drive, Scott Air Force Base, Illinois 62225.



[redacted]

[redacted]

## III. JURISDICTION

4. This Court has jurisdiction over this action, and venue lies in this Court, under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b)(1), as this action arises out of Suddath's objection to "violations of statute or regulation in connection with a procurement."

5. Suddath is an interested party within the meaning of 28 U.S.C. § 1491(b), as its direct economic interest as a prospective bidder was affected by the cardinal change to the work awarded under the GHC contract. Suddath suffered non-trivial competitive injury by TRANSCOM's non-competitive change to the scope of the procurement. As will be discussed further below, Suddath has been a long-time contractor both under the current Defense Personal Property Program ("DP3"), as well as its predecessors, and was thus eligible and highly qualified to compete for and be awarded GHC, as changed after award. But for TRANSCOM's inaccurate solicitation that was cardinally changed after the award—in other words, had TRANSCOM issued a solicitation that accurately reflected its needs—Suddath would have competed for the contract and would have had a substantial chance to win. [redacted] Decl. at ¶ 5.

## IV. BACKGROUND

6. TRANSCOM is a unified combatant command that conducts globally integrated mobility operations for the Joint Deployment and Distribution Enterprise and supports ten other U.S. combatant commands (such as Africa Command and Special Operations Command), the military services, defense agencies, and other government organizations.

7. The procurement at issue is GHC. Through GHC, TRANSCOM plans to consolidate into one contractor the management of door-to-door moving services for the DOD and U.S. Coast Guard personnel and their family members. The GHC contractor will be



[redacted]

[redacted]

responsible for packing, shipping, storage-in-transit warehouse services, delivering, and unpacking household goods all around the globe. To carry out this service, the contractor will manage a network of commercial moving companies. GHC is intended to improve the DP3 by replacing the legacy Tender of Service program, under which DOD hired many commercial moving companies on a one-by-one basis throughout the world to move the household goods. By empowering and holding accountable one contractor to manage all such shipments, the DOD plans to institute one set of formally defined standards and oversight responsibilities, incentives, and consequences for the benefit of GHC customers. GHC will include enhanced customer care representative communications, modern smart-phone management systems, simplified claims processes, more options for moving services, shorter transit times, and increased service standards.

### *A. Solicitation History*

8. On November 29, 2018, TRANSCOM issued the initial Request for Information ("RFI") conducting market research of available and capable commercial movers. Question number twelve on the RFI stated: "Please describe all the ways you utilize technology for move management services. Specifically, are customers able to access information about their shipments using a smart phone and/or similar mobile technology (application based tablets, etc.)?" **Ex. A** at 2.

9. On September 13, 2019, TRANSCOM issued a Request for Proposals ("RFP") No. HTC711-19-R-R004 for GHC potentially worth up to twenty billion dollars for a contractual period of up to nine years and three months. The RFP's Performance of Work Statement ("PWS") requires:



[redacted]

[redacted]

> **1.2.2. Information Technology (IT) Systems.** The contractor ***shall provide and maintain*** an easy to use, secure, web-based, mobile-device compatible IT system able to manage complete household goods relocation services globally during peak (surge) and non-peak seasons. The contractor's ***IT system shall interface with a government managed system*** for the purposes of issuing and receiving task orders, third party payment system (TPPS) payment requests, shipment ITV, government data access, and claims management/filing. The contractor's IT system(s) shall permit the customer to coordinate all phases of their move, be accessible from a commercial or government network using common browsers and include the ability to upload attachments.

**Ex. B** at 3 (emphases added).

10. The RFP was amended on October 4, 2019, and Appendix A: Transition & Phase-In Phase-Out Plan was added. According to Appendix A, the Transition Period is from May 1, 2020 through January 31, 2021, about nine months. **Ex. C** at 1.

11. On April 30, 2020, TRANSCOM awarded the GHC contract to American Roll on Roll Off Carrier Group, Inc. ("ARC") more than 7.2 billion dollars, over HomeSafe Alliance, LLC ("HomeSafe") and Connected Global Solutions, LLC ("CGSL"). **Ex. D**. The Technical Capability Subfactors evaluation ratings regarding Subfactor 4 IT Services were "Acceptable" for CGSL, "Good" for HomeSafe, and "Outstanding" for ARC, the original awardee. **Ex. E**.

12. In response to the award decision, in July 2020, HomeSafe and CGSL filed protests with the Government Accountability Office ("GAO"), but the protests were dismissed when TRANSCOM took corrective action. **Ex. F**.

13. Within weeks, TRANSCOM reversed course and confirmed the award of GHC to ARC on June 29, 2020. **Ex. G**. In response, HomeSafe and CGSL filed a second round of protests with the GAO. On October 21, 2020, GAO sustained the protest and recommended that TRANSCOM conduct and document a new round of oral presentations with each offeror, reevaluate technical capability proposals, and perform a new best-value tradeoff analysis. *See HomeSafe Alliance, LLC*, B-418266.5 et al., 2020 CPD ¶ 350 (Comp. Gen. Oct. 21, 2020).



[redacted]

[redacted]

TRANSCOM took corrective action, and the Source Selection Authority ("SSA") and the Source Selection Advisory Council ("SSAC") concluded that while CGSL was lower-priced, HomeSafe was higher-rated technically, providing best value to the government. For "IT Services," ARC and CGSL were rated "Acceptable" while HomeSafe was rated "Good." *Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720, 731 (2022).

14. On November 4, 2021, TRANSCOM awarded the GHC contract to HomeSafe worth over 6.1 billion dollars over four years as a Fixed-Price with Economic Price Adjustment, Indefinite Delivery, Indefinite Quantity ("IDIQ") contract. **Ex. H**. The November 4, 2021 award included a combined contract Transition Period and base period of performance from December 1, 2021 to August 31, 2025; and planned to issue the first task order for moving services on September 1, 2022. *Id.* The first step for HomeSafe was to integrate its smartphone application "HomeSafe Connect" to the government's systems. **Ex. I** at 2.

15. CGSL and ARC filed another bid protest with the GAO, which was denied. CGSL and ARC then filed with the Court of Federal Claims. *See Connected Glob. Sols.*, 162 Fed. Cl. 720. The Court granted the defendants' motions for judgment on the administrative record ("MJAR") and denied the plaintiffs' MJAR on October 28, 2022. *Id.*

### *B. Cardinal Changes*

16. Over the 23 months since November 2022, DOD has worked with HomeSafe on GHC transition and phase-in. DOD says it has used conditions and metric-based decisions about the moving order volume to control the volume of GHC shipments based on HomeSafe's capabilities.

17. The scope of the Transition Period for the phase-in has undergone numerous changes since the beginning. In the initial 2019 RFP, the Transition Period was from May 1, 2020



[redacted]

[redacted]

through January 31, 2021, about nine months. When HomeSafe was awarded the contract (Contract Award No. HTC711-22-D-R002), the Transition Period was extended from the initial nine months to twelve months in Appendix A: Transition & Phase-In Phase-Out Plan: from March 4, 2022 through March 23, 2022 and November 3, 2022 through September 30, 2023. **Ex. J** at 1.

18. Appendix A also states that "[t]he Contractor's IT system shall be able to execute an end-to-end, origin to destination Household Goods ("HHG"), Unaccompanied Baggage ("UB") and Storage-In-Transit ("SIT") moves, [not later than] the contract base period year one (1) start date." *Id.* Base period was to start on December 1, 2021, which puts the IT system delivery date to November 30, 2022. There was no provision for funding for the development of said IT system. *See generally id.*

19. TRANSCOM, however, modified contract No. HTC711-22-D-R002 and additionally awarded HomeSafe $60 million to develop a mobile application for GHC and to fund another 12 months of transition services. **Ex. K**.[1] And the transition period was delayed and extended to last from February 12, 2024 to February 12, 2025. *Id.*

20. The transition was then further delayed and started only in April 2024. A letter dated August 22, 2024 from Ms. Tamara D. Thouvenot, SES, DAF, Deputy Director of Acquisition at TRANSCOM, to Senator Sullivan, stated: "Awarded to HomeSafe Alliance, LLC (HomeSafe) in November 2021, DoD has worked with HomeSafe on GHC Transition and phase-in activities ***since November 2022***" **Ex. L** at 1 (emphasis added). But clearly the transition did not start until much later in April 2024, giving HomeSafe eighteen months of pre-transition period, which is out of the scope of the solicitation and award.

[1] *See also* Contracts for Feb. 12, 2024, U.S. Department of Defense, https://www.defense.gov/News/Contracts/Contract/Article/3674428/ (last visited Oct. 15, 2024).



[redacted]

[redacted]

21. TRANSCOM circulated Personal Property Advisory #24-0044 dated February 22, 2024, advising the DOD approved transportation service providers that "DOD will begin executing shipments under GHC at selected locations in ***April 2024***" delaying the start of domestic phase-in to spring 2024. **Ex. M** at 1 (emphasis added). And international GHC phase-in is planned to begin no earlier than ***September 2025***, stretching the total phase-in period to more than 34 months. *Id.* at 2 (emphasis added).

22. Accordingly, HomeSafe only began moving household goods under the GHC program in April 2024. **Ex. N**. DOD's established moving companies have voiced concerns about the GHC Program on Capitol Hill, both individually, as well as, through the industry trade associations including the Moving and Storage Conference of The American Trucking Associations. The industry coalition "Movers for America," has also voiced repeated concerns about the GHC program. *Id.*

23. On July 25, 2024, Mr. Robert A. "Andy" Dawson at TRANSCOM sent an email titled "DP3 and Global Household Goods Contract (GHC) Update #3 June/July 2024," stating: "As of this email, USTRANSCOM has awarded HomeSafe ***96*** shipments with more in the pipeline." **Ex. O** at 2 (emphasis added). The email included a chart that showed a progress plan for domestic GHC expansion:

| APR 2024 | MAY 2024 | JUN 2024 | JUL 2024 | AUG 2024 | SEP 2024 | OCT 2024 | NOV 2024 | DEC 2024 | JAN 2025 | FEB 2025 | MAR 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 Shipments | SO Shipments | 50 Shipments | 50 Shipments | 250 Shipments | 500 Shipments | 1000 Shipments | 10% Shipments | 20% Shipments | 40% Shipments | 80% Shipments | 100% Shipments |
| <1% Domestic Volume | <1% Domestic Volume | <1% Domestic Volume | <1% Domestic Volume | ~2% Domestic Volume | ~4% Domestic Volume | ~10% Domestic Volume | 10% Domestic Volume | 20% Domestic Volume | 40% Domestic Volume | 80% Domestic Volume | 100% Domestic Volume |

*Id.* at 3; **Ex. P** at 4. This amounts to a transition of less than 1% of household goods moves transitioned after 20 months since the transition began in November 2022, despite the contractual requirement for a 12-month transition of 100% of household goods. In fact, HomeSafe released a



[redacted]

[redacted]

press release on September 3, 2024, announcing completion of only its first one hundred local moves. **Ex. Q**.

24. On August 26, 2024, Mr. Dawson sent an email titled "GHC Announcement" stating that beginning on or about September 6, 2024, local shipments would begin in Arizona, California, Colorado, Georgia, Maryland, North Dakota, Pennsylvania, South Carolina, and Virginia; and GHC interstate moves would begin: Norfolk, Virginia to/from Seattle, Washington area, Jacksonville, Florida area, and San Diego, California area, and San Diego, California to/from Seattle, Washington area. The email explained that in October, GHC will be phased in in Alabama, Colorado, Florida, Georgia, Kansas, Kentucky, Maryland, Mississippi, Missouri, New Mexico, North Dakota, Texas, and Utah. **Ex. R**.

25. On September 13, 2024, TRANSCOM published an RFI notice No. HTC711-RFI-1 "to have in place for MilMove that will provide agile software design development and sustainment . . . to support USTRANSCOM's Global Household Goods Contract (GHC)." **Ex. S** at 1. MilMove is a web application that customers can log in to request shipments. **Ex. T** at 1. TRANSCOM published the RFI seeking a contractor "to provide software development support and expertise for the MilMove Program." **Ex. S** at 2–3. TRANSCOM has published RFIs for MilMove at least twice before, on February 11, 2021, No. TRANSCOM21D009, **Ex. U**, and on October 3, 2023, No. TRANSCOM24R001, **Ex. V**.

26. On November 4, 2024, TRANSCOM sent a letter to Senator Dan Sullivan to answer his August 12, 2024 query regarding GHC transition in Alaska, indicating the 34-month transition is likely to get longer. **Ex. W**. TRANSCOM stated that additional time is needed for the Alaska GHC phase-in, which is currently scheduled to begin on January 1, 2025. *Id.* at 1. Stated reasons were "the readiness of DoD installations, the supporting information technology



[redacted]

[redacted]

(IT) systems integration, HomeSafe's capacity to support the phase-in, and the operational environment." *Id.*

27. The November 4 letter also stated that the Agency is reconsidering the terms of the solicitation, specifically with regards to whether and how the McNamara-O'Hara Service Contract Act (SCA) of 1965 applies to GHC. *Id.* at 3–4. TRANSCOM said "compliance with the SCA might create challenges" and it is working with the Department of Labor to come up with a solution. *Id.* at 4.

### *C. Suddath's Capabilities and Direct Economic Interest*

28. Each year, Suddath's military division, which maintains [redacted], moves more than [redacted] military families all around the nation and globe, leveraging many locations and a global partner network. [redacted] Decl. at ¶ 4.

29. Suddath is currently one of the largest military household goods providers of managed and serviced shipments/customers in the DP3 program for domestic and international moves. [redacted] Decl. at ¶ 5.

30. Suddath has provided those services for more than 75 years and successfully relocated over one million military families around the world. [redacted] Decl. at ¶ 6.

31. Suddath's existing worldwide agency network and van line affiliations with partners including lift van manufacturers, third party service providers, domestic and international agents, ocean carriers, air carriers, and port agents are and were ready willing and able to provide more than enough capacity to handle the 350,000 moves DOD will require annually under the Global Household Goods Contracts (GHC) program. [redacted] Decl. at ¶ 7.

32. Many of Suddath's trained and experienced personnel have been in the military household goods business with Suddath and others for many years, including the military



[redacted]

[redacted]

leadership team which has two hundred years of combined industry experience, and have the knowledge to execute timely on the transition schedule and execution of the contract. [redacted] Decl. at ¶ 8.

33. Suddath is a major provider for residential, corporate and logistics services across the globe providing relocation solutions for Fortune 500 companies. [redacted] Decl. at ¶ 9.

34. Suddath has numerous household goods-based facilities across the U.S. and overseas [redacted]. [redacted] Decl. at ¶ 10.

35. Suddath currently has [redacted] to accommodate both domestic and international movements. [redacted] Decl. at ¶ 11.

36. Suddath [redacted] Decl. at ¶ 12.

37. Suddath is a century-old company that not only has military experience but also is highly respected as a worldwide mover for corporate and residential service that would enhance the military customer service experience. Suddath brings many of those same processes and experiences to GHC. [redacted] Decl. at ¶ 13.

38. As one of the largest international providers in the military program, [redacted] Decl. at ¶ 14.

1. <u>GHC Solicitation</u>



[redacted]

[redacted]

39. Had Suddath known about the Agency's actual requirements for a flexible 3-year-plus transition and a government-funded software development effort, Suddath could and would have bid. Suddath stands ready to perform GHC services. [redacted] Decl. at ¶ 15.

40. Suddath has the financial wherewithal to fund the ongoing costs associated with development of technology and execution of the GHC contract. Suddath is of the right size—[redacted]—with existing and operational technology that could have been used to implement GHC. [redacted] Decl. at ¶ 16.

41. Given the additional time for GHC implementation, [redacted] Decl. at ¶ 17.

42. [redacted] Had Suddath known the actual GHC implementation time, it would have been able to offer a much more competitive price and better value to the government than the awardee. [redacted] Decl. at ¶ 18.

43. [redacted] Decl. at ¶ 19.



[redacted]

[redacted]

44. Running two separate programs (GHC and DP3) and not achieving the cost reductions TRANSCOM was seeking have resulted in redundant negative cost structure to the government. As GHC implementation continues to drag on, Suddath's original bid price would have been lower than the awardee's bid price, because a longer preparation would have avoided the needed surge capacity of people and resources to be ready within nine months, as initially solicited. [redacted] Decl. at ¶ 20.

45. Given the extended transition period, [redacted] Decl. at ¶ 21.

2. Suddath's [redacted]

46. [redacted] Decl. at ¶ 22.

47. Suddath's partners around the world would be staffed, trained, and ready to work immediately. [redacted] Decl. at ¶ 23.

48. Suddath's executive leadership brings together [redacted] of experience in military household good relocation experience to include logistics, freight forwarding and brokerage. [redacted] Decl. at ¶ 24.



[redacted]

[redacted]

49. Suddath's executive leadership has on average thirty years of experience with the company and the DP3 program. [redacted] Decl. at ¶ 25.

3. Suddath's [redacted]

50. Because of Suddath's existing relationships and participation in the DP3 program, [redacted] Decl. at ¶ 26.

51. Suddath's network of service providers has been built on a basis of trust for over 75 years. Suddath's average "tenured" partner suppliers, consisting of moving and storage agents, van lines, ocean carriers, appliance service/crating services, liftvan manufacturers is over twenty years. [redacted] Decl. at ¶ 27.

4. Specific Harm from Suddath's Missed Opportunity

52. Based upon its unique capabilities and experience, Suddath had a substantial likelihood of being selected in a competitive procurement based upon the Agency's actual transition timeline and willingness to fund cooperative technology development.

53. Missing out on the opportunity to compete and participate in GHC irreparably harmed Suddath by depriving it of a transformative opportunity.

54. Had Suddath been able to propose and been selected for the Agency's actual GHC requirements, it would have been able to leverage Suddath's strengths and experience to facilitate material growth, [redacted]. [redacted] Decl. at ¶ 28.

55. The guaranteed business volume generated by the GHC contract would enable Suddath to materially expand its global business for non-DOD customers as well. When building



[redacted]

[redacted]

[redacted] Decl. at ¶ 29.

56. Suddath would [redacted]. [redacted] Decl. at ¶ 30.

57. In addition, had Suddath known about the extended GHC implementation, it would have [redacted]. [redacted] Decl. at ¶ 31.

58. To support the increased GHC volume, other Suddath subsidiaries would have actively provided both transportation and storage services. [redacted] Decl. at ¶ 32.

59. Due to the cardinal change, [redacted]:

a. [redacted]

b. [redacted]

c. [redacted]

[redacted] Decl. at ¶ 33.



[redacted]

[redacted]

## CAUSES OF ACTION

## COUNT I

### TRANSCOM's Out-of-Scope Modification to the GHC Contract Violates the Competition in Contracting Act Mandate for Full and Open Competition

60. Suddath incorporates and realleges all preceding paragraphs.

61. TRANSCOM's actual needs are vastly different from the requirements of the solicited GHC contract but TRANSCOM failed to invite proposals to meet its materially changed performance requirements. First, the GHC RFP required the offerors to complete transition of 100% of household goods moves in nine months, but the Agency has transitioned less than 1% of household good moves 20 months after transition began, and *at best* will achieve 100% domestic transition within 27 months, three times the transition period provided in the solicitation. Second, despite the solicitation saying offerors "***shall provide and maintain*** an easy to use, secure, web-based, mobile-device compatible IT system" which "***shall interface with a government managed system***" the Agency modified the GHC contract to provide an additional $60 million both to fund part of the materially extended implementation period and also to cooperatively develop such a system with the awardee. Nothing in the Solicitation alerted offerors that they would receive an additional 18 months and $60 million of software development dollars to become ready to begin transition.

62. In the initial 2019 RFP, the GHC contract Transition Period was from May 1, 2020 through January 31, 2021, about nine months. In the 2021 Award, the Transition Period was split with an initial transition of domestic moves from November 3, 2022 through September 30, 2023, and from March 4, 2023 through March 23, 2023, with the transition of international moves to start in September 2025. But the actual domestic transition did not start until April 2024. At this point, the transition period has included an initial pre-transition period of eighteen months during



[redacted]

[redacted]

which no household goods moves were transitioned and four months in which less than 1% of domestic household goods were transitioned with plans for full domestic transition to take more than 27 months. In fact, it was announced on September 3, 2024 that only 100 local moves (and no interstate moves) had been completed as of that date. TRANSCOM is also considering further delaying GHC implementation in some states, such as Alaska.

63. In TRANSCOM's solicitations, it expected the awardee to deliver a mobile platform that can be integrated into the military's system to provide modern and user-friendly moving services to the U.S. military and Coast Guard personnel and family through GHC. TRANSCOM's solicitation did not anticipate or include further funding or time for the development of a mobile platform. However, TRANSCOM gave $60 million to HomeSafe to develop a mobile application, which was not an anticipated funding. This ad hoc, post hoc windfall software development contract to prop up HomeSafe while the Agency continued to meet its household good move needs under the legacy tender program was an illegal cardinal change.

64. TRANSCOM's changed GHC implementation needs are further demonstrated by the RFI No. HTC711-RFI-1 seeking additional contractors to help development web-platform MilMove for GHC. This RFI is at least the third time TRANSCOM sought sources to develop and revamp the Government-side software of GHC.

65. Furthermore, the Agency is considering changing fundamental legal requirements of GHC, like compliance to the SCA.

66. Had Suddath and other offerors known that the Agency would allow flexible transition over a period of nearly three years and that the Agency would fund the cooperative development of the mobile application that the RFP required offerors to provide, there would have



[redacted]

[redacted]

been a substantially different pool of eligible offerors. And Suddath, one of the world's most experienced and successful DP3 contractors would have had a substantial chance of receiving the award.

67. TRANSCOM's cardinal change to GHC without competition violates law and regulation.

## COUNT II

### TRANSCOM Should Be Enjoined from Proceeding with Further Performance of the GHC Contract and Ordered to Issue a New Full and Open Competition That Accurately Reflects TRANSCOM's Needs

68. Suddath incorporates and realleges all preceding paragraphs.

69. TRANSCOM's cardinal change to the GHC contract irreparably deprived Suddath from competing for GHC. Before deciding not to bid for the GHC contract, Suddath has carefully reviewed and considered the nine-month transition period as well as the requirement to deliver a working mobile application. Had TRANSCOM accurately stated its needs in the solicitation concerning the transition period and $60 million in additional funding for mobile application development, Suddath would have competed for the award and had substantial chance of winning. As GHC only contemplated just one awardee, TRANSCOM's cardinal change permanently deprived Suddath of the opportunity to fairly compete for the award.

70. GHC is not just a contract worth billions of dollars with a multi-year contractual period but also a one-of-a-kind contract for military personnel movers, the benefit of which cannot be monetarily quantified. The awardee is given an unprecedented task of managing *all* military household goods moves. The expertise, experience, and infrastructure that will be developed to meet such requirements—e.g., [redacted],



[redacted]

[redacted]

[redacted]—are irreplaceable. This is especially the case when the government has been illegally enlarging the transition period and providing additional funding to prop up the awardee in unfairness to all other bidders and potential bidders.

71. TRANSCOM made meager progress in implementing GHC. TRANSCOM has to this date, after almost three years of the award, transitioned less than 1% of the household goods moves to GHC. Given that TRANSCOM is in the very early stages of implementing GHC, now is the right time for TRANSCOM to revisit the illegally issued solicitation and reissue it to reflect its needs accurately. On the other hand, Suddath has already been long-deprived of the opportunity of participating in the extra-prolonged transition period as well as $60 million funding to develop a mobile application and the capacity-building entailed by such efforts.

72. The public, including affected military personnel and families, was divested of a full and open competition because many bidders and potential bidders who were not aware of TRANSCOM's actual needs could not accurately bid and compete for the award. It is in public interest for GHC to be resolicited such that the military may select an awardee that best addresses TRANSCOM's actual needs. Further, given that GHC has been mired in problems and less than 1% of total military household goods moves are now being conducted under GHC, military personnel and their families will suffer minimal to no disruption by a reissuance of GHC solicitation.

73. TRANSCOM's cardinal change to GHC should be redressed by a permanent injunction to stop the implementation of the illegal contract and to reissue the solicitation to accurately reflect TRANSCOM's needs.



[redacted]

[redacted]

## PRAYER FOR RELIEF

WHEREFORE, Suddath respectfully asks this Court to enter judgment in its favor and against the United States as follows:

i. Declare that TRANSCOM's substantial modification to the scope of GHC without competition violates CICA;

ii. Enjoin TRANSCOM from proceeding with further performance under the materially changed and illegal GHC;

iii. Order TRANSCOM to issue a new solicitation that accurately reflects TRANSCOM's needs; and

iv. Grant any other relief as the Court deems just.



[redacted]

[redacted]

Dated: November 8, 2024

Respectfully submitted,

/s/ Jeffery M. Chiow
Jeffery M. Chiow (attorney of record)
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3149
jeff.chiow@gtlaw.com
*Counsel for The Suddath Companies*

Of Counsel:

Yongho Lee
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202) 533-2318
Andrew.Lee@gtlaw.com

Shirin Afsous
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 749-1300
Shirin.Afsous@gtlaw.com



[redacted]