# In the United States Court of Federal Claims

**Bid Protest**

| | |
|---|---|
| THE SUDDATH COMPANIES,<br><br>Plaintiff,<br><br>and<br><br>TOTAL MILITARY MANAGEMENT, INC.,<br><br>Consolidated Plaintiff,<br><br>and<br><br>NATIONAL HOLDING COMPANY, INC.,<br><br>Consolidated Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOMESAFE ALLIANCES LLC,<br><br>Defendant-Intervenor. | **REDACTED VERSION**<br><br>Nos: 1:24-cv-01836, 1:24-cv-02029, 1:24-cv-02112<br><br>Judge Zachary N. Somers |

**PLAINTIFF THE SUDDATH COMPANIES' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the United States Court of Federal Claims and this Court's Amended Scheduling Order (ECF 42), Plaintiff, The Suddath Companies (Suddath), by and through undersigned counsel, hereby respectfully files this timely Motion for Judgment on the Administrative Record (Motion). Suddath respectfully moves this Court to grant declaratory relief

and a permanent injunction. This Motion is supported by Plaintiff's Memorandum in Support of Its Motion for Judgment on the Administrative Record.

Dated: January 17, 2025

Respectfully submitted,

/s/ Jeffery M. Chiow
Jeffery M. Chiow (attorney of record)
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3149
Jeff.Chiow@gtlaw.com
*Counsel for The Suddath Companies*

*Of Counsel:*

Shirin Afsous
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 749-1300
Shirin.Afsous@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
Cassidy.Kim@gtlaw.com

Yongho Lee
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202) 533-2318
Andrew.Lee@gtlaw.com

Olivia Bellini
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 903-7514
Olivia.Bellini@gtlaw.com

# In the United States Court of Federal Claims

**Bid Protest**

| | |
|---|---|
| THE SUDDATH COMPANIES,<br><br>Plaintiff,<br><br>and<br><br>TOTAL MILITARY MANAGEMENT, INC.,<br><br>Consolidated Plaintiff,<br><br>and<br><br>NATIONAL HOLDING COMPANY, INC.,<br><br>Consolidated Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>HOMESAFE ALLIANCES LLC,<br><br>Defendant-Intervenor. | Nos: 1:24-cv-01836, 1:24-cv-02029, 1:24-cv-02112<br><br>Judge Zachary N. Somers |

**PLAINTIFF THE SUDDATH COMPANIES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Dated: January 17, 2025

Respectfully submitted,

/s/ Jeffery M. Chiow
Jeffery M. Chiow (attorney of record)
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3149
Jeff.Chiow@gtlaw.com
*Counsel for The Suddath Companies*

*Of Counsel:*

Shirin Afsous
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 749-1300
Shirin.Afsous@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
Cassidy.Kim@gtlaw.com

Yongho Lee
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202) 533-2318
Andrew.Lee@gtlaw.com

Olivia Bellini
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 903-7514
Olivia.Bellini@gtlaw.com

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. QUESTIONS PRESENTED ..... 3

III. STATEMENT OF THE CASE ..... 4

A. Solicitation and Evaluation ..... 7

1. Pre-Solicitation and Solicitation ..... 7

2. Bid Protests ..... 9

B. Transition Period Delays and Enlargements under Appendix A ..... 11

C. Increased Funding and Changes to IT System Requirements ..... 12

D. Volume Phase-In Period Extensions and Schedule Deviations ..... 14

E. Economic Price Adjustments and Fee Increases ..... 15

IV. LEGAL STANDARD ..... 16

A. Bid Protest Review ..... 16

B. The Cardinal Change Doctrine in the Bid Protest Context ..... 17

V. ARGUMENT ..... 20

A. TRANSCOM's Out-of-Scope Contract Modifications Amount to A Cardinal Change that Unfairly Limited Competition in Contracting ..... 20

1. TRANSCOM Materially Enlarged the Transition Period By Three-Fold and Converted the Nature of the GHC Contract. ..... 20

2. TRANSCOM Doubled the Anticipated Funding Under the Transition Period to Accommodate the Out-of-Scope Enlargements of Time and Additions to the IT System Requirements. ..... 26

3. TRANSCOM Indefinitely Extended the Volume Phase-In Period and Materially Altered the Pricing Structure for Shipment Transfers. ..... 29

4. TRANSCOM Executed Other Out-of-Scope Price Adjustments. ..... 30

B. Suddath is Entitled to a Permanent Injunction ..... 32

1. Suddath Has Established Success On the Merits ..... 33

2. Suddath Will Suffer Irreparable Harm Absent Injunctive Relief ..... 33

3. Balance of Hardships Weighs Heavily in Favor of Suddath. ..... 35

4. The Public Interest Is Served by Imposing the Requested Injunction. ..... 36

VI. CONCLUSION AND RELIEF REQUESTED ..... 36

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*AGMA Sec. Serv., Inc. v. United States*,
152 Fed. Cl. 706 (2021) ....................35

*Air-A-Plane Corp. v. United States*,
187 Ct. Cl. 269, 408 F.2d 1030 (1969) ....................7

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998) ....................16

*Allied Materials & Equip. Co. v. United States*,
215 Ct. Cl. 406, 569 F.2d 562 (1978) ....................17

*Am. Safety Council, Inc. v. United States*,
122 Fed. Cl. 426 (Fed. Cl. 2015) ....................17

*AT&T Commc'ns Inc. v. Wiltel, Inc.*,
1 F.3d 1201 (Fed. Cir. 1993) ....................17, 18, 19

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005) ....................16, 17

*CeleraPro, LLC v. United States*,
168 Fed. Cl. 408 (Fed. Cl. 2023) ....................18, 25, 33

*Centech Grp., Inc. v. United States*,
554 F.3d 1029 (Fed. Cir. 2009) ....................32

*CESC Plaza Ltd. P'ship v. United States*,
52 Fed.Cl. 91 (2002) ....................19

*Connected Glob. Sols. LLC v. United States*,
162 Fed. Cl. 720 (2022) ....................10

*Dell Fed. Sys., L.P. v. United States*,
906 F.3d 982 (Fed. Cir. 2018) ....................33

*Edward R. Marden Corp. v. United States*,
442 F.2d 364 (Ct. Cl. 1971) ....................19

*Glenn Def. Marine (Asia) PTE Ltd. vs. United States*, 97 Fed. Cl. 568, 578 (Fed.
Cl. 2011) ....................3

*Golden Mfg. Co. v. United States*,
107 Fed. Cl. 264 (2012) ....................16, 17, 19

*Hosp. Klean of Tex., Inc. v. United States*,
65 Fed. Cl. 618 (2005) ....................36

*HP Enter. Servs., LLC v. United States*,
104 Fed. Cl. 230 (2012) ....................34

*Ian, Evan & Alexander Corp. v. United States*,
136 Fed. Cl. 390 (2018) ....................18, 25

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001)....................16

*Jordan Pond Co., LLC v. United States*,
115 Fed. Cl. 623 (2014) ....................17

*Leupold Stevens, Inc.*,
B-417796, 2019 CPD ¶ 397 (Comp. Gen. Oct. 30, 2019) ....................19

*Mangi Env't Grp., Inc. v. United States*,
47 Fed. Cl. 10 (2000) ....................36

*Nat'l Holding Co., Inc. v. United States*,
No. 1-24-cv-02112 (ECF 10) (Fed. Cl. 2024) ....................1

*Northrop Grumman Corp. v. United States*,
50 Fed. Cl. 443 (Fed. Cl. 2001) ....................17, 18, 19

*Orion Tech., Inc. v. United States*,
704 F.3d 1344 (Fed. Cir. 2013)....................34

*Overstreet Elec. Co. v. United States*,
47 Fed. Cl. 728 (2000) ....................34

*Parcel 49C Ltd. P'ship v. United States*,
31 F.3d 1147 (Fed. Cir. 1994)....................3, 36

*PCL Const. Servs., Inc. v. United States*,
47 Fed. Cl. 745 (2000) ....................19

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004)....................32, 36

*Piedmont Propulsion Sys., LLC v. United States*,
167 Fed Cl. 72 (2023) ....................3, 32, 34

*Reilly's Wholesale Produce v. United States*,
73 Fed. Cl. 705 (2006) ....................35

*Rumsfeld v. Freedom N.Y., Inc.*,
329 F.3d 1320 (Fed. Cir. 2003)....................19

*SOS Int'l LLC v. United States*,
127 Fed. Cl. 576 (2016) ....................34

*Sys. Studies & Sim., Inc. v. United States*,
146 Fed. Cl. 186 (2019) ....................36

*Total Military Mgmt., Inc. v. the United States*,
No. 1:24-cv-02029 (Fed. Cl. 2024)....................1

*Turner Constr. Co. v. United States*,
645 F.3d 1377 (Fed. Cir. 2011)....................32

*WellPoint Mil. Care Corp. v. United States*,
953 F.3d 1373 (Fed. Cir. 2020)....................16

**Statutes**

5 U.S.C. § 706....................16

10 U.S.C. § 2305(a)(1)(B) ....................17

10 U.S.C. § 3206(a)(2)(B) ....................3

28 U.S.C. § 1491(b)(4) ....................16

**Administrative Record**

AR47....................4

AR49....................7

AR71....................7

AR88....................7

AR93....................7

AR110....................7

AR119....................7

AR121-26....................8

AR135 ..... 8
AR137 ..... 7
AR178 ..... 8
AR200-201 ..... 8, 9
AR208 ..... 1,4, 8, 22
AR210-211 ..... 1, 2, 4, 8, 9, 22, 29
AR443 ..... 30
AR462 ..... 4
AR463 ..... 8
AR478 ..... 22
AR645 ..... 7, 8
AR665 ..... 29
AR667-68 ..... 7
AR693 ..... 7
AR3527 ..... 8
AR3594 ..... 29
AR15803 ..... 9
AR15805 ..... 9
AR16180 ..... 9
AR16319 ..... 9
AR16431 ..... 9
AR16437 ..... 9
AR18318 ..... 10
AR20988 ..... 10

AR21184 ..... 10

AR21187 ..... 10

AR21222 ..... 10

AR22567-568 ..... 22

AR22966-972 ..... 22

AR23133-134 ..... 22

AR35238 ..... 10

AR35263 ..... 26

AR37516-517 ..... 10

AR37592 ..... 10

AR38306-307 ..... 10

AR58832 ..... 12

AR58834 ..... 12

AR58924 ..... 31

AR58930 ..... 15, 31

AR58937 ..... 12

AR58939 ..... 12

AR58940-44 ..... 12

AR59001 ..... 23

AR59003 ..... 23

AR59014 ..... 12, 23

AR59016 ..... 12

AR59040 ..... 12

AR59042 ..... 12

AR59064 ....12
AR59066 ....12
AR59110 ....12
AR59112 ....12
AR59122 ....23
AR59126 ....2, 5
AR59127 ....2
AR59130 ....5, 28
AR59167 ....12
AR59169 ....12
AR59178 ....27
AR59192-193 ....5, 26
AR59230 ....25
AR59234 ....6, 13, 24, 27
AR59239 ....13
AR59241 ....2, 5, 6, 14, 24, 29
AR59242 ....13, 28
AR59246 ....513
AR59247 ....12, 13, 24, 26, 27
AR59251 ....13
AR59252 ....27
AR59279 ....12
AR59281 ....12, 13, 14, 27, 29
AR59400 ....15, 32

AR59445 ....... 12

AR59447 ....... 12

AR59529-530 ....... 4

AR59535 ....... 7

AR59546 ....... 7, 21

AR59554 ....... 30

AR59555 ....... 21

AR59586 ....... 30

AR60260 ....... 12

AR60262 ....... 12

AR60270 ....... 15, 31

AR60316 ....... 31

AR60421 ....... 23

AR60578 ....... 23

AR60635 ....... 26

AR68927 ....... 15, 31

AR69279 ....... 24

## I. INTRODUCTION

Per Rule 52.1 of the United States Court of Federal Claims (Court) and this Court's Amended Scheduling Order (ECF 42), the Suddath Companies (Plaintiff or Suddath) respectfully files this timely Motion for Judgment on the Administrative Record (Motion). This is a cardinal change bid protest brought by Suddath arising out of significant post-award contractual modifications. The Court has also consolidated this case with the protests of Total Military Management, Inc. and National Holding Company, Inc., *Total Military Mgmt., Inc. v. the United States*, No. 1:24-cv-02029 (Fed. Cl. 2024) and *Nat'l Holding Co., Inc. v. United States*, No. 1-24-cv-02112 (ECF 10) (Fed. Cl. 2024), respectively.

The United States Transportation Command (Government, Agency, or TRANSCOM) pursued the ambitious goal of rapidly consolidating all its household goods moving services under the Global Household Goods Contract (GHC Contract), which had been previously serviced by over 900 service providers. In September 2019, TRANSCOM published Solicitation No. HTC711-19-R-R004, (Solicitation or RFP), in which the Agency required that ***100% of its global*** household goods moving services be transitioned under the purview of a single contractor performing all of those services in just ***a twenty month period***. Tab 7(a)(1) at AR210-11.[1] The awardee contractor would also be required to first set up a secure, web-based and mobile-compatible Information Technology software application (IT System or IT Software) that would interface with TRANSCOM's own systems, including its order acceptance and invoicing application (MilMove), ***within an expedited, upfront nine-month transition period***. *Id.* at AR208. Capable offerors, including Suddath, which attended pre-solicitation presentations, elected not to submit a proposal because they could not realistically meet the restrictive requirements set forth in the Solicitation.

---

[1] Cites to the Administrative Record (AR) are referenced by document tab number, as specified on the Index to the Correction to the Administrative Record (ECF 39), and pincite(s) to the bates labeled page number for each document.

Time has revealed, however, that TRANSCOM did not have an actual minimum need for an expedited 9-month transition period with contemporaneous full integration of its IT System and the Agency's MilMove system. As reflected in the awardee's own words, there were "[d]elayed MilMove development[ and] significant deviations in the contract scope," resulting in "increased [Program Management Office] and IT development funding requirements" to support the protracted development of an IT System that was said to be ready for integration within the strict transition period. Tab 357 at AR59126. Indeed, nearly three years after award, the Agency issued a Request for Information (RFI) for a separate contractor to "provide software development support and expertise for the MilMove Program" that "continues and builds on current MilMove development to support [GHC]." ECF 1, Exh. V (citing to TRANSCOM's RFI for "MilMove Development and Sustainment"). *See also* RFI Technical Summary v.2, Sep. 23, 2024 (explaining that "there are still several remaining features needed for customers, office users, admins, ***and GHC prime*** to build prior to orders integration") (emphasis added). ECF 1-2 at 113.

Nor did the Agency have the minimum need to transfer responsibility for "complete, global HHG relocation services" based on an aggressive volume phase-in schedule, which required 100% transfer of domestic service areas in seven months following transition, immediately followed by 100% transfer of international service areas in the next three months. Tab 7(a)(1) at AR210-211. In fact, as part of the extended transition period to "accommodate[] the completion of outstanding development and integration of both MilMove and HomeSafe Connect," the Agency modified the GHC Contract "to shift from a time-definite schedule to a lower-risk, conditions-based phase-in approach with significantly lower volumes." Tab 375 at AR59241. *See also* Tab 358 at AR59127 (HomeSafe characterizing this shift as "a significant change from the contractual Volume Phase-In schedule."). These modifications are not just out-of-scope changes to the contract but rather represent a fundamental transformation from the solicited service contract into a development, test,

and evaluation contract to develop, test, and conduct operational risk reduction efforts, before ultimately implementing a new household goods moving solution.

If the Agency would have issued a proper RFP—or if now it were to issue a revised solicitation—reflecting its actual minimum needs, the Agency would have attracted an entirely different field of competitors, including Suddath. The Competition in Contracting Act ("CICA"), embodies the fundamental principle of full and open competition that all offerors must be advised of an agency's actual minimum needs so that they can compete "intelligently and on a relatively equal basis." *Glenn Def. Marine (Asia) PTE Ltd. vs. United States*, 97 Fed. Cl. 568, 578 (Fed. Cl. 2011).

Restrictive provisions or conditions are to be included "only to the extent necessary to satisfy the needs of the executive agency or as authorized by law." 10 U.S.C. § 3206(a)(2)(B). Overstating requirements, as happened here, leads predictably to decreased competition which deprives the Agency of best value and undermines the integrity of the procurement system. If the Court determines that a requirement "violates the prohibition against restrictive terms that are not required to meet the government's minimum needs, the requirement will be deemed to be unduly restrictive and the agency's decision to include the requirement in the solicitation will be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Piedmont Propulsion Sys., LLC v. United States*, 167 Fed Cl. 72, 82-83 (2023) (cleaned up); *Parcel 49C Ltd. P'ship*, 130 Fed. Cl. 109, 125 (2016).

Suddath respectfully requests that the Court grant this Motion, permanently enjoin TRANSCOM from proceeding with further performance, and direct TRANSCOM to conduct a full and open competition to meet TRANSCOM's actual minimum needs.

## II. QUESTIONS PRESENTED

1. Whether TRANSCOM's actual minimum needs as reflected in post-award modifications are so different from the requirements stated in the GHC Solicitation as to represent

a cardinal change that requires a new RFP which would attract a different field of competitive offerors?

2. Whether Suddath will be irreparably harmed if it is denied the opportunity to compete against TRANSCOM's actual minimum requirements?

3. Whether injunctive relief is warranted to meet CICA's mandate for full and open competition and permit Suddath to submit a proposal in accordance with a revised TRANSCOM solicitation?

## III. STATEMENT OF THE CASE

This protest seeks the Court's review of TRANSCOM's procurement, under which the Government sought to replace its long-standing multi-vendor Defense Personal Property Program (DP3) with a single award IDIQ contract. The goal was to improve household goods moving services by electing a single prime contractor to provide comprehensive end-to-end global relocation services. Tabs 2 at AR47; 7(b) at AR462; 8(a) at AR642; 412 at AR59529-530. From the pre-solicitation stages, however, TRANSCOM delineated highly restrictive parameters that were not aligned with its actual minimum needs. Most notably, TRANSCOM defined an aggressive nine-month transition period (Transition Period) during which the awardee was required to set up its IT System, which "shall be fully integrated with [MilMove] and able to accept task orders not later than (NLT) contract base period year one (1) start date," and further required "successful testing [to be] completed no later than 30 days prior to the contract base period year one (1) start date." Tab 7(a)(1) at AR208. Following transition, TRANSCOM also defined strict, back-to-back periods for the complete transfer of geographic moving service responsibilities (Volume Phase-In Period), which required that "[t]he Contractor shall be operational and able to begin performance NLT the specified timelines" in each of the Volume Phase-In Periods. *Id.* at AR 210-211.

Since contract award in November 2021, however, TRANSCOM and HomeSafe Alliances LLC (HomeSafe or Awardee) have had to negotiate multiple, material out-of-scope changes to meet the Government's actual needs.

***First***, TRANSCOM delayed, prolonged, and materially changed the mandatory Transition Period, including the associated IT System requirements, and subsequent Volume Phase-In Period. *See e.g.*, Tabs 377-380 (Modification 13 adding twelve months to an already extended Transition Period and exercising concurrent performance with Base Period Year 1). Indeed, the negotiation and execution of these changes with HomeSafe explicitly acknowledged that these are material modifications. Tabs 357 at AR59126 (HomeSafe describing "[d]elayed MilMove development[ and] significant deviations in the contract scope"); 358 at AR59130 (referencing TRANSCOM's "desire to change the phase-in approach" due to its "'desire to roll the program out in the lowest-risk manner possible' [ ] because there were 'a lot of eyes (from Service Members to Congress) on the DoD and HomeSafe regarding GHC implementation'"); 375 at AR59241-242 (TRANSCOM's Modification Information Paper specifying contract modifications for additional transition services, PWS requirements, and move management fees as "an appropriate course correction measure that considerably reduces programmatic risk").

***Second***, TRANSCOM agreed to provide additional funding in an amount not-to-exceed $60 Million to compensate for the foregoing delays and additional IT System development costs for HomeSafe's IT System (HomeSafe Connect), which were not initially contemplated. *Compare* Tabs 365 at AR59192-193 (modified IGCE analyzing continued initial vendor IT development costs and future IT development/sustainment costs that have "no known requirements at th[at] time"); *with* 375 at AR59241 (specifying additional contract requirements "to develop and integrate HomeSafe Connect and MilMove capabilities," including "up to eight rigorous test events," which will be "negotiated/priced individually [ ] and is ***not included*** in the NTE $60M price") (emphasis added). While the Solicitation and the record of the Agency's evaluation

emphasized the need for a fully-developed and ready-to-integrate application within the expedited Transition Period, the Agency is still developing its own MilMove application with which HomeSafe Connect will eventually need to integrate.

The unanticipated funding also restructured the expected compensation scheme such that HomeSafe would be paid based on the number of moves during the modified Transition and Volume Phase-In periods "and not *schedule driven* (i.e., month)". Tab 374 at AR59234 (emphasis added). Whereas the Solicitation clearly restricted offerors to price one-time transition fees in their proposals, TRANSCOM has made material changes "to shift from a time-definite schedule to a lower-risk, conditions-based phase-in approach," with new monthly fees priced on that basis. Tab 375 at AR59241.

***Third***, in another change that no potential GHC offeror could have reasonably expected, the Agency made out-of-scope price adjustments, including the extended application of the Economic Price Adjustment clause to ***pre***-Base Period Year 2 (Tab 314) and permitting multiple fee increases without the requisite price escalation discounts (Tabs 308, 391). Had potential offerors known that their submitted pricing was only a floor for negotiating better rates, this too would have affected the competitive landscape.

Collectively, these modifications constitute a cardinal change to the Agency's solicited requirements, requiring cancellation of the GHC Contract and re-solicitation of TRANSCOM's actual minimum needs. The clear disconnect between the Solicitation's stated requirements and TRANSCOM's actual needs violated CICA's prohibition on unduly restrictive requirements that prevented capable offerors from competing intelligently against the Agency's actual minimum needs. These violations deprived Suddath of the opportunity to compete and constitute a non-trivial competitive injury that can only be remedied by the relief Suddath seeks.

### A. Solicitation and Evaluation

#### 1. Pre-Solicitation and Solicitation

In its pre-solicitation combined acquisition and source selection plan, TRANSCOM estimated the cost for GHC services to range from $14.6 to $15.4 Billion, for fiscal years (FY) 2020–2029, and envisioned the initial transition would be funded by task orders worth about $6.1 Million during the nine-month Transition Period. Tabs 2 at AR49; 2(a) at AR71; 2(b) at AR88; Tab 2(c) at AR93. *See also* Tab 412 at AR59546 (Market Research Report noting that pre-solicitation "respondents recommended a minimum lead time of 6 to 12 months"). A rough order of magnitude cost estimate affirmed the nine-month Transition Period and the expectation that an awardee "bring[] scalable IT piece to integrate with the government system that requires ***nominal further investment***." Tab 3 at AR110 (emphasis added). *See also* Tab 412 at AR59535 (Market Research Report estimating that "build[ing] interfaces . . . should be relatively inexpensive").

On September 26, 2019, Suddath attended the pre-proposal conference for the GHC Contract. Tab 8(b) at AR693. In addition to providing an overview of GHC, TRANSCOM explained the Solicitation requirements, including the expedited Transition Period, IT System integration requirements, and expectation to be "fully operational" in accordance with the Volume Phase-In timelines. Tab 8(a) at AR645, 667–68. Key requirements were further detailed under the Performance Work Statement ("PWS") and Appendix A: Transition & Phase-In Phase-Out Plan ("Appendix A"). *See generally* Tabs 4; 7(a)(1).

On September 13, 2019, TRANSCOM published the Solicitation for household goods relocation services on a global basis, including a minimum annual estimate of 50,000 domestic and 35,000 international household shipments. Tab 7 at AR119, 137. Consistent with TRANSCOM's pre-proposal materials, the Solicitation provided for the following key requirements:

- **Expedited Transition Period.** The Solicitation contemplated an IDIQ contract to a single awardee and required compliance with an expedited nine-month Transition Period, followed by a three-year base period, three one-year option periods, two one-year award terms, and an option to extend the contract by an additional six months. Tabs 7 at AR121–26, 135, 178; 7(a) at AR208; 8(a) at AR645; 18 at AR3527. For the initial Transition Period, which was originally scheduled from May 1, 2020 through January 31, 2021, offerors were required to describe their "approach to meet the required implementation and transition for establishment of successful IT system connections with the Offeror's IT system and the Government's system, to include interface endpoints, protocols, transports, and payloads, and other requirements such as training, cyber security, etc." Tab 7 at AR200–201 (describing Vol. II, Sub-Factor 3 evaluation requirements).

- **Fully Operational IT System Integration.** The Solicitation also required that offerors develop a fully operational IT System, which was to be evaluated under the Factor 2 Technical Capability Sub-Factor 3 (Transition/Volume Phase-In) and Sub-Factor 4 (Information Technology Services) criteria. Tab 7 at AR200-201. *See also* Tab 7(b)(1) at AR463 (PWS stating that "[t]he contractor shall provide and maintain an easy to use, secure, web-based, mobile-device compatible IT system able to manage complete household goods relocation services globally"). The prime contractor's IT System was further required to be "fully integrated with [MilMove] and able to accept task orders not later than (NLT) contract base period year one (1) start date." Tab 7(a)(1) at AR208.

- **Complete Global Volume Phase-In Timeline.** Immediately following the Transition Period, the Solicitation defined strict transfer timelines under the Volume Phase-In Period, which was projected to commence from February 1, 2021 through January 1, 2022 for a duration of eleven months. Tab 7(a)(1) at AR210. The Volume Phase-In would entail a two-part transition of ***all*** household good relocation services, starting with 100% transfer of domestic service areas in a seven-month period corresponding to Base Period Year 1. Tab 7(a)(1) at AR210. Base Period Year

2, which ran only three months, would then require the complete transfer of all international service area relocation needs to the GHC Contract awardee. *Id.* at AR211. Under the Volume Phase-In Period, offerors were required to describe their "approach and associated timelines to be fully operational for complete global HHG relocation services for each of the service areas identified in RFP, Attachment 2, Pricing Rate Table." *Id.* at AR201.

In short, the Solicitation contemplated strict deadlines under an expedited Transition Period and a complete transfer of all household goods moving services—for both domestic and international service areas—under an aggressive Volume Phase-In Period by January 1, 2022, *i.e.*, within twenty months from the start of transition on May 1, 2020. As reflected in the record and described in this Motion, TRANSCOM's projections and stated requirements were not reflective of its actual minimum needs.

### 2. Bid Protests

TRANSCOM's ultimate award to HomeSafe was preceded by a series of overturned award decisions and bid protests.

Initially, on April 30, 2020, TRANSCOM awarded the GHC Contract to American Roll On Roll Off Carrier Group, Inc. (ARC). Tab 71 at AR15803. ARC's Total Evaluated Price (TEP) was $19,993,626,842.40. *Id.* at AR15805. This GHC Contract was executed on April 30, 2020, which set forth the same nine-month Transition Period as in the Solicitation. Tab 74 at AR16180. On May 22, 2020, Connected Global Solutions, LLC (CGSL) filed a protest challenging the award before the Government Accountability Office (First GAO Protest). Tab 78 at AR16319. On May 26, 2020, HomeSafe also filed a protest before GAO (Second GAO Protest). Tab 83 at AR16437. On June 9, 2020, the Agency issued notice of corrective action and informed GAO it would reevaluate CGSL's proposal. Tab 80 at AR16431.

On July 13, 2020, CGSL filed another protest (Third GAO Protest) on the basis that, despite the Agency's notice of corrective action, it failed to reevaluate CGSL's proposal or address

CGSL's protest grounds. Tab 103 at AR18318. On October 21, 2020, GAO sustained the protest. Tab 133 at AR20988. Subsequently, TRANSCOM issued another set of corrective actions and proceeded to amend the Solicitation thirteen times. The last amendment, executed on May 20, 2021, set the Transition Period from December 1, 2021 through August 31, 2022, maintaining the nine-month timeframe from the original Solicitation. Tabs 140 at AR21184; 141.7 at AR21222. All thirteen amendments retained the Volume Phase-In schedule, which would commence concurrently with the completion of the Transition Period, and the requirement that the awardee's IT system be fully integrated with the Government's IT system by the start date of Base Period Year 1. Tab 140 at AR21187.

After rounds of discussions, on November 4, 2021, TRANSCOM awarded the GHC Contract to HomeSafe, the current awardee. Tab 205 at AR35238. On November 23, 2021, ARC and CGSL each filed a protest before GAO (Fifth GAO Protest and Sixth GAO Protest, respectively). Tabs 214; 253. CGSL argued that TRANSCOM should have rejected HomeSafe's proposal as technically unacceptable because it failed to comply with the RFP's material requirements for Transition and Volume Phase-In. Tab 243 at AR37592. On March 3, 2022, GAO denied both protests. Tabs 251 at AR37516-517; 267 at AR38306-307.

CGSL and ARC then filed the final bid protests with the Court of Federal Claims. *See Connected Glob. Sols. LLC v. United States*, 162 Fed. Cl. 720 (2022). On October 28, 2022, the presiding court granted the defendants' Motions for Judgment on the Administrative Record and denied the plaintiffs' corresponding motions. *Id.*

After the conclusion of the GAO and COFC protests, the Agency began issuing modifications to HomeSafe's Contract, materially altering the requirements under the Transition Period, IT Services scope, and Volume Phase-In Period. Changes also included significant funding increases and unforeseeable price adjustments. Together these effected a cardinal change to the GHC Contract.

### B. Transition Period Delays and Enlargements under Appendix A

The Agency frequently altered the Transition Period and Volume Phase-In Period start dates and anticipated timelines through numerous modifications involving Appendix A:

| Doc | Date | Transition Phase-In Period | Volume Phase-In Start Date |
|---|---|---|---|
| Modification 2, Appendix A | March 5, 2022 | March 4, 2022 through December 3, 2022 (9 months). *See* Tab 297 at AR58832. | December 4, 2022. *See* Tab 297 at AR58834. |
| Modification 4, Appendix A | November 11, 2022 | March 4, 2022 through March 23, 2022 (20 days);[2] and November 3, 2022 to July 13, 2022 (8 months). *See* Tab 424(a) at AR60260. | September 1, 2023. *See* Tab 424(a) at AR60262. |
| Modification 6, Appendix A | May 5, 2023 | November 3, 2022 to August 31, 2023 (10 months). *See* Tab 318 at AR58937. | September 1, 2023. *See* Tab 318 at AR58939. |
| Modification 8, Appendix A | August 30, 2023 | November 3, 2022 through September 30, 2023 (11 months). *See* Tab 333 at AR59014. | October 1, 2023. *See* Tab 333 at AR59016. |
| Modification 9, Appendix A | October 3, 2023 | November 3, 2022 to October 31, 2023 (12 months). *See* Tab 339 at AR59040. | November 1, 2023. *See* Tab 339 at AR59042. |
| Modification 10, Appendix A | November 8, 2023 | November 3, 2022 through November 14, 2023 (12.5 months). *See* Tab 345 at AR59064. | November 15, 2023. *See* Tab 345 at AR59066. |
| Modification 11, Appendix A | November 14, 2023 | November 3, 2022 to January 7, 2024 (14 months). *See* Tab 353 at AR59110. | January 8, 2024. *See* Tab 353 at AR59112. |
| Modification 12, Appendix A | January 8, 2024 | November 3, 2022 through February 4, 2024 (15 months). *See* Tab 363 at AR59167. | February 5, 2024. *See* Tab 363 at AR59169. |
| Modification 13, Appendix A | February 12, 2024 | November 3, 2022 to February 4, 2024 (15 months); and February 12, 2024 to February 11, 2025 (12 months). *See* Tab 380 at AR59279. | February 12, 2024. *See* Tab 380 at AR59281. |

[2] This brief performance period occurred after GAO's denial of the Fifth and Sixth GAO Protests, which was then stayed pursuant to the aforementioned COFC protests. For ease of viewing, this initial performance period is populated just once in Table 1 but applies to all subsequent modifications.

| Doc | Date | Transition Phase-In Period | Volume Phase-In Start Date |
|---|---|---|---|
| Modification 16, Appendix A | May 9, 2024 | November 3, 2022 through February 4, 2025 (15 months); and February 12, 2024 through February 11, 2025 (12 months). *See* Tab 399 at AR59445. | February 12, 2024. *See* Tab 399 at AR59447. |

Table 1.

Additionally, with respect to Appendix A, in Modification 6, the Agency crossed out the Volume Phase-In start dates for multiple direct procurement method locations without explanation, noting that they will be revised "in a forthcoming modification." Tab 318 at AR58940–44. *See also* Tabs 333, 339, 345, 353, and 363 (subsequent modifications 8-12 showing that the direct procurement dates remained outstanding). Then, under Modification 13, TRANSCOM completely omitted the Volume Phase-In from Appendix A, replacing it with a significantly limited, conditions-based approach for one year. *See* Tab 380 at AR59281–287. TRANSCOM further recharacterized its initial volume transfers as "developmental shipments" for the Government to work up to making move orders more than 3,104 shipments in one month, representing only a fraction of total moves. *Id.* at AR59281.

### C. Increased Funding and Changes to IT System Requirements

In addition to the significant Appendix A revisions, Modification 13 made other significant and unanticipated changes.

***First***, it increased the GHC Contract's total cost by a not-to-exceed amount of $60 Million. Tab 377 at AR59247. Specifically, as set forth in Appendix A, in addition to move costs, the Agency agreed to pay HomeSafe as follows:

- $5 Million each month the Government orders less than 3,104 shipments;
- $3.3 Million for months that the Government orders equal to or more than 3,104 but less than 5,596 shipments;
- $1,927,000 for equal to or more than 5,596 shipments but less than 7,771 shipments;
- $1.5 Million for more than 7,771 shipments.

Tabs 377 at AR59247; 380 at AR59281. TRANSCOM described this funding as "expenses essential for HomeSafe operational capabilities until the Government Move Task Orders reach [specified] volumes." *Id*. at AR59281.

The Agency's Final Price Negotiation Memorandum further clarified that the sliding scale is event-driven (i.e., based on number of moves), and not schedule-driven (i.e., by month), and the months with the associated dollar amounts would not be reflected in the Contract's Appendix A modification. *See* Tab 374 at AR59234, n. 2. This new ***unscheduled additional funding*** scheme completely replaced the scheduled Volume Phase-In approach under Appendix A.

***Second***, under the PWS, Modification 13 added new IT System requirements for HomeSafe to connect its IT System to the Government's MilMove, Advana, and Third Party Payment System (TPPS). Tab 378 at AR59251. TRANSCOM also added System Surveillance and Oversight Access requirements, in addition to ad hoc testing requirements at a price not-to-exceed $807,000.00 for a single test event, which costs were ***not included*** in the $60 Million funding increase. Tabs 374 at AR59239; 375 at AR59242. *See also* Tab 375 at AR59242 (noting "[a]ddition of well-defined IT system testing requirements, inclusive of up to eight rigorous test events" and "[a]ddition of ongoing, ad hoc testing of HomeSafe Connect, and increased IT engagements . . . to develop and integrate HomeSafe Connect and MilMove capabilities"); 377 at AR59246 (characterizing these modifications as a settlement of HomeSafe's request for a price adjustment under FAR 52.212-4(c) for "[c]hanges stemming from any and all costs related to the volume phase-in and delays relating to ***contractually required capabilities not yet developed of GHC*** and all future contractually required development of HomeSafe Connect against the Government.") (emphasis added). In doing so, the Agency materially and impermissibly changed the GHC Contract from a services agreement to one better described as a technology development and prototyping effort with a guaranteed follow-on of services.

### D. Volume Phase-In Period Extensions and Schedule Deviations

TRANSCOM's material changes to the Transition Period also effected out-of-scope modifications to the Volume Phase-In Period, which the Solicitation had required to start the day after the nine-month Transition Period lapsed. *See generally* Tab 7(a)(1). *See also* Tabs 297, 318, 333, 339, 345, 353, and 363 (subsequent modifications retaining this sequential scheduling).

Indeed, over the contract performance period, TRANSCOM made multiple public representations concerning the anticipated Volume Phase-In Period start after the Transition Period. *See e.g.*, ECF 37 at Exh. 8 (post-COFC protest press release, dated October 28, 2022, projecting that "a measured phase-in of domestic shipments will begin after the 2023 peak moving season," after Modification 4 extended the Transition Period to July 13, 2022); *id.* at Exh. 9 (September 11, 2023 TRANSCOM press release delaying the start date for local shipments to "later in 2023 instead of the initial target of September," in part to ensure "interoperability between MilMove and HomeSafe Connect" under the expected Transition Period); *id.* at Exh. 10 (December 7, 2023 TRANSCOM press release, further delaying shipments "[d]ue to the complexity of system issues needing to be resolved," noting that "the command has not yet been able to test the systems again as originally planned" and that "[t]hese two systems ***must be fully compatible and integrated before*** USTRANSCOM will begin awarding shipments under GHC") (emphasis added).

Under Modification 13, TRANSCOM completely abandoned this schedule-based approach, instead exercising Base Period Year 1 concurrently with the extended Transition Period and leaving the schedule for the remaining base periods undefined. Tab 380 at AR59281. *See also* Tab 375 at AR59241 ("This modification reflects the deliberate decision to shift from a time-definite schedule to a lower-risk, conditions-based phase-in approach with significantly lower volumes."). In an April 2, 2024 press release, TRANSCOM further explained that for ***domestic*** installations, 14 selected sites would be ready for GHC shipments by early May 2024—totaling

less than 1% through July 2024 and less than 2% in August 2024, and "[p]rojected volume under GHC will be 4% for September, 10% for October and November, and 20% for December." ECF 37 at Exh. 11. *See also id.* ("International shipments under GHC will begin ***no earlier*** than September 2025, with a similar gradual phase-in of locations and shipment volume.") (emphasis added). TRANSCOM's current approach to shipment transfers is completely misaligned with the strict timeline that offerors were required to compete on.

**E. Economic Price Adjustments and Fee Increases**

In addition to the doubling of transition and IT System development funding under Modification 13, HomeSafe benefitted from other price adjustments that were not anticipated under the Solicitation's terms.

For example, in connection with the protest related stop-work orders, HomeSafe submitted a request to "adjust the Economic Price Adjustment (EPA) Schedule contained in Appendix G to GHC from the beginning of Base Period Year 2 to Base Period Year 1." Tab 425 at AR60270. Under Modification 6, the parties executed a rate adjustment by [redacted]% based on the unanticipated, frontloaded application of the EPA provision. Tab 315 at AR58930. This rate adjustment was also higher than what TRANSCOM would have been entitled to if the required price escalation discount applied. *See* Tab AR68927 (TRANSCOM's Memorandum for Record noting "an adjustment of [redacted]% without the Price Escalation Discount [of [redacted]%] and [redacted]% with the Price Escalation Discount").

HomeSafe also requested, and TRANSCOM approved, multiple wage determination updates. *See* Tab 308 (Modification 5, updating 885 individual wage determinations covering 226 service areas). Under Modification 15, TRANSCOM further "approve[d] an increase of $[redacted] per move to the Move Management Fee" based on the rates incorporated in Modification 5. Tab 391 at AR59400. *Cf.* Tab 9(j) (Q&A Response #287) (TRANSCOM stating that it "does not expect 'significant changes' that would require a contract modification resulting in an increased

Management Fee" and rejecting offeror request for more information to assist with pricing development).

Taken together, these adjustments reflect a material deviation from the assumptions and risks that offerors were required to accept when developing their GHC pricing.

## IV. LEGAL STANDARD

### A. Bid Protest Review

Under the Tucker Act, the Court reviews an agency's decision-making under the Administrative Procedure Act (APA) standards. 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706). The Federal Circuit has adopted a two-factor test under the APA to determine the merits of a bid protest. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines whether the agency action at issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A bid protest may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). *See also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (citation omitted)). Second, the court "proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 271 (2012) (quoting *Bannum*, 404 F.3d at 1351). In demonstrating prejudice in a cardinal change case, where the protestor "seeks a change in the procurement vehicle chosen by the government, and the 'but for' world that would follow the issuance of a new solicitation is not documented in the administrative record . . . , the 'non-trivial competitive injury' test for standing must be employed." *Id.* at 273 (applying pre-award prejudice standard in a cardinal change challenge).

In deciding on cross-motions for judgement on the administrative record under the Rule of the United States Court of Federal Claims 52.1, the Court "make[s] factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354. "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id.* at 1355–56. Thus, the Court "asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014) (citing *Bannum*, 404 F.3d at 1356–57).

**B. The Cardinal Change Doctrine in the Bid Protest Context**

The Competition in Contracting Act requires that a procuring agency "include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency." 10 U.S.C. § 2305(a)(1)(B). Although agencies have broad discretion in determining what their minimum needs are, unduly restrictive requirements that serve no legitimate agency need will be deemed arbitrary, capricious, and an abuse of discretion. *See Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435 (Fed. Cl. 2015) (finding that requirements that "do not properly reflect the agency's needs" are unduly restrictive).

"If the government procures services through competition, but then changes the contract work being performed by the contract awardee, such changes may effectively circumvent the competition requirements of the CICA." *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 464 (Fed. Cl. 2001) (citing *AT&T Commc'ns Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993)). The Court in *Northrop Grumman Corp.* summarized the cardinal change bid protest cause of action as follows:

> The Federal Circuit has adopted the classic doctrine of 'cardinal change,' cultivated by the Court of Claims, as the standard for determining whether a contract modification runs afoul of the competition requirements of the CICA. The Court of Claims described the doctrine:

> Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then, a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

> *Allied Materials & Equip. Co. v. United States*, 215 Ct. Cl. 406, 409, 569 F.2d 562 (1978), quoted in *Wiltel*, 1 F.3d at 1205; *see also Air-A-Plane Corp. v. United States*, 187 Ct. Cl. 269, 408 F.2d 1030 (1969). The cases that developed the cardinal change doctrine, however, were different from this case. Here, instead of determining whether the government has breached a contract, entitling a plaintiff-awardee to damages or other relief, ***the court must decide 'whether Government modifications changed the contract enough to circumvent the statutory requirement of competition***. The cardinal change doctrine asks whether a modification exceeds the scope of the contrac's changes clause; ***this case asks whether the modification is within the scope of the competition conducted to achieve the original contract***.' *Wiltel*, 1 F.3d at 1205. Thus, the courts have created two tests when considering the cardinal change doctrine: (1) when the dispute is between the contractor and the government, the court looks to whether the change was within the 'scope of the contract'; (2) when the dispute originated within a third-party competitor protest, as in this case, ***the court will decide whether the change was within the 'scope of the competition.*** *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 384, 388 (3d ed. 1995).

50 Fed. Cl. at 465 (emphases added). "A modification generally falls within the scope of the original procurement if ***potential bidders*** would have expected it to fall within the contract's changes clause." *AT&T Commc'ns*, 1 F.3d at 1205 (emphasis added). *See also CeleraPro, LLC*, 168 Fed. Cl. at 426 ("This Court has considered . . . whether the modification is of a nature which potential offerors would reasonably have anticipated[.]") (citation omitted); *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 417, 421 (2018) (finding cardinal change where potential bidders could not have anticipated a modification involving new developments and responsibilities).

A modification that constitutes a cardinal change requires a revised full and open competition against an agency's actual minimum needs in accordance with CICA. *CeleraPro, LLC v. United States*, 168 Fed. Cl. 408, 425-26 (Fed. Cl. 2023) (quoting *AT&T Commc'ns v. United States*, 1 F.3d 1201, 1204-05 (Fed. Cir. 1993)). In comparing the modification to the original

contract, the Court "must look beyond simple arithmetic" to determine whether the modification constitutes a cardinal change. *PCL Const. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 806 (2000). Indeed, "[a] cardinal change can occur ***even when there is no change in the final product*** because 'it is the entire undertaking of the contractor, rather than the product, to which we look.'" *Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (quoting *Edward R. Marden Corp. v. United States,* 442 F.2d 364, 370 (Ct. Cl. 1971)) (emphasis added).

Relatedly, GAO has considered the "plain language of the solicitation," "circumstances attending the procurement that was conducted," "changes in the type of work, performance period, and costs between the contract as awarded and as modified," and "***whether the modification could have changed the field of competition.***" *Leupold Stevens, Inc.*, B-417796, 2019 CPD ¶ 397 (Comp. Gen. Oct. 30, 2019) (emphasis added). The Court has too. *See AT&T Commc'ns*, 1 F.3d at 1205; *CESC Plaza Ltd. P'ship v. United States*, 52 Fed.Cl. 91, 93 (2002*); Northrop Grumman Corp. v. United States*, 50 Fed.Cl. 443, 466 (2001). "Nevertheless, the basic analytical framework of the cardinal change doctrine is the same . . . , *i.e.,* that the procuring agency has impermissibly strayed from the scope of the contract requirements ***that were advertised to offerors***." *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 275 (2012) (emphasis added).

"[W]hen a solicitation expressly prohibits certain types of modification, such a modification, when it occurs, is outside the scope of the solicitation and a new procurement is required by the CICA. Also, when contract language requires very specific products or services, and bids for the contract were keyed primarily to those requirements, changing such requirements after contract award will be deemed outside the scope, even if such a change does not significantly alter the work being performed." *Northrop Grumman Corp.*, 50 Fed. Cl. at 466 (internal citations omitted). Thus, where an Agency expressly rejects requests to amend restrictive requirements and also rejects offers based upon an assessment that they would not meet restrictive requirements, there can be no doubt that relaxing those requirements is a cardinal change. Those are not changes

to the scope of performance prospective bidders reasonably could have anticipated. Under those circumstances, there is a direct conflict between requirements the Agency imposed on prospective offerors and the agency's actual minimum needs reflected in the contract-as-modified.

## V. ARGUMENT

The procedural history of the GHC Contract plainly demonstrates there were impermissible, material changes in the post-award performance of the household good relocation services—arising prominently under the PWS and Appendix A terms — that (1) at least tripled the transition and volume ramp-up performance period, (2) more than doubled the value of the transition funding, (3) fundamentally changed the transition from a strict time-based performance deadline to a cooperative, task-dependent development and test effort, and (4) transformed the nature of the competed contract from simple transition and performance of moving services to a cooperative development effort with the Government of a new household goods moving solution. The terms of the Solicitation and original Contract did not contemplate such changes, and prospective offerors could not reasonably have anticipated such changes either. TRANSCOM's out-of-scope modifications to HomeSafe's Contract constitute a cardinal change that warrants a new procurement that invites offerors to compete to satisfy TRANSCOM's actual minimum needs.

### A. TRANSCOM's Out-of-Scope Contract Modifications Amount to A Cardinal Change that Unfairly Limited Competition in Contracting

#### 1. TRANSCOM Materially Enlarged the Transition Period By Three-Fold and Converted the Nature of the GHC Contract.

***First,*** from the inception of the Solicitation, the Agency envisioned a nine-month Transition Period prior to actual shipment transfers to the new GHC prime contractor. Tab 412 at AR59546 (Market Research Report, dated June 13, 2019). The clear and express goal of implementing this lead time was to ensure that the contractor will "perform IT enhancements and ramp-up for a 1 February 2021 phased-in start date," during which "the contractor will ensure its

IT system is ***fully functioning with the Government's IT system*** and be able to accept Service Member orders" and "***fully functioning with the Government invoicing system*** and able to process invoices for payment." Tab 413 at AR59555 (Combined Acquisition and Source Selection Plan, dated November 13, 2019) (emphasis added).

Consistent with the stated goals, the Solicitation included, *inter alia*, the following "Information Systems" terms:

> **A.2.2.1. Order Acceptance.** The Contractor's Information Technology (IT) system shall be fully integrated with applicable Government managed IT system and able to accept task orders not later than (NLT) contract base period year one (1) start date; This requirement is based on successful testing completed no later than 30 days prior to the contract base period year one (1) start date. System testing for this capability will be available within 60 days of contract award date.
>
> **A.2.2.2. Invoicing.** The Contractor's invoicing system shall be fully integrated with Government managed invoicing system and able to process invoices for payment NLT contract base period year one (1) start date; this requirement is based on successful testing completed no later than 30 days prior to the contract base period year one (1) start date. System testing for this capability will be available within 60 days of contract award date.
>
> **A.2.2.3. Shipment Management.** The Contractor's IT system shall be able to execute an end-to-end, origin to destination Household Goods (HHG), Unaccompanied Baggage (UB) and Storage-In-Transit (SIT) move NLT the contract base period year one (1) start date; this requirement is based on successful testing completed no later than 30 days prior to the contract base period year one (1) start date. System testing for this capability will be available on contract award date.
>
> **A.2.2.4. System Development or Reconfiguration of Existing IT System**. The Contractor's IT systems shall be able to securely handle processing of required shipments NLT contract base period year one (1) start date.

Tab 7(a)(1) at AR208.

Critically, all of the foregoing requirements included a NLT deadline and needed to be fully in place by the start of Base Period Year 1 on February 1, 2021. *Id*. at 208, 210. *See also* Tabs 7(b)(1) at AR478 (requiring the contractor to perform the Transition Period "in a manner which

results in minimal disruption to existing operation by the contract start date[.]"); Tab 9(j) (Q&A Response #291) (affirming that "[t]he relevant requirement is for the GHC contractor's IT system to be fully integrated with applicable Government managed IT system and able to accept task orders NLT contract base period year one (1) start date (with successful testing completed no later than 30 days prior to the contract base period year one (1) start date).").

Offerors' ability to strictly meet the Transition Period deadlines were a critical part of TRANSCOM's continuing assessment of potential deficiencies. *See e.g.*, Evaluation Notices (EN) at Tabs 153(a)(1) at AR22567-568 ("[redacted] does not mention executing an end-to-end move specifically and does not detail that testing for executing an end-to-end move will be available within 60 days of contract award date."); 154(a)(1) at AR22966-972 (taking issue with [redacted] proposal that "IT development, to include order acceptance, will not be complete until 291 days after contract award," which is "17 days after the contract base period year one start date" and inconsistent with the Solicitation requirements); 155(a)(1) at AR23133-134 ("[T]he Government is unable to ascertain whether [redacted] met the portion of the requirement that successful testing be completed no later than 30 days prior to the contract base period year one start date."). The Agency's evaluation also clarified that even "early completion of transition requirements was not advantageous to the Government . . . due to the fact that the tasks and respective timelines associated with transition, as set forth in Appendix A, coincide with the Government's estimated timelines for the Government to be prepared to handle said transition-related tasks." Tab 201 at AR34665 (Source Selection Decision Document).

***Second***, in direct contradiction to everyone's expectations under the pre-solicitation and Solicitation's clear requirements, over the course of multiple contractual modifications, TRANSCOM and HomeSafe repeatedly enlarged the Transition Period. *See generally* Tabs 424(a), 318, 333, 339, 345, 353, 363, 380, 399. Notably, in August 2023, the parties expanded the Transition Period to span nearly eleven months, from November 3, 2022 to September 20, 2023.

Tab 333 at AR59014 (Modification 8). The documented reason for this delay was certain "transition requirements that [ ] have definitively not been satisfied." Tab 329 at AR59001 (citing to deficiencies in meeting the "A.2.2.3 (Shipment Management)" and "A.2.2.4 (System Development or Reconfiguration of Existing IT System)" PWS requirements). *See also* Tab 330 at AR59003 (HomeSafe "agree[ing] there were certain 'critical' issues identified during the HomeSafe Connect testing the Government conducted from 31 July to 2 August").

Moreover, TRANSCOM also "acknowledge[d] that MilMove does not currently have some capabilities" at the time of the Modification 8 negotiations. Tab 329 at AR59001. *See also* Tabs 355 at AR59122 (November 27, 2023 "Tiger Team" charter document establishing cross-functional TRANSCOM and HomeSafe team to "address Information Technology (IT) and other challenges preventing GHC from executing or scaling to full operational capability," including "review and identifying . . . ***required functionality shortfalls for MilMove*** and/or [HomeSafe Connect]"); 441 at AR60421 (HomeSafe noting, in early January 2024 Tiger Team meeting, that the Agency had yet to "determine how they want to address" API requirements under PWS 1.2.2.1); 444 at AR60578 (HomeSafe stating that "***the Government's development of its MilMove system***, with which HomeSafe's IT system must interface, ***was incomplete and behind schedule*** in development, which would require ***significant changes in HomeSafe's development efforts***, and "[t]hese delays were unknown to HomeSafe at the time it submitted the proposal and at award.") (emphasis added). They were also unknown to other offerors who reasonably believed they would have to achieve integration during the 9-month transition period. *See* ECF 2, Declaration of [redacted] ([redacted] Decl.) at ¶ 15 ("Had Suddath known about the Agency's actual requirements for a flexible 3-year-plus transition and a government-funded software development effort, Suddath could and would have bid on the GHC Solicitation.").

Accordingly, due to the unavailability of MilMove, the parties continued to execute additional modifications to extend the Transition Period as an ad hoc measure, transforming to a

cooperative development effort. On February 12, 2024, TRANSCOM executed yet another extension under Modification 13, but this time significantly enlarged the Transition Period by an additional ***twelve months***. Tabs 377 at AR59247 (adding CLIN 0005 for "Transition Services Phase 2" "through 11 Feb 2025"); 380 at AR69279 (revised Appendix A schedule demonstrating same).

***Third***, in conjunction with Modification 13's significant extension of the Transition Period, the parties ***added*** key requirements to the PWS to "encompass the following requirements:

> i. Specificity regarding IT systems integration for MilMove, Advana, and TPPS;
> ii. Handling of new Contractor-generated IT system capabilities;
> iii. Ad hoc IT system testing and enhanced Government surveillance and evaluation of Contractor performance;
> iv. IT system accommodation regarding changes to source data;
> v. Ongoing training requirements by way of a Learning Management System (LMS) with respect to Contractor's IT system;;
> vi. Contractor participation in the Government's Integrated Master Schedules (IMS); and
> vii. Participation in IT system Government Operational Test and Evaluation (OT&E) events, ordered on an as-needed basis by the Government (i.e., optional CLIN)."

Tab 374 at AR59234-235. *See also* Tab 375 at AR59241 (noting "***new requirements codifying development/integration of other MilMove and HomeSafe Connect capabilities*** (Storage-in-Transit, Personally Procured Moves, International Shipments), which are projected to continue for a year" and "***[a]dditional requirements*** incorporated into the modification, [which] include, but are not limited to IT Governance, improved testing definition, and data integration amongst MilMove, HomeSafe Connect, Advana and the Third Party Payment System (TPPS).") (emphasis added).

The foregoing additional requirements were memorialized in the revised PWS under §§ 1.2.2.1, 1.2.2.1.6, 1.2.2.2, 1.2.2.6, 1.2.2.7, and 1.2.4. *See generally* Tab 378. When making this

change, the Agency considered but reflexively rejected a suggestion that a Justification and Approval pursuant to FAR 6 may be required to "extend[] the transition period by 12 months and also add[] new IT-related requirements to the PWS." Tab 373 at AR59230. The Agency's rationale, in a conclusory internal statement, was that "[e]xtending the transition period is within the scope of the current contract and extending it to another vendor is unrealistic" and, therefore, "[FAR] 6.001(c) would apply." *Id. Cf. CeleraPro, LLC*, 168 Fed. Cl. at 432 (requiring documented evidence of agency's analysis and consideration of "the type of work, performance period, and the cost between the contract as awarded and modified") (citations omitted). Contrary to the Agency's sweeping generalization, the plain text of the revised PWS requirements demonstrate that the parties executed out-of-scope changes that not only continued the performance period—more than doubling the original timeframe—but also constituted changes to the final work product that was neither contemplated nor could have been anticipated by any offeror. *See Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 423.

As a capable prospective bidder, had Suddath known or reasonably could have anticipated the actual length of development of MilMove—i.e., it would have more than two years to cooperatively develop and fully integrate an interoperable IT system before needing to start the shipment transfers—Suddath would have bid on the Solicitation as a prime contractor. [redacted] Decl. ¶¶ 12 ("Suddath has [redacted]") and 22 ("Given the extended transition period, [redacted] . . . .").

//

//

//

//

### 2. TRANSCOM Doubled the Anticipated Funding Under the Transition Period to Accommodate the Out-of-Scope Enlargements of Time and Additions to the IT System Requirements.

Initially, HomeSafe's GHC Contract was executed based on the competed monthly unit price of $6,001,479.65, amounting to $54,013,316.85 for the anticipated nine-month Transition Period. Tab 211 at AR35263 (specifying max net amount for CLIN 0002). *See also id*. (specifying that "[t]he first payment of the Monthly Transition Price will be considered the Minimum Contract Value Guarantee"). In negotiating the IT System PWS modifications with HomeSafe, the Agency estimated there would be "two potential opportunities for additional cost, the first being continued development of the vendors IT system for initial integration into MilMove (or any other Government System) and the second effort being future development and sustainment of the vendor IT system ***above and beyond what is initially expected for integration with MilMove i.e. MilMove has capability enhancements that the vendors*** [sic] ***IT system needs to meet/match***." Tab 365 at AR59192 (February 6, 2024 Independent Government Cost Estimate – Modification) (emphasis added).

***First,*** in order to support the foregoing out-of-scope modifications to the Transition Period and IT System requirements, TRANSCOM agreed to increase the contract value by a not-to-exceed amount of $60 Million to cover the twelve months added to the Transition Period—***more than doubling*** the anticipated funding for the Transition Period as projected in the Solicitation. Tab 377 at AR59247 (pricing for new CLIN 0005 under which "[t]he first payment of the Monthly Transition Price will be considered the Minimum Contract Value Guarantee").

***Second,*** Modification 13 also included the concurrent exercise of Base Period Year 1 with the extended Transition Period. *Id*. *See also* Tab 447 at AR60635 (HomeSafe responding to TRANSCOM's request to exercise concurrent performance periods "to advance MilMove development to enable HomeSafe to advance the HomeSafe Connect interface as we work toward GHC Full Operational Capability"). *Compare with* Tab 364 AR59178 ("As of 31 December 2023,

[HomeSafe] estimated that HomeSafe Connect's Full Operational Capability (FOC) overall readiness assessment is at [redacted]% capability.").

In addition to completely discarding the Solicitation's longstanding requirement that the Transition Period PWS requirements be complete ***before*** the start of Base Period Year 1 (and multiple modifications reflecting this sequential requirement), the increased funding under CLIN 0005 was based on a completely new, sliding scale tied to monthly shipment orders, the quantity of which was also unspecified:

> "Contractor shall receive $5,000,000.00 for each month the Government orders less than 3,104 shipments . . . $3,300,000.00 for each month the Government orders equal to or more than 3,104 shipments but less than 5,596 shipments . . . $1,927,000.00 for each month the Government orders equal to or more than 5,596 shipments but less than 7,771 shipments . . . $1,500,000.00 for each month the Government orders equal to or more than 7,771 shipments."

Tab 377 at AR59247. The new funding structure was designed to "compensate [HomeSafe] for maintaining the viability and functionality of GHC infrastructure necessary to ensure performance and effectiveness of ongoing operations and maintenance during the Transition Period . . . and expenses essential for HomeSafe operational capabilities until the Government Move Task Orders reach the volumes [above]." Tab 380 at AR59281. In this regard, TRANSCOM acknowledged that the increased funding "sliding scale is *event-driven* (i.e., number of moves), and not *schedule-driven* (i.e., month)." Tab 374 at AR59234 (emphasis in original). This approach contradicts the Solicitation's clear requirements that offerors "propose ***one price*** for Transition," which shall be a "One-Time Amount (applied in Base Period Year 1)." Tab 7(b)(2) (Pricing Rate Table) (emphasis added).

***<u>Third</u>,*** under Modification 13, the parties also agreed to add testing requirements, which "shall not exceed $807,00.00 for a single test event." Tab 378 at AR59252 (new PWS requirement 1.2.2.7 under Modification 13). However, the record shows that the increased consideration was

not fully accounted for in the contract modification. *See* Tab 375 at AR59242 ("Each test event will be negotiated/priced individually as each requirement emerges and is not included in the NTE $60M price."). The Agency further estimated there would be "an increase of $[redacted] per shipment ordered under GHC" to account for the "[a]ddition of ongoing, ad hoc testing of HomeSafe Connect, and increased IT engagements to deliver a more streamlined approach to develop and integrate HomeSafe Connect and MilMove capabilities." *Id*. This approach is entirely antithetical to the underlying presumption that "[t]ransition price is incurred only once during Base Period Year 1" and pricing instructions based on a fixed volume phase-in schedule. Tabs 7(b)(2) (Pricing Rate Table); 7(a)(1) (Appendix A). *See also* Tab 358 at AR59130 (HomeSafe explaining that it "bid GHC by spreading its fixed costs across the contractual Volume Phase-in number of moves and that, in the absence of such a Volume Phase-in, HomeSafe will suffer a significant and negative financial impact").

Had Suddath known or reasonably could have anticipated that the pricing structure and volume ramp-up was flexible and that it would be able to negotiate increased funding on a risk-reduced monthly volume basis, it would have bid on the Solicitation [redacted]. [redacted] Decl. ¶¶ 5 ("Suddath is currently one of the largest military household goods provider[s] of managed and serviced shipments/customers in the [DP3] program for domestic and international moves of military personnel personal property."); 15 ("Had Suddath known about the Agency's actual requirements for a flexible 3-year-plus transition and a government-funded software development effort, Suddath could and would have bid on the GHC solicitation."); 18 ("Had Suddath known the actual GHC implementation timeline, it would have been able to offer a much more competitive price and better value to the government than the awardee."); 19 ("[redacted]")

### 3. TRANSCOM Indefinitely Extended the Volume Phase-In Period and Materially Altered the Pricing Structure for Shipment Transfers.

In connection with the significant changes under Modification 13, TRANSCOM eliminated the longstanding Volume Phase-In Period, which had largely been maintained and only affected by way of the Base Period Year 1 start date under all prior modifications. Indeed, offerors' ability to strictly meet the Volume Phase-In Period was a critical factor that defined the initial competitive range. *See* Tab 20 at AR3594 (finding unacceptable [redacted] proposal where "it failed to provide a significant level of information relating to Volume Phase-in which is one of the two primary elements of this Sub-Factor" and while it "provide[d] some milestones regarding what [redacted] will do prior to the first 25% of volume phase-in, the plan lack[ed] depth regarding domestic and international volume phase-in"). In other words, [redacted] was rejected from the competition based upon worries about its ability to meet Volume Phase-In obligations that the Agency later replaced with a significantly less restrictive event-driven sliding scale volume approach.

Under Modification 13, TRANSCOM adopted a much less burdensome approach than bidders were required to meet during which "OCONUS will be phased in as ordered." Tab 380 at AR59281. *Compare with* Tabs 7(a)(1) at AR210-11 (requiring full transition of domestic and international services in a 12-month period); 8(a) at AR665 (requiring "Offeror's approach and associated timelines to be fully operational for complete global HHG relocation services for each of the service areas identified"). TRANSCOM acknowledged the substantive change in approach to the shipment transfers. *See* Tab 375 at AR59241-242 (explaining that Modification 13 "reflects the deliberate decision to shift from a time-definite schedule to a lower-risk, conditions-based phase-in approach with significantly lower volumes" and "[p]rovides consideration to HomeSafe for the ***sizable shift in the originally planned shipment phase-in schedule to a low-risk lower volume phase-in schedule that is conditions-based***") (emphasis added).

To date, TRANSCOM has transitioned only a small fraction of domestic services with no end date for full volume transition, and international shipments have not yet begun. *See* ECF 37 at Exh. 11 (TRANSCOM's April 2, 2024 press release) ("International shipments under GHC will begin ***no earlier*** than September 2025, with a similar gradual phase-in of locations and shipment volume.") (emphasis added). TRANSCOM's altered approach to shipment transfers is completely misaligned with the strict timeline that offerors were required to compete on and evaluated upon.

Had Suddath known or reasonably could have anticipated that it would not be held to the Solicitation's strict schedule-based approach and could take a longer, lower-risk conditions-based approach to a more practicable volume phase-in plan, it would have bid [redacted] *See e.g.* [redacted] Decl. ¶¶ 15 and 19.

**4. TRANSCOM Executed Other Out-of-Scope Price Adjustments.**

The Solicitation accounted for an Economic Price Adjustment (EPA) Schedule under Appendix G. Tab 7(a)(8) at AR443 ("In order to protect the contractor and government against significant market fluctuations, all prices ***other than the shipment management services and counseling services***, will be adjusted ***prior to the start of Base Period 2***, Base Period 3, the extension of every option year, and award terms (if applicable) thereafter." ). *See also* Tabs 413 at AR59554 ("A Fixed Price-Economic Price Adjustment (EPA) clause will be included for fuel adjustments, to count for fluctuations in the market."); 414 at AR59586 ("[A] FFP-EPA clause will be included to accommodate the fluctuating fuel market.").

Despite the Solicitation's clear requirements and application of law, in connection with the protest related stop-work orders, HomeSafe submitted multiple requests for equitable adjustments under different theories. *See generally* Tab 432 (TRANSCOM tracking and responding to "four (4) separate Request for Equitable Adjustments (REA) submitted by HomeSafe since performance was resumed on 3 November 2022"). This included a request to "adjust the Economic Price Adjustment (EPA) Schedule contained in Appendix G to GHC from the beginning of Base Period

Year 2 to Base Period Year 1." Tab 425 at AR60270. In negotiations, TRANSCOM agreed that "***[a]s written, the Appendix G does not contemplate that the EPA would be applied prior to the start of Base Period 1; however, a year-long delay in contract start was also not contemplated in the EPA schedule.***" Tab 314 at AR58924 (emphasis in original). Indeed, under Modification 6, the parties executed a rate adjustment by [redacted]% based on the unanticipated, frontloaded application of the EPA provision. Tab 315 at AR58930.

This rate adjustment was also higher than what TRANSCOM would have been entitled to if the required price escalation discount applied. *See* Tab AR68927 (TRANSCOM's Memorandum for Record noting "an adjustment of [redacted]% without the Price Escalation Discount [of [redacted]%] and [redacted]% with the Price Escalation Discount"); Tab 433 at AR60316 ("Although GHC Appendix G requires a discount to the EPA calculation [redacted]%, HomeSafe requests that, because this equitable adjustment addresses the unprecedented economic conditions since submission of the FPR, and sets a new baseline price, that this modified EPA not apply [redacted]% discount." *Cf.* Tab 7(a)(8) (Appendix G, EPA Schedule, specifying that "if the contractor elects to do so, they can offer the Government an additional downward price adjustment (discount), effective at the time of the option exercise, ***in lieu of*** an increased EPA option year adjustment," but "[t]he contractor ***may not waive*** a downward EPA adjustment") (emphasis added). TRANSCOM's application of the upward rate adjustment is wholly inconsistent with the Solicitation's terms.

HomeSafe also requested, and TRANSCOM approved, multiple wage determination updates. *See* Tab 308 (Modification 5, updating 885 individual wage determinations covering 226 service areas). *See also* Tab 425 at AR60270 (HomeSafe's subsequent REA noting that "the imposition in Modification P00005 of an Operational Test Period was not included in either TRANSCOM's Request for Proposals or HomeSafe FPR and, therefore, HomeSafe reserves all rights to seek additional costs arising from this novel Operational Test Period"). Under Modification 15, TRANSCOM further "approve[d] an increase of $[redacted] per move to the Move

Management Fee" based on the rates incorporated in Modification 5. Tab 391 at AR59400.[3] *Cf.* Tab 9(j) (Q&A Response #287) (TRANSCOM stating that it "does not expect 'significant changes' that would require a contract modification resulting in an increased Management Fee" and rejecting offeror request for more information to assist with pricing development).

Had Suddath known or reasonably could have anticipated it would have much more flexibility in pricing, and that committed prices would be a floor to negotiating better pricing, it would have further minimized risk of bidding on the GHC Contract. *Accord* [redacted] Decl. ¶ 18.

**B. Suddath is Entitled to a Permanent Injunction**

The Court has "broad equitable powers to fashion an appropriate remedy" in bid protest matters. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). In deciding whether injunctive relief is appropriate, the Court must consider whether: (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)(citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). "[P]roving success on the merits is a necessary element for a permanent injunction, [but the court] may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief…" *Piedmont Propulsion Sys., LLC, supra*, 167 Fed. Cl at 90-91 (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed.

[3] The Pricing Rate Table under Modification 15 states that the new rate, as adjusted upwards, is $[redacted]. Tab 394 at "4a) Mgmt., Couns. Trans. Prices" tab. However, this reflects a [redacted] per move increase based on the Modification 13 rate of $[redacted] (Tab 379), not the Modification 5 rate of $[redacted] (Tab 310). To the extent TRANSCOM exercised adjustments based on the wrong standard, the impact of the out-of-scope rate increase is further inflated.

Cir. 2018)). Suddath has demonstrated success on the merits and is entitled to relief under the balance of factors.

**1. Suddath Has Established Success On the Merits**

TRANSCOM's out-of-scope contract modifications cardinally changed the GHC contract. The RFP imposed onerous requirements for transition and complete IT system integration within nine months and complete Volume Phase-in globally ten months later. But the contract as modified tripled the transition timeline while doubling transition funding, removed the volume phase-in scheme replacing it with a less burdensome sliding scale approach. Comparing the contract as changed with the contract as solicited shows that TRANSCOM imposed undue restrictions that were arbitrary, capricious and unreasonable. The restrictive requirements that the Agency declined to change and rejected offerors for failing to meet plainly did not reflect the Agency's actual minimum needs. Thus, on the merits, it is clear that TRANSCOM did not have a rational basis for imposing those restrictions on prospective offerors. And it follows that the Agency's decision to include the requirements was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

The proper remedy where there has been a cardinal change is to resolicit under a revised full and open competition against an agency's actual minimum needs in accordance with CICA. *CeleraPro, LLC, supra,* 168 Fed. Cl. at 425-26.

**2. Suddath Will Suffer Irreparable Harm Absent Injunctive Relief**

Suddath was irreparably harmed by the incorporation of unduly restrictive terms by TRANSCOM in the RFP. The significantly increased funding related to transition period delays and IT requirement changes were material changes that would have directly enabled Suddath to bid as a prime contractor. Had Suddath further known that it would be able to negotiate increased funding on a monthly volume basis, it could have bid. However, as this information was not included in the original RFP Suddath reasonably decided it could not submit a proposal that

satisfied the Agency's restrictive stated requirements. Depriving Suddath of the opportunity compete caused it irreparable harm.

A bid protester can demonstrate prejudice by showing that it was deprived of the opportunity to compete. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013); *Piedmont Propulsion Systems, LLC,* 167 Fed. Cl. at 89; *SOS Int'l LLC v. United States*, 127 Fed. Cl. 576, 586 (2016); *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 (2012)). But for the inclusion of the unduly restrictive transition, IT system integration and Volume Phase-In requirements in the solicitation, Suddath would have been able to compete as a prime contractor for the GHC contract. Because the unduly restrictive provisions prevented Suddath from competing, it has established direct harm. Ultimately, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 743 (2000) (cites omitted).

Suddath has already suffered irreparable harm and will continue to suffer irreparable harm until an injunction is granted. Suddath is currently one of the largest providers of services under the DP3 program, and Suddath has lost and will continue to lose workshare as household goods servicing moves to the GHC Contract. [redacted] Decl. ¶ 5. "Had Suddath been able to propose and been selected for the Agency's actual GHC requirements, it would have represented a transformative opportunity to leverage Suddath's strengths and experiences to facilitate material growth [redacted]. The guaranteed business volume generated by GHC would enable Suddath to materially expand its global business for non-DoD customers as well." *Id.* at ¶¶ 28, 29. "Due to the cardinal change, [redacted]). *Id.* at ¶33. Absent an injunction, Suddath will lose its substantial share of work under the legacy DP3 contract and have no opportunity to compete fairly for the replacement GHC contract. This represents a fundamental blow to Suddath's business, one of the highest-rated and active household goods moving contractors in the Nation.

### 3. Balance of Hardships Weighs Heavily in Favor of Suddath.

In weighing the third factor for injunctive relief, the Court must balance the harm plaintiff would suffer without injunctive relief against the harm that would be inflicted on defendant and defendant-intervenor by way of that injunction. *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006). Today the Government continues to receive high quality household goods moving services from hundreds of companies operating under the legacy DP3 procurement system. *See* [redacted] Declaration of Harms ([redacted] Decl.) ¶ 3. In fact, recent TRANSCOM data shows that metrics under the DP3 program are historically high whereas the GHC program has attracted complaints. *Id*. The only threat to the status quo under DP3 are imminent proposed changes to the business rules that govern that program. *Id*. at ¶ 4. Suddath and similarly-situated companies may be negatively impacted by proposed business rule changes that would effectively upend the status quo that is currently serving the Agency. *Id*. The Agency alone has the ability to avoid disruption to the status quo. *Id*. at ¶ 5. DP3 contractors will learn whether the Agency moves forward with drastic rule changes in coming days and will be required to submit pricing in February 2025 that will be effective from May 2025-May 2026. *Id*.

So long as DP3 continues, there is no hardship to the Army. And any potential hardship caused by the injunction would not substantially outweigh the harm Suddath has already suffered from being excluded from the GHC procurement by arbitrary, capricious and unreasonable inclusion of unduly restrictive requirements.

Defendant-Intervenor HomeSafe will claim that it will be irreparably harmed by a permanent injunction. But no contractor is entitled to a contract that was awarded in violation of law, as the GHC contract was. Moreover, to date HomeSafe has negotiated substantial consideration from the Government even as its contract obligations have been substantially relaxed.

#### 4. The Public Interest Is Served by Imposing the Requested Injunction.

"[T]here is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations." *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). Indeed, the public interest in honest, fair and open competition is compromised when the government strays from the requirements of the procurement laws. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994); *PGBA, LLC*, 57 Fed. Cl. at 663. And violations of procurement regulations undercut the public's faith in the integrity of government acquisitions. *See AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 741 (2021). While there is a countervailing government interest in efficiency of operations, this cannot come at the expense of providing a fair and level playing field for all competitors in the federal marketplace and preserving the integrity of the public procurement process. *Mangi Env't Grp., Inc. v. United States*, 47 Fed. Cl. 10, 19–20 (2000); *Sys. Studies & Sim., Inc. v. United States*, 146 Fed. Cl. 186, 204 (2019) ("the public interest is best served by requiring the government to comply with federal procurement law—law that was intended to promote competition."). Because the GHC solicitation overstated the Agency's actual needs, it was improper to solicit and make award based upon those unduly restrictive requirements. Full and fair competition requires that the Agency resolicit and do so based upon a reasonable assessment of its actual minimum needs.

## VI. CONCLUSION AND RELIEF REQUESTED

For the reasons detailed above, the injunctive relief factors weigh heavily in Suddath's favor. Consequently, Suddath respectfully requests that the Court:

(1) grant Suddath's Motion for Judgment on the Administrative Record;

(2) declare that TRANSCOM's substantial modification to the scope of GHC without competition violates CICA;

(3) enjoin TRANSCOM from proceeding with further performance under the materially

changed and illegal GHC;

(4) order TRANSCOM to issue a new solicitation that accurately reflects TRANSCOM's needs; and

(5) grant any other relief as the Court deems just.

Dated: January 17, 2025

Respectfully submitted,

/s/ Jeffery M. Chiow
Jeffery M. Chiow (attorney of record)
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3149
Jeff.Chiow@gtlaw.com
*Counsel for The Suddath Companies*

*Of Counsel:*

Shirin Afsous
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 749-1300
Shirin.Afsous@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
Cassidy.Kim@gtlaw.com

Yongho Lee
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202) 533-2318
Andrew.Lee@gtlaw.com

Olivia Bellini
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 903-7514
Olivia.Bellini@gtlaw.com