**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

**FINAL PUBLIC VERSION**

THE SUDDATH COMPANIES; TOTAL MILITARY MANAGEMENT, INC.; NATIONAL HOLDING COMPANY, INC.,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant,*

and

HOMESAFE ALLIANCE, LLC,

*Defendant-Intervenor.*

Case Nos.: 24-1836, 24-2029, 24-2112

Judge Zachary N. Somers

[redacted]

**PLAINTIFFS TOTAL MILITARY MANAGEMENT, INC.'S AND NATIONAL HOLDING COMPANY, INC.'S JOINT MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims, Plaintiff Total Military Management, Inc., and Plaintiff National Holding Company, Inc., respectfully request that the Court GRANT judgment on the administrative record in their favor and provide the declaratory and injunctive relief requested in the accompanying Memorandum in support of this Motion.

Dated: January 17, 2025

Respectfully submitted,

/s/ *Noah B. Bleicher*
Noah B. Bleicher (Counsel of Record)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6063
*nbleicher@jenner.com*

*Of Counsel*

Moshe B. Broder
Jennifer Eve Retener
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

*Counsel for Total Military Management, Inc., and National Holding Company, Inc.*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

THE SUDDATH COMPANIES; TOTAL MILITARY MANAGEMENT, INC.; NATIONAL HOLDING COMPANY, INC.,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant,*

and

HOMESAFE ALLIANCE, LLC,

*Defendant-Intervenor.*

Case Nos.: 24-1836, 24-2029, 24-2112

Judge Zachary N. Somers

[redacted]

**MEMORANDUM IN SUPPORT OF PLAINTIFFS TOTAL MILITARY MANAGEMENT, INC.'S AND NATIONAL HOLDING COMPANY, INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Dated: January 17, 2025

Respectfully submitted,

/s/ *Noah B. Bleicher*
Noah B. Bleicher (Counsel of Record)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6063
*nbleicher@jenner.com*

*Of Counsel*

Moshe B. Broder
Jennifer Eve Retener
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

*Counsel for Total Military Management, Inc., and National Holding Company, Inc.*

# TABLE OF CONTENTS


I. STATEMENT OF THE CASE ..... 1

II. QUESTIONS PRESENTED ..... 3

III. STATEMENT OF RELEVANT FACTS ..... 3

A. The GHC Procurement ..... 3

B. The GHC Transition and Volume Phase-In ..... 4

C. Proposal Evaluations, Contract Award, and Bid Protests ..... 7

1. First GHC Award ..... 7

2. Second GHC Award ..... 8

3. Final GHC Award ..... 8

D. TRANSCOM Changes Transition and Volume Phase-In Requirements ..... 9

1. Modifications 2 Through 6 ..... 9

2. Modifications 8 Through 12 ..... 11

3. Modification 13 ..... 13

4. Modification 15 ..... 18

IV. JURISDICTION, STANDING, AND STANDARD OF REVIEW ..... 19

A. This Court Has Jurisdiction over this Bid Protest ..... 19

B. TMM and National Have Standing to Pursue Their Claims ..... 20

C. A Contracting Action Must Be Set Aside if it Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law ..... 21

V. THE AGENCY'S MODIFICATIONS TO THE GHC VIOLATED CICA AND WERE ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW ..... 22

A. TRANSCOM's Extension of the Transition Period and Shift to a "Conditions-Based Phase-In Approach" Are Out-of-Scope Modifications ..... 22

1. TRANSCOM's Modifications Substantially Changed the GHC's Work, Performance Period, and Price ..... 23


[redacted]

2. TRANSCOM's Modifications Were Not of a Nature Which Offerors Would Have Reasonably Anticipated.......... 27

B. TMM and National Suffered Competitive Prejudice.......... 34

VI. INJUNCTIVE RELIEF IS WARRANTED.......... 36

VII. CONCLUSION AND RELIEF REQUESTED.......... 39

[redacted]

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air-A-Plane Corp. v. United States*,
408 F.2d 1030 (Ct. Cl. 1969) ........ 23

*Am. Relocation Connections, L.L.C. v. United States*,
789 F. App'x 221 (Fed. Cir. 2019) ........ 20

*Amazon Web Servs., Inc. v. United States*,
147 Fed. Cl. 146 (2020) ........ 38

*AT&T Commc'ns, Inc. v. Wiltel, Inc.*,
1 F.3d 1201 (Fed. Cir. 1993) ........ 22, 23

*Banknote Corp. of Am., Inc. v. United States*,
365 F.3d 1345, 1350-51 (Fed. Cir. 2004) ........ 22

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005) ........ 21

*BayFirst Sols., LLC v. United States*,
102 Fed. Cl. 677 (2012) ........ 37

*Cardinal Maint. Serv., Inc. v. United States*,
63 Fed. Cl. 98 (2004) ........ 23, 27, 36, 37

*CCL, Inc. v. United States*,
39 Fed. Cl. 780 (1997) ........ 1, 2, 20

*Centerra Grp., LLC v. United States*,
138 Fed. Cl. 407 (2018) ........ 22

*CGS-SPP Sec. Joint Venture v. United States*,
158 Fed. Cl. 120 (2022) ........ 33, 39

*Cmty. Consulting Int'l*,
ASBCA No. 53489, 02-2 BCA ¶ 31,940 ........ 31, 32

*Connected Glob. Sols., LLC v. United States*,
162 Fed. Cl. 720 (2022) ........ 8

*CWT/Alexander Travel Ltd. v. United States*,
78 Fed. Cl. 486 (2007) ........ 30

[redacted]

*Elec. On-Ramp, Inc. v. United States*,
104 Fed. Cl. 151 (2012) .......... 35

*FMC Corp. v. United States*,
3 F.3d 424 (Fed. Cir. 1993) .......... 36

*G4S Secure Integration LLC v. United States*,
161 Fed. Cl. 387 (2022) .......... 20

*Glob. Computer Enters., Inc. v, United States*,
88 Fed. Cl. 350 (2009) .......... 25

*HP Enter. Servs., LLC v. United States*,
104 Fed. Cl. 230 (2012) .......... 39

*Ian, Evan & Alexander Corp. v. United States*,
136 Fed. Cl. 390 (2018) .......... *passim*

*IgniteAction JV, LLC v. United States*,
174 Fed. Cl. 62 (2024) .......... 28, 33, 37

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) .......... 22

*Magnum Opus Techs., Inc. v. United States*,
94 Fed. Cl. 512 (2010) .......... *passim*

*MORI Assocs., Inc. v. United States*,
102 Fed. Cl. 503 (2011) .......... 36

*Neil R. Gross & Co., Inc.*,
B-237434, Feb. 23, 1990, 90-1 CPD ¶ 212 .......... 27

*PGBA, LLC v. United States*,
389 F.3d 1219, 1228-29 (Fed. Cir. 2004) .......... 36

*Piedmont Propulsion Sys., LLC v. United States*,
167 Fed. Cl. 72 (2023) .......... 35

*Treadwell Corp. v. United States*,
133 Fed. Cl. 371 (2017) .......... 27

*Vanquish Worldwide, LLC v. United States*,
147 Fed. Cl. 390, 399 (2020) .......... 31

*W. Pilot Service; et al.*,
*B-415732 et al.*, Mar. 6, 2018, 2018 CPD ¶ 104 .......... 25, 26

[redacted]

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) .......... 21, 22, 34

*Zolon PCS II, LLC v. United States*,
172 Fed. Cl. 742 (2024) .......... 36

**Statutes**

28 U.S.C. § 1491 .......... 21

28 U.S.C. § 1491(b) .......... 19

28 U.S.C. § 1491(b)(1) .......... 19

28 U.S.C. § 1491(b)(2) .......... 20

41 U.S.C. § 3301(a)(1) .......... 22

**Other Authorities**

*Defense Personal Property Program Metrics*, USTRANSCOM,
https://www.ustranscom.mil/dp3/tspinformation.cfm (last accessed Jan. 17, 2025) .......... 38

H.R. Rep. No. 118-529 (2d. Sess. 2024) .......... 38

*New PCS Contract Amid Diminishing Self Move Rates*, Change.org, PBC (Jan. 6, 2025), https://www.change.org/p/military-families-forced-to-new-pcs-contract-amid-diminishing-self-move-rates .......... 38

RCFC 52.1(c) .......... 1

Statement to Accompany the Servicemember Quality of Life Improvement and
National Defense Authorization Act for Fiscal Year 2025 (Comm. Print 2024) .......... 38

[redacted]

Pursuant to the Court's Scheduling Orders (ECF Nos. 17 and 42) and Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiffs Total Military Management, Inc. ("TMM"), and National Holding Company, Inc. ("National"), (collectively, "Co-Plaintiffs"), through undersigned counsel, respectfully submit this Memorandum in Support of their Joint Motion for Judgment on the Administrative Record ("MJAR").

## I. STATEMENT OF THE CASE

The cornerstone of the Federal acquisition framework is the Competition in Contracting Act's ("CICA") mandate for full and open competition. "That requirement cannot be avoided by using the device of contract modification." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1997). Yet that is precisely what occurred in this case.

More than five years ago, the Department of Defense ("DoD"), acting through the U.S. Transportation Command ("TRANSCOM" or "Agency"), sought to overhaul how it handled the relocation of household goods for servicemembers and their families, and in late 2019, TRANSCOM commenced its competition for the Global Household Goods Contract ("GHC" or "Contract"). That Solicitation included numerous ambitious performance requirements, including aggressive mandates for transitioning onto the contract and phasing-in the work scope. TRANSCOM required the GHC contractor to complete complex transition tasks, including standing up an information technology ("IT") system, in only a 9-month period, and then to assume responsibility for nearly all military relocations—some 400,000 domestic and international moves annually—over only the next 8 months. These daunting requirements effectively served as a gatekeeping mechanism, precluding companies like TMM and National from bidding for the GHC as prime offerors.

But now, just over 2 years into contract performance, these strict schedule mandates have fallen by the wayside. Indeed, TRANSCOM has dramatically changed its contract: The [redacted]

9-month Transition Period has now been expanded to 28 months, and the 8-month Phase-In Period has been abandoned altogether, with TRANSCOM opting for a laxer "conditions-based" approach. The record thus establishes that the modified contract materially departs from the scope of the original procurement.

The Court need not take Co-Plaintiffs' word for it. As the GHC was being substantially reworked by the Agency, TRANSCOM's GHC contractor raised the same alarm bells. Specifically, the contractor warned TRANSCOM of the "magnitude" of the "significant change":

> [T]he only reasonable interpretation of the RFP and Contract is that TRANSCOM could shift the Phase-In period to avoid peak relocation season to accommodate changes in the schedule due to bid protests. The RFP and Contract language do not permit an extension to the 8-month Phase-In period or a reduction to the guaranteed percentage of moves each month. . . .

(AR, Tab 434 at 60328, 60329 (emphasis removed).) As the contractor recognized, the GHC Solicitation provided no flexibility for TRANSCOM to relax the rigid requirements.

TRANSCOM's profound modification of the GHC so that it materially departed from the original procurement violates CICA because it prevented potential bidders from participating or competing for what should be a new procurement. Ultimately, TRANSCOM impermissibly strayed from what the Solicitation initially advertised to offerors and thus circumvented the statutory requirements for competition. On this record, the Court should find that TRANSCOM's unlawful procurement actions "transcended the boundary between permissible and impermissible alterations," warranting declaratory and injunctive relief. *CCL, Inc.*, 39 Fed. Cl. at 792.

[redacted]

## II. QUESTIONS PRESENTED

1. Whether TRANSCOM's extension of the GHC's Transition Period by 19 months is an out-of-scope modification that violates CICA.
2. Whether TRANSCOM's modification of the GHC's Volume Phase-In requirements from a scheduled approach with threshold volumes to a "conditions-based" approach materially departs from the scope of the original GHC procurement and violates CICA.

## III. STATEMENT OF RELEVANT FACTS

### A. The GHC Procurement

TRANSCOM is responsible for providing "complete door-to-door global household goods relocation transportation and warehouse services worldwide for DoD Service Members, Coast Guard Service Members, and DoD civilians." (AR, Tab 2c at 90.) Prior to the GHC, TRANSCOM awarded moves under the Defense Personal Property Program ("DP3") via tenders of service ("TOS"), utilizing "approximately 900 transportation service providers (TSPs), comprised of both small and large businesses, who function as move managers, third party logistics providers, storage warehouses, and/or transportation agents." (*Id.* at 90–91.) TRANSCOM awarded over 400,000 moves annually under DP3. (*Id.*)

In 2019, seeking to improve move experiences for service members, TRANSCOM decided to award a single contract to a sole move manager that would provide all relocation services. (AR, Tab 2 at 47.) Accordingly, on September 13, 2019, TRANSCOM issued Request for Proposals No. HTC711-19-R-R004 ("Solicitation" or "RFP") for the GHC. (AR, Tab 416a). The Solicitation contemplated the award of a single indefinite-delivery, indefinite-quantity ("IDIQ") contract, on a best-value basis, for complete global household goods ("HHG")

[redacted]

relocation services. (AR, Tab 136[1] at 21147–48; Tab 134b1[2] at 21077.) This was a massive contract in terms of duration and value. The Solicitation contemplated award of a nearly 10-year contract, inclusive of a 9-month transition period, a 3-year base period, three 1-year option periods, two 1-year award terms, and an option to extend the contract for 6 months. (AR, Tab 7 at 121–128.) The contract value was estimated to approach $15 billion. (AR, Tab 4 at 113.)

### B. The GHC Transition and Volume Phase-In

Transition was critically important given the enormous undertaking of consolidating the services of more than 900 geographically dispersed contractors under the predecessor DP3 program to a single contractor managing all military moves for the foreseeable future. (*See generally* AR, Tab 2.) TRANSCOM detailed its transition and phase-in requirements for the GHC contractor in RFP Appendix A, Transition & Phase-In Phase-Out Plan. (AR, Tab 140 at 21187–94.[3]) The contractor was to assume complete responsibility of all TRANSCOM domestic and international household moving requirements following an aggressive Transition Period and Volume Phase-In Period. (*See id.*)

As competed and originally awarded, the Transition Period was to span 9 months (December 2021 through August 2022), and thereafter the Volume Phase-In Period would span 8 months (September 1, 2022, following the summer peak relocation season, through May 1, 2023). (*Id.* at 21187, 21189–90.) Meeting these deadlines was a threshold requirement. (*See id.*) Offerors were required to submit a Transition Plan that clearly identified "activities required

---

[1] Amendment 9 to the Solicitation finalized the Solicitation's instructions and evaluation criteria.

[2] Amendment 7 to the Solicitation finalized the Performance Work Statement ("PWS") and the Solicitation's Terms and Conditions.

[3] Amendment 13 to the Solicitation finalized Appendix A to the Solicitation.

[redacted]

and the timeframe for accomplishing each Performance Work Statement (PWS) requirement to begin contract performance, in accordance with the parameters [in Appendix A]." (*Id.* at 21187.)

During the 9-month **Transition Period**, the contractor was to perform complex technical tasks to stand up a fully compliant and integrated solution, including IT systems. (*See id.*) This included personnel administration; developing compliant information systems; fully integrating the contractor's IT system with Government-managed IT systems and being able to accept task orders no later than contract base period start date; fully integrating the contractor's invoicing system with Government-managed invoicing systems; developing a compliant shipment management IT system no later than contract base period year 1 start date; and conducting a range of IT security audits, penetration testing, and training. (*Id.*) Further, many of the IT systems requirements were contingent on successfully completing testing. (*Id.* (explaining "successful testing" was required for A.2.2.1. Order Acceptance, A.2.2.2. Invoicing, and A.2.2.3. Shipment Management).) The contractor was also expected to submit monthly Transition Reports to the contracting officer detailing progress toward accomplishing the tasks necessary to begin full performance. (*Id.* at 21188.)

The **Volume Phase-In Period**, commencing in the base year, would involve the Government transferring responsibility for "complete, global HHG relocation services" under a phased approach. (*Id.* at 21189.) TRANSCOM stated that "[t]he Government intends to transfer responsibility for complete, global HHG relocation services [in accordance with] the phased approach outlined below. ***The Contractor shall be operational and able to begin performance [no later than] the specified timelines***." (*Id.*[4]) The Solicitation strictly dictated that the

[4] All emphases are added unless otherwise noted.

[redacted]

contractor had to be ready to assume responsibility over domestic and international relocations within a 9-month Volume Phase-In Period. (*See id.* at 21189–90.)

Specifically, from September 1, 2022, until December 1, 2022, the contractor had to meet progressive thresholds of responsibility for the Solicitation's domestic service areas, such that the first month required a minimum of 25%, the second month 50%, the third month 75%, and the fourth month 100%. (*See id.*) By January 1, 2023, the contractor was also required to assume responsibility for 100% of domestic household goods, unaccompanied baggage ("UB"), and short-term storage or storage-in-transit ("SIT"). (*Id.* at 21190.)

After assuming full responsibility for domestic relocation services, the contractor was to follow a similar progression for international relocation services. (*Id.* at 21189–90.) Beginning on February 1, 2023, and continuing for four months, the contractor was required to progress a minimum of 25% each month until reaching 100% of all international service areas on May 1, 2023. (*See id.* at 21190.) In other words, within the 8 months, the GHC contractor would rapidly assume full responsibility for all domestic and international service areas—[redacted], among others, on the DP3 program. (*See id.* at 21189–90; ECF No. 35-18 ("Decl. of [redacted]") ¶ 5; ECF No. 37-18 ("Decl. of [redacted]") ¶¶ 4, 6.)

In addition to this domestic and international volume phase-in, the Agency also would transfer responsibility for shipment volume currently performed by various worldwide Direct Procurement Method ("DPM") contracts. (AR, Tab 140 at 21190.) In this regard, the Solicitation listed military installations worldwide and identified dates by which time the contractor was to complete phase-in and assume shipment responsibility. (*See id.* at 21190–94.)

Avoiding delay or disruption was critical to GHC program success. Thus, under the Solicitation's Transition/Volume Phase-In subfactor, TRANSCOM scrutinized the offerors'

[redacted]

approaches to meet the arduous transition and phase-in requirements. (*See* AR, Tab 7 at 137.) This included assessing "implementation and transition for establishment of successful IT system connections between the Offeror's IT system and the Government's system," as well as the "timelines to be fully operational for complete global HHG relocation services. . . ." (*Id.* at 200–01.) As discussed further below, TRANSCOM assigned deficiencies to proposals that fell short of these minimum requirements. (*See, e.g.*, AR, Tab 91b at 17246; *see also* Tab 20 at 3594.)

### C. Proposal Evaluations, Contract Award, and Bid Protests

TRANSCOM received seven proposals in response to the Solicitation. (*See* AR, Tab 20 at 3567–68.) The initial evaluation found only four within the competitive range: APL Move, LLC, ("APL"), American Roll-On Roll-Off Carrier Group Inc. ("ARC"), Connected Global Solutions, LLC ("CGSL"), and HomeSafe Alliance, LLC ("HomeSafe"). (*Id.* at 3574–86.)

#### 1. First GHC Award

TRANSCOM initially attempted to award the Contract to ARC in May 2020, but this award was thwarted by Government Accountability Office ("GAO") protests from CGSL and HomeSafe. (AR, Tabs 82, 87.) In discussions during the first corrective action, the evaluators stated that a proposal would be acceptable and not deficient only if the offeror committed to meeting Appendix A requirements. For example, TRANSCOM had assigned [redacted] a deficiency for not demonstrating the "steps and timeline required to achieve end-to-end testing" for its IT system as required by Appendix A. (AR, Tab 91b at 17246.) TRANSCOM found this omission to be a "***material failure to meet the government's requirements*** because it is critical that successful testing be completed prior to contract start date." (*Id.*) This discussion item was resolved only after [redacted] revised its proposal to clarify the date to complete end-to-end testing as required by Appendix A. (*Id.*) Similarly, the Source Selection Evaluation Board ("SSEB") referenced TRANSCOM's "***minimum*** 25/50/75/100% volume for each period" when evaluating

[redacted]

offerors' phase-in approaches. (AR, Tab 107a at 18979.) In other words, TRANSCOM required offerors to meet the minimum requirements in Appendix A to be acceptable for GHC award.

2. Second GHC Award

In June 2020, TRANSCOM's re-award to ARC and was again protested. (*See* AR, Tabs 118, 113.) During the second corrective action, the SSEB re-affirmed that Appendix A's schedule was non-negotiable, stating that 25%, 50%, 75%, and 100% of all Domestic and International Service Areas "***must*** be phased in by" the dates set forth in Appendix A. (AR, Tab 198e at 31560–61; *accord* Tab 198l at 31932–33; *see also id.* at 31965–68.)

3. Final GHC Award

After evaluating revised proposals, the Agency changed course and selected HomeSafe as the best value offeror and awarded the company Contract No. HTC711-22-D-R002 ("Contract") on November 4, 2021. (AR, Tab 201 at 34673; *see also* Tab 211 at 35260.) HomeSafe's total evaluated price was $17,908,768,040.96 (AR, Tab 201 at 34671), and as re-awarded, the period of performance was from December 1, 2021, to August 31, 2030. (AR, Tab 211 at 35268–69.)

HomeSafe's award was protested by CGSL and ARC, first at GAO and then at COFC. (*See* AR, Tabs 214, 253.) In light of the November 2021 GAO protests, TRANSCOM issued Modification 1 to HomeSafe's Contract, directing HomeSafe to stop work, which delayed transition. (AR, Tab 292 at 58783.) On March 3, 2022, GAO denied the protests. (AR, Tabs 251, 267.) TRANSCOM issued Modification 2 the following day, lifting the stop work order and briefly commencing the Transition Period. (AR, Tab 295 at 58791.)

ARC and CGSL then filed bid protest complaints at COFC. TRANSCOM issued Modification 3 on March 23, 2022, implementing a stay of performance and again pausing transition after only 20 days. (AR, Tab 271, at 58537.) The Court ultimately denied the protests on October 28, 2022. *See Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720 (2022).

[redacted]

On November 3, 2022, TRANSCOM issued Modification 4 lifting the stop work order and authorizing HomeSafe to resume transition. (AR, Tab 304 at 58864; *see also* Tab 306 at 58874.)

**D. TRANSCOM Changes Transition and Volume Phase-In Requirements**

Since directing HomeSafe to commence performance more than 2 years ago, TRANSCOM has progressively relaxed the GHC's rigorous transition requirements. In total, TRANSCOM has issued 17 modifications to HomeSafe's Contract (*see* AR, Tab 407). Discussed below are modifications most relevant to this protest, including changes to transition, phase-in, PWS requirements, and price.

1. Modifications 2 Through 6

**Modification 2** (effective March 3, 2022) lifted the stop work order following the GAO protests and shifted the 9-month **Transition Period** to March 4, 2022, through December 3, 2022. (AR, Tab 295 at 58791–93; Tab 297 at 58832 (Appendix A).) Modification 2 also shifted the **Phase-In Period** for domestic relocation services by two months, to December 4, 2022, through April 4, 2023. (AR, Tab 297 at 58834–35.) Additionally, Modification 2 created a new 4-month break in between domestic and international phase-in, to avoid phase-in during peak season,[5] such that the international phase-in would occur from September 4, 2023, through December 2023. (*Id.*)

**Modification 4** (effective November 3, 2022), lifted the stop work following the Court's denial of the ARC and CGSL protests and shifted the remainder of the **Transition Period** to November 3, 2022, through July 13, 2023.[6] (AR, Tab 304 at 58864, 58866; Tab 424a at 60260

[5] Appendix A required the contractor to "accommodate Government requested shifts to Volume Phase-In periods such that significant volume phase-in does not occur during peak relocation season (15 May through 30 September)." (*E.g.*, AR, Tab 297 at 58832.)

[6] When calculating the new transition time frame in Modification 4, TRANSCOM acknowledged that HomeSafe had already performed 20 days of the transition prior to the stop work order.

[redacted]

(Appendix A).) Modification 4 also shifted the beginning of the Base Period for phase-in to begin on September 1, 2023, and run through May 1, 2024, for domestic and international relocation services. (AR, Tab 424a at 60262–63.) For DPM Phase-In, TRANSCOM struck through the phase-in dates, stating that it "will identify revised GHC Phase-In Dates for DPM locations in a forthcoming modification." (*Id.*)

When executing Modification 4, HomeSafe reserved its right to pursue an equitable adjustment for "expected cost impacts arising from the stop work orders" under the first two modifications. (AR, Tab 303 at 58863.) A month later, HomeSafe asserted its right to an equitable adjustment ("REA"), requesting additional funds for "the delays caused by the [Stop Work Orders] and the changing worldwide economic conditions." (AR, Tab 425 at 60269.) On December 22, 2022, HomeSafe formally requested an economic price adjustment ("EPA").[7] (AR, Tab 427.)

Although meaningful performance had not begun and the Solicitation prohibited EPA adjustments until after Base Period 1, (AR, Tab 7a8 at 443), HomeSafe nevertheless requested a whopping [redacted]% increase to Base Period 1 rates. (AR, Tab 433 at 60317.) HomeSafe argued that its moving and storage costs had increased due to "drastic changes in the world economic conditions" since it submitted its pricing. (AR, Tab 425 at 60271; Tab 314 at 58920–21.)

**Modification 6** (effective May 9, 2023) settled HomeSafe's REA. (*See* AR, Tab 316 at 58934; *see also* Tab 315.) ***First***, despite recognizing that "***[a]s written, the Appendix G does***

---

(AR, Tab 306 at 58874.) Thus, the revised Transition period for Modification 4 was 8 months and 10 days, considering HomeSafe had already performed 20 days of transition. (*See id.*)

[7] The Contract contained an EPA Schedule to "protect the contractor and government against significant market fluctuations." (AR, Tab 7a8 at 443.) Pursuant to the EPA Schedule, "all prices other than the shipment management services and counseling services, will be adjusted prior to the start of Base Period 2, Base Period 3, the extension of every option year, and award terms (if applicable) thereafter." (*Id.*; *see also* Tab 136 at 21146.)

[redacted]

***not contemplate that the EPA would be applied prior to the start of Base Period 1***," TRANSCOM agreed to increase HomeSafe's Base Period 1 rates by [redacted]*%*. (AR, Tab 314 at 58924, 58928 (first emphasis in original).) TRANSCOM reasoned that the "evolving economic conditions" and the "one-year delay in performance" justified providing HomeSafe "adequate relief." (*Id*. at 58924.) This [redacted]% increase was also applied to the remaining period of performance. (*Compare* AR, Tab 310 at Tab "Total Evaluated Price" *with* Tab 317 at Tab "Total Evaluated Price.") As a result, HomeSafe's awarded price ballooned from $17,908,768,041 to [redacted], a total adjustment of [redacted]. (*Compare* AR, Tab 310, Tab "Total Evaluated Price" at F10 *with* Tab 317 at Tab "Total Evaluated Price" at F10.)

***Second***, Modification 6 extended the **Transition Period** by 48 days through August 31, 2023, to "close the gap" in performance between the end of transition on July 13, 2023, and the beginning of phase-in on September 1, 2023. (AR, Tab 314 at 58927–28 (internal quotations omitted); *see also* Tab 318 at 58937 (Appendix A).) TRANSCOM reasoned that the gap was created as an effect of lifting the stop work order on November 3, 2023, and the contractual requirement to avoid phase-in during peak moving season. (AR, Tab 314 at 58928.)

In sum, Modification 6 raised the Contract price by ***more than $***[redacted] and extended the 9-month Transition Period by close to 2 months. (AR, Tab 316 at 58935 (48-day extension).)

2. Modifications 8 Through 12

**Modification 8** (effective August 31, 2023) extended the **Transition Period** by an additional month through September 30, 2023, shifting the **Phase-In Period** by 1 month to October 1, 2023, through June 1, 2024. (AR, Tab 332 at 59006; *see also* Tab 333 (Appendix A) at 59014, 59016–17.) Prior to executing the modification, TRANSCOM conducted contractually required testing of the IT systems, including testing the integration of its IT system, MilMove, with HomeSafe's IT system, HomeSafe Connect. (AR, Tab 327 at 58998; Tab 318 at 58937–

[redacted]

38.) The testing revealed [redacted][8] (AR, Tab 327 at 58999–59000; *see also* Tab 328.) Due to these problems, the parties agreed to extend the Transition Period. (AR, Tabs 330–31.) At this point, TRANSCOM had extended the Transition Period by over 2.5 months. (AR, Tab 332 (cumulative extension of 78 days).)

**Modification 9** (effective October 1, 2023) extended the Transition Period by another month through October 31, 2023. (AR, Tab 338 at 59032; *see also* Tab 339 at 59040 (Appendix A).) This modification also shifted the Phase-In Period by 1 month to November 1, 2023, through July 1, 2024. (AR, Tab 339 at 59042–43.) The Transition Period had now been extended to over 3.5 months, transforming the original 9-month transition to ***over 1 year***. (*See* AR, Tab 338 at 59033 (cumulative extension of 109 days).)

**Modification 10** (effective October 31, 2023) extended the Transition Period and Phase-In Period, each by 2 weeks. The Transition Period was now extended through November 14, 2023 and the Phase-In period through July 15, 2024. (AR, Tab 344 at 59056; *see also* Tab 345 at 59064, 59066–67 (Appendix A).) By this time, TRANSCOM had extended transition by more than 4 months. (AR, Tab 344 at 59057 (cumulative extension of 123 days).)

Notably, on the heels of Modification 10, the Agency issued HomeSafe a "[redacted]" documenting that HomeSafe had "not [redacted]

[8] TRANSCOM conducted two more rounds of testing in September 2023 and January 2024 to resolve TPRs. (AR, Tabs 335 and 370–71.)

[redacted]

[redacted]." (AR, Tab 347.) Because [redacted] the Agency "reserve[d] the right to take additional action." (*Id.* at 59075.)

**Modification 11** (effective November 14, 2023) extended the Transition Period and Phase-In Period, each by 53 days, such that the Transition Period would run through January 7, 2024, and the Phase-In Period through September 8, 2024. (AR, Tab 352 at 59102; *see also* Tab 353 at 59110, 59113–16 (Appendix A).) The Transition Period had now been extended by 6 months.[9] (*See* AR, Tab 352 at 59103 (cumulative extension of 176 days).)

**Modification 12** (effective January 7, 2024) extended the Transition Period and Phase-In Period, each for another 28 days. The Transition Period would now run through February 4, 2024, while the Phase-In Period would run through October 5, 2024. (AR, Tab 362 at 59159; *see also* Tab 363 at 59167–70.) In other words, the Transition Period had now been extended by nearly 7 months. (AR, Tab 362 at 59160 (cumulative extension of 204 days).)

3. Modification 13

**Modification 13** (effective February 12, 2024) directed a sweeping change to the Contract's Transition Period, Phase-In approach, PWS requirements, and payment structure. The impetus for Modification 13 began a year prior, when the Government first floated the idea of broad changes to the volume phase-in requirements to minimize risk:

> We would like to collaborate with HomeSafe on modifications to the current plan to minimize operational risk in order to ensure overall program success. While we are all very excited to execute moves under GHC, ***we believe phase-in changes are required*** as, ultimately, this will impact thousands of Service Members and their families. . . . The reliance on commercial best practices should not be undone by overly conservative government processes, but conversely***, the program cannot be compromised by moving too***

[9] Around this same time, TRANSCOM stood up a cross-functional "Tiger Team" to "address [IT] and other challenges preventing GHC from executing or scaling to full operational capability." (AR, Tab 355 at 59121.)

[redacted]

> ***fast and failing to deliver the improved experience for the Servicemembers***. This is a significant issue to work through. . . .

(AR, Tab 430 at 60291.) In other words, just a few months into contract performance, TRANSCOM decided to relax the phase-in schedule announced in the Solicitation. (*See id.*)

Months later, in May 2023, TRANSCOM proposed extending the phase-in schedule from 8 months to 20 months. (AR, Tab 434 at 60234–25.) HomeSafe and TRANSCOM became locked in a "fundamental disagreement" regarding the phase-in volume required under the Contract. (*See*, *e.g.*, AR Tab 368 at 59204.)

Specifically, on May 18, 2023, days after Modifications 6 and resolution of HomeSafe's REA, HomeSafe submitted an initial iteration of a "Phase-In Change Proposal" responding to TRANSCOM's suggested changes. (AR, Tab 434.) HomeSafe acknowledged that TRANSCOM's proposed changes to the volume-phase in requirements were "significant" and did not accurately reflect the number of moves HomeSafe was entitled to during phase-in:

> TRANSCOM's requested changes are significant. The requested changes not only extend the contractually required 8-month Volume Phase-In period by 12 months and reduce the guaranteed percentage of moves during the Phase-In period, they change the very bargain the parties agreed upon.
>
> * * *
>
> Even if the Government could move the Phase-In period for reasons other than bid protests . . ., the RFP (and later Contract) language does not permit an extension of the Phase-In period (and most certainly not for an additional 12 months); rather, it permits only a shift to avoid peak relocation season.

(*Id*. at 60324, 60327.) Indeed, HomeSafe emphasized that it had "priced its proposal" consistent with its understanding that the Phase-In Period could not be extended and the number of moves phased-in monthly would not be reduced. (*Id*. at 60328.)

[redacted]

On May 26, 2023, the Agency responded to HomeSafe's proposal with its (incorrect) view that the proposed schedule would not constitute a change and that Appendix A contemplated flexibility:

> Paragraph A.3. specifically states "[t]he Government *intends* to transfer responsibility for complete, global HHG services IAW the phased approached below." (emphasis added). On the other hand, Paragraph A.3. specifically states "[t]he Contractor *shall* be operational and able to begin performance NLT the specified timelines." (emphasis added). The Government's use of this precise verbiage was deliberate. *Intending* to transfer responsibility is not synonymous with being *required* to transfer responsibility. Nothing in Appendix A, or the contract overall, is binding on the Government to transfer responsibility in accordance with the schedule from A.3.

(*See* AR, Tab 321 at 58951 (emphasis in original).)

Months passed without resolution. Then, in December 2023, HomeSafe submitted to TRANSCOM "[redacted]." (AR, Tab 357 at 59126; Tabs 358–59.) HomeSafe explained that delays in the development of MilMove, along with the "***significant deviations in the contract scope***," required increased PMO and IT development funding. (*Id.*) HomeSafe thus requested $[redacted] million per month for IT development funding and $[redacted] million per month for PMO funding, again citing "significant change from the contractual Volume Phase-in schedule." (AR, Tab 358 at 59127–31.) In that same letter, HomeSafe reiterated its interpretation of the GHC phase-in requirements and made clear that it was "prepared to challenge USTRANSCOM's contract interpretation through a Claim . . . upon USTRANSCOM's failure to provide HomeSafe with the contractually-required 25% Volume Phase-in in the first month of performance." (AR, Tab 358 at 59130.)

[redacted]

Exploring other ways to slow down phase-in, TRANSCOM began planning major changes to the Contract's scope. (*See* AR, Tab 364 at 59175–76.) TRANSCOM wanted to add ***another 12 months*** to the Transition Period, which would run concurrent with Base Period 1. (*Id*. at 59176.) During this extended transition, the cost of transition would decrease as shipment volume to HomeSafe increased. (*Id.*) Additionally, TRANSCOM sought to add new PWS requirements, including: IT systems integration and testing requirements; HomeSafe's required participation in the Government's Integrated Master Schedule ("IMS"); and participation in IT system Operation Test and Evaluation ("OT&E") events. (*Id.*)

**Modification 13** settled HomeSafe's PMO and IT funding proposal, including the disagreement over the required phase-in volume. It also drastically changed the Contract.

***First***, Modification 13 extended the **Transition Period** by 12 months, from February 14, 2024, through February 11, 2025. (AR, Tab 377 at 59246-47; *see also* AR, Tab 380 at 59279.) This was accomplished by adding an additional contract line-item number ("CLIN") to the Contract for "Transition Services Phase 2" at an additional expense not to exceed ***$60 million***. (AR, Tab 377 at 59247.) By now, the aggressive 9-month Transition Period that TRANSCOM solicited for was out the window; transition had been extended to a total of nearly ***2.5 years***. (*See* AR, Tab 380 at 59279 (Appendix A).) In other words, the contractor enjoyed 21 extra months to stand up its IT system and have it interoperate with MilMove, now with extra funding and the help of a "Tiger Team" of Government experts. (*See* AR, Tab 355.)

***Second***, TRANSCOM jettisoned the Solicitation's 8-month **Phase-In Period**. (*Id.* at 59281–83 (striking Phase-In timeline for domestic and international relocation services).) Instead of following a specified timeline as stated in the Solicitation and required in Modifications 1 through 12, TRANSCOM stated that "[u]ntil the Government orders more than 3,104 shipments in one month, the shipments shall be characterized as developmental

[redacted]

shipments." (*Id.* at 59281.) Additionally, the pricing for the extended Transition would be based on the number of shipments TRANSCOM ordered from HomeSafe, as the extended Transition Period would run concurrent with Base Year 1. (*See* AR, Tab 377 at 59247.) Modification 13 provided the following payment terms for transition services:

> Contractor shall receive $5,000,000.00 for each month the Government orders less than 3,104 shipments. Contractor shall receive $3,300,000.00 for each month the Government orders equal to or more than 3,104 shipments but less than 5,596 shipments. Contractor shall receive $1,927,000.00 for each month the Government orders equal to or more than 5,596 shipments but less than 7,771 shipments. Contractor shall receive $1,500,000.00 for each month the Government orders equal to or more than 7,771 shipments.

(AR, Tab 377 at 59247; Tab 380 at 59281). And instead of the 4-month phase-in schedule for <u>international</u> relocation services required by the Solicitation, TRANSCOM revised Appendix A to state that "OCONUS will be phased in as ordered." (AR, Tab 380 at 59281.) Modification 13 also deleted in its entirety the DPM phase-in requirement. (*Id.* at 59283.)

Thus, instead of requiring the GHC contractor to handle a specified phase-in volume under a strict timeline as announced in the Solicitation, HomeSafe instead would handle ***lower volumes over an indefinite period of time with additional transition services funding***. (*See* AR, Tab 375 at 59241.) These profound changes—first contemplated mere months after Contract performance commenced—"reflect[ed] the deliberate decision to ***shift from a time-definite schedule to a lower risk, conditions-based phase-in approach with significantly lower volumes***." (*Id.*) Indeed, the changes introduced in Modification 13 were so substantial that TRANSCOM notified Congress of the new path forward. (AR, Tab 385.)

***Third***, TRANSCOM modified the PWS to add IT system testing, training and integration items, and requiring HomeSafe's participation in IMS and OT&E events. (AR, Tab 374

[redacted]

at 59234–40; *accord* Tab 375 at 59241–42; *see also* Tab 378.) In exchange, TRANSCOM increased HomeSafe's Move Management Fee by $[redacted], a per-move service fee.[10] (AR, Tab 374 at 59238; AR, Tab 375 at 59242). The $[redacted] increase was equally applied to HomeSafe's escalating Move Management Fee rates for all remaining periods of performance. (*Compare* AR, Tab 197.1 at Tab "4a) Mgmt., Coun., Trans. Prices" Cell D10 *with* Tab 379 at Tab "4a) Mgmt., Coun., Trans. Prices" Cell D10.) In total, this change increased HomeSafe's Shipment Management Fees by $[redacted]. (*Compare* AR, Tab 379 at Tab "Total Evaluated Price," Cell F41 *with* Tab 317 at Tab "Total Evaluated Price," Cell F41.) Separately, HomeSafe would receive $[redacted] for each OT&E test event. (AR, Tab 378 at 59254; *see also* Tab 374 at 59239.)

In sum, TRANSCOM had extended the transition to a nearly ***2.5-year period*** with additional funding up to ***$60 million***, abandoned all requirements to complete Phase-In on a 8-month schedule, and increased HomeSafe's fees by more than $[redacted] million—all before a single shipment had been made under the GHC.[11] (*See* AR, Tab 375 at 59241–42.)

4. Modification 15

**Modification 15** (effective April 22, 2024) again increased HomeSafe's Move Management Fee. (AR, Tab 391 at 59400.) As background, the GHC was also subject to the Service Contract Act ("SCA") and contemplated SCA price adjustments. (*See* AR, Tab 136 at 21146; *see also* Tab 134 at 21042 (incorporating FAR 52.222-41, Service Contract Labor

---

[10] TRANSCOM would thus pay HomeSafe $[redacted] per move for Base Period 1, instead of HomeSafe's initially proposed fee of $[redacted]. (*Compare* AR, Tab 197.1 at Tab "4a) Mgmt., Coun., Trans. Prices" Cell D10:D17 *with* Tab 379 at Tab "4a) Mgmt., Coun., Trans. Prices" Cell D10:D17.)

[11] One person at TRANSCOM assessed that the changes in Modification 13, including the transition extension, were "within the scope of the current contract" and did not require a justification and approval under FAR part 6.3. (AR, Tab 373 at 59230.) As described below, he was mistaken.

[redacted]

Standards).) On August 18, 2023, HomeSafe submitted an updated proposal requesting an SCA wage determination ("WD") adjustment, but suggested incorporating the increase to the Shipment Management Services contract price. (*See* AR, Tab 451 at AR60650–51; *see also* Tab 389.) After months of negotiations, TRANSCOM rejected HomeSafe's requested changes to its transportation rates due to lack of supporting data (AR, Tab 391 at 59401), but nonetheless agreed to adjust HomeSafe's Move Management Fee by $[redacted], increasing the Contract price by $[redacted]. (*Compare* AR, Tab 394 at Tab "Total Evaluated Price," Cells F10 and F41 *with* Tab 379 at Tab "Total Evaluated Price," Cells F10 and F41.) The total Contract price was now $[redacted], nearly $[redacted] more than the original price.

In April 2024, ***15 months after the beginning of contract performance***, TRANSCOM placed its first orders under the GHC. (ECF No. 35-11 (April 2, 2024, TRANSCOM Press Release) at 2.) The orders represented less than 1% of all military moves. (*See id.*)

## IV. <u>JURISDICTION, STANDING, AND STANDARD OF REVIEW</u>

### A. This Court Has Jurisdiction over this Bid Protest.

This Court's jurisdictional grant over bid protests is found in the Tucker Act, 28 U.S.C. § 1491(b). Pursuant to the Act, this Court has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.* § 1491(b)(1). Here, Co-Plaintiffs object to TRANSCOM's out-of-scope modification to the GHC and allege that the Agency violated the CICA requirement that agencies procure services through full and open competition. *See Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 413 (2018) (citing 41 U.S.C. § 3301(a)(1)). Accordingly, because Co-Plaintiffs protest an alleged statutory violation in connection with a procurement or proposed procurement, this bid protest is within the Court's jurisdiction. 28 U.S.C. § 1491(b)(1). Moreover, the declaratory judgment and

[redacted]

permanent injunctive relief sought by Co-Plaintiffs are authorized under 28 U.S.C. § 1491(b)(2) ("[T]he courts may award any relief that the court considers proper, including declaratory and injunctive relief.").

**B. TMM and National Have Standing to Pursue Their Claims.**

"[A] plaintiff must prove two elements to establish that it has standing: 1) that it is an actual or prospective bidder/offeror, and 2) that it possesses a direct economic interest in the award of the contract." *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 396 (2022) (citation omitted). For standing, the court should "presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions." *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019). In protests challenging "an alleged illegality with respect to a 'proposed procurement,'" "[t]he appropriate inquiry . . . is whether the plaintiff has demonstrated a non-trivial competitive injury which can be redressed by judicial relief." *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 530 (2010) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361–62 (Fed. Cir. 2009)). "A deprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing." *Id.* at 533. Indeed, "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *CCL, Inc.*, 39 Fed. Cl. at 790.

Plaintiff TMM has standing because it would be a qualified bidder for any resolicitation whose direct economic interest has been affected by the unlawful "cardinal change" to the Contract. TMM is a qualified bidder because it is [redacted].

[redacted]

(ECF No. 35 ("TMM Compl.") at 2.) If TRANSCOM engaged in full and open competition for its modified GHC requirements, as required by law, [redacted]. *See Magnum Opus*, 94 Fed. Cl. at 531 ("[A] plaintiff possesses standing where it 'established an interest in bidding' and 'had a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations.'" (brackets omitted) (quoting *Weeks Marine*, 575 F.3d at 1361)). Further, TMM has demonstrated a non-trivial competitive injury because TMM was wrongly deprived of the opportunity to fairly compete for TRANSCOM's actual requirements under the GHC. *Id.*

Plaintiff National would also be a qualified bidder for any resolicitation whose direct economic interest has been affected by the unlawful cardinal change to the Contract. National is a qualified bidder because its subsidiaries provide relocation services across multiple markets and audiences, including providing military moves under the predecessor DP3. (ECF No. 37 ("National Compl.") at 1–2.) If TRANSCOM engaged in full and open competition as required by law, [redacted]. *Magnum Opus*, 94 Fed. Cl. at 531. Further, National has demonstrated a non-trivial competitive injury because National was wrongly deprived of the opportunity to fully and fairly compete for TRANSCOM's actual requirements under the GHC. *Id.*

### C. A Contracting Action Must Be Set Aside if it Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law.

An agency's action is judged under the standards in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The proper inquiry is whether, based on a preponderance of the evidence, the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

[redacted]

law." *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 412 (2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004)). The Court is to set aside an agency decision if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation of procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

To prevail on the merits, a protester also must demonstrate prejudice. Based on the nature of this case—where the Co-Plaintiffs allege that the Agency's unlawful actions have precluded their participation in a procurement competition for TRANSCOM's true requirements—the protesters must clear the "non-trivial competitive injury" prejudice standard advocated in *Weeks Marine*, 575 F.3d at 1361. As discussed below, Co-Plaintiffs have done so.

## V. THE AGENCY'S MODIFICATIONS TO THE GHC VIOLATED CICA AND WERE ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW

### A. TRANSCOM's Extension of the Transition Period and Shift to a "Conditions-Based Phase-In Approach" Are Out-of-Scope Modifications.

TRANSCOM nearly tripled the GHC's Transition Period and drastically changed the Phase-In requirements, among other significant changes. These modifications were beyond the scope announced in the Solicitation, violating CICA's requirement for full and open competition.

CICA requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a)(1); *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1204–05 (Fed. Cir. 1993). "Modifying an existing contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating in or competing for what should be a new procurement." *Ian*, 136 Fed. Cl. at 414. "Because CICA does not define whether a modification of an existing contract is beyond or within the scope of the original competitive procurement, the Federal Circuit has at times analogized to the cardinal change doctrine as the

[redacted]

test to ascertain whether the modification is in-scope or violates the competition requirements of CICA." *Id.* at 415 (citing *AT&T*, 1 F.3d at 1205). "A cardinal change occurs when the government effects an alteration to the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Id.* (quotations marks and ellipsis omitted.).

"In applying this concept to CICA, the Federal Circuit has held that the government cannot modify a contract to such an extent that the contract, as modified, is materially different from the contract that was originally competed." *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 106 (2004). When determining whether a modification "materially departs" from the scope of the original procurement, the Court should consider (1) "whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract" and (2) "whether the modification is of a nature which potential offerors would reasonably have anticipated." *Ian*, 136 Fed. Cl. at 416 (quotation marks omitted). The analysis "focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified." *AT&T*, 1 F.3d at 1205; *see also Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969) ("[e]ach case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and ***their cumulative effect*** upon the project as a whole.") (emphasis added).

1. <u>TRANSCOM's Modifications Substantially Changed the GHC's Work, Performance Period, and Price.</u>

TRANSCOM's 17 modifications since its award to HomeSafe have substantially changed the GHC's required work, performance period, and price. (*See* AR, Tab 272; *supra* § III.D.) The end result is a Contract that is materially different when compared to the Solicitation. The GHC today, as transformed by TRANSCOM, violates CICA.

[redacted]

*a. TRANSCOM Substantially Changed the Transition Requirements.*

TRANSCOM's modifications have substantially relaxed the time the GHC contractor must complete transition, turning what was to be an audacious 9-month period into an incredibly flexible almost 2.5 years. (*See supra* § III.D.) To be sure, standing up a successful IT system during the 9-month Transition Period and then being fully operational for complete global HHG relocation services over a 9-month period was no easy feat. In fact, the aggressive schedule was one of the core reasons [redacted]. (Decl. of [redacted] ¶ 7; Decl. of [redacted] ¶ 9.) But even though the Solicitation requirements were daunting, the Government highly valued an expedited transition that enabled TRANSCOM to roll out the GHC's expected benefits. Indeed, transition was such a vital part of the GHC program that TRANSCOM determined to scrutinize offerors' plans to meet the strict transition requirements as one of four equally weighted technical evaluation subfactors. (*See* AR, Tab 136 at 21149.) And as the record shows, multiple offerors were assigned deficiencies for not clearly committing to meeting the Appendix A mandates. (*See supra* § III.C.) Without question, an offeror's ability to successfully deploy an IT system during the 9-month Transition Period was of paramount importance.

As awarded, HomeSafe's Contract mirrored the Solicitation, requiring the company to complete transition within 9 months. (AR, Tab 211 at 35263, 35268; Tab 424a at 60260 (lifting the stop work order and merely shifting the 9-month Transition Period).) But just a few months before the Transition Period was supposed to end, TRANSCOM began moving the goal posts through a series of extensions: Modification 6 – 48 days; Modification 8 – 30 days; Modification 9 – 30 days; Modification 10 – 14 days; Modification 11 – 53 days; Modification 12 – 28 days. (*See supra* § III.D.) By the beginning of 2024, these extensions ballooned the

[redacted]

Transition Period by a cumulative ***204 days***, such that the extended transition was 175% of the originally contemplated 9-months. (*See* AR, Tab 362 at 59160.)

Then, in February 2024, TRANSCOM tore down the goal posts, casting aside the terms under which offerors competed to add an entire extra year to transition. Modification 13 extended the Transition Period through February 11, 2025, as well as added a $60 million CLIN for "Transition Services Phase 2" that would be performed concurrent with Base Period 1. (*See* AR, Tab 377 at 59247; *see also* Tab 380 at 59279; Tab 364 at 59176.) In other words, TRANSCOM solicited for an aggressive 9-month Transition Period but modified the Contract to a leisurely almost 2.5-year Transition Period—***310%*** of the time announced to GHC offerors. Unquestionably, in substantially changing the length of time the GHC contractor had to stand up its IT system and complete transition tasks, TRANSCOM materially departed from the Solicitation. *See Ian*, 136 Fed. Cl. at 416. Such a sea change warranted a new competition, and TRANSCOM's decision to fundamentally alter the Contract violates CICA. *See Glob. Computer Enters., Inc. v, United States*, 88 Fed. Cl. 350 (2009) (finding modification materially departed from scope of original procurement in violation of CICA); *W. Pilot Service; et al., B-415732 et al.*, Mar. 6, 2018, 2018 CPD ¶ 104 (sustaining protest where "service model" fundamentally changed; frequency of services changed from on-call to at least 75 days of performance at predetermined locations).

*b. TRANSCOM Substantially Changed the Phase-In Requirements.*

TRANSCOM also substantially changed the GHC's volume phase-in and DPM phase-in requirements by changing the risk calculus and shifting to a "conditions-based phase-in approach." This was very different from the Solicitation's explicitly defined and scheduled phase-in requirements.

[redacted]

As competed, the Solicitation stipulated a methodical, but unforgiving, approach to launching the GHC program: the contractor would have 5 months to take on all domestic moves and then 3 months to add international moves, along with a staggered schedule for DPM. (AR, Tab 140 at 21189–90.) But just a few months into performance, TRANSCOM floated the idea of "modifications to the current [phase-in] plan to ***minimize*** operational risk in order to ensure overall program success." (AR, Tab 430 at 60291.) A year later, after much back and forth between TRANSCOM and HomeSafe,[12] TRANSCOM shifted from the rigid, schedule-based Volume Phase-In Period in the RFP and adopted a more flexible "conditions-based phase-in approach." (AR, Tab 377; Tab 380 at 59281 (Modification 13).) TRANSCOM explained:

> GHC was initially awarded with a nine-month period for shipment phase-in, commencing immediately after transition. The contract stated the Government intended [to] start the first month of shipments with 25% of domestic move volume, followed by the second month with 50%, etc. ***This modification reflects the deliberate decision to shift from a time-definite schedule to a lower-risk, conditions-based phase-in approach with significantly lower volumes***.

(AR, Tab 375 at 59241.) Under the terms memorialized in Modification 13, TRANSCOM would dictate the volume of shipments that HomeSafe would receive, and HomeSafe would earn extra monthly payments depending on that volume. (AR, Tab 377 at 59247; Tab 380 at 59281.) Thus, instead of requiring the GHC contractor to meet increasing monthly thresholds on a defined schedule, as demanded by the Solicitation, TRANSCOM fundamentally changed the Contract such that HomeSafe did not have to meet any phase-in goals at all. (*See id.*) Moreover, Modification 13 altogether removed the transfer of shipment volume covered by various DPM contracts. (AR, Tab 80 at 59283.) That no longer appears to be a Contract requirement.

[12] *See, e.g.*, AR, Tabs 434 (HomeSafe Phase-In Change Proposal), 321 (TRANSCOM Response to Phase-In Change Proposal), 357 (HomeSafe PMO and IT Development Funding Proposal).

[redacted]

To reiterate, TRANSCOM deliberately modified the GHC's overarching risk strategy to performance, shifting from a fast-paced high-risk schedule that placed enormous risk and responsibility on the contractor to a low-risk schedule in which TRANSCOM bears substantially all the risk of delays and under-performance. Now, absent any contractual requirement ensuring that phase-in is completed under a specific timeline, there is no telling when GHC phase-in will be completed. Because the Solicitation contained exact deadlines with enumerated thresholds for the completion of domestic and international phase-in, TRANSCOM could not simply abandon this inflexible approach for the conditions-based approach deployed in Modification 13. See *Neil R. Gross & Co., Inc.*, B-237434, Feb. 23, 1990, 90-1 CPD ¶ 212 (sustaining protest challenging modification to court reporter contract; existing contract had 20-day delivery time for transcription, but modification required 3-day or 1-day delivery requirement, a change which protester argued "significantly increases the difficulty and, therefore, the cost of performance"); *cf. Treadwell Corp. v. United States*, 133 Fed. Cl. 371, 387 (2017) (finding schedule extension fell within the scope of the original procurement because the solicitation lacked specific deadlines). Thus, the wholesale relaxation of phase-in requirements was outside the scope of the original procurement. *See Cardinal Maint.*, 63 Fed. Cl. at 106–10.

2. TRANSCOM's Modifications Were Not of a Nature Which Offerors Would Have Reasonably Anticipated.

Not only were the modifications—individually and collectively—substantial, but they were also beyond prediction. Given the unambiguous and inflexible Solicitation terms, offerors could not have reasonably foreseen that TRANSCOM would so drastically change the GHC's transition and phase-in requirements. This Court explains that "[w]hether potential bidders would have anticipated a particular modification is judged under an objective standard and depends heavily on the language of the solicitation." *Ian*, 136 Fed. Cl. at 417 (internal citation

[redacted]

and quotation marks omitted). "The court must look at the 'totality of the change,' which is a fact-based determination." *IgniteAction JV, LLC v. United States*, 174 Fed. Cl. 62, 69 (2024) (citation omitted). "If a court ultimately finds a modification 'to be outside the reasonable expectations of the bidders, the government must show that it adequately advised the bidders that such a change might occur.'" *Ian*, 136 Fed. Cl. at 417 (internal quotations and citation omitted).

*a. The Solicitation did not contemplate the changes at issue.*

***First***, with respect to the **Transition Period**, offerors could not have reasonably anticipated that the awardee would have more than 9 months. Again, the Solicitation defined the Transition Period as occurring December 2021 through August 2022, a 9-month period. (AR, Tab 140 at 21187.) Nothing in the Solicitation suggested offerors could propose a lengthier Transition Period. (*See id.*) To the contrary, the Solicitation required offerors to submit Transition Plans demonstrating how the offeror would "accomplish transition requirements . . . tak[ing] into consideration the parameters provided in PWS paragraph 1.2.9 and Appendix A. . . ." (AR, Tab 136 at 21143.) The PWS hammered this home, mandating that the contractor "shall perform transition" in accordance with its Transition Plan. (AR, Tab 134b1 at 21093.) Based on the Solicitation language, offerors understood that transition, to include standing up the IT system, had to be completed in 9 months and that the GHC contractor bore all the risk of an unsuccessful transition. (*See id.*)

Offerors had no reason to anticipate that TRANSCOM could abandon the Solicitation's rigid Transition Period, let alone ***tripling*** it to nearly 2.5 years, as well as adding additional fees for transition services. (*See* AR, Tab 377 at 59247.) Quite simply, this flexibility was foreign to a Solicitation in which daunting transition parameters were central. (*See, e.g.*, AR, Tab 136 at 21149; Tab 140 at 21187.) TRANSCOM's extended transition was not of a nature that

[redacted]

offerors could have foreseen. *Ian*, 136 Fed. Cl. at 424 (potential offerors could not have anticipated from terms of solicitation government's modification to resulting contract).

***Second***, with respect to the **Volume Phase-In Period**, GHC offerors could not have reasonably expected that TRANSCOM would jettison the rigid, risky schedule. The Solicitation specified the volume threshold the GHC contractor was required to assume each month and a precise timeline to complete domestic and then international phase-in. (*See* AR, Tab 140 at 21189–90.) The Solicitation was unequivocal: "***The Contractor shall be operational and able to begin performance [no later than] the specified timelines***." (*Id*. at 21189.) There was no caveat that permitted TRANSCOM to disregard the Appendix A parameters. While Appendix A accommodated "shifting" the Volume Phase-In Period to avoid phase-in during peak relocation, (*id*. at 21187), the Solicitation did not permit extensions of the Phase-In Period nor permit offerors to phase in less volume than required by the schedule. (*See generally id*.) Likewise, with respect to DPM shipments, Appendix A only advised that the phase-in dates were "estimated dates"—not that they were optional work scope. (*Id*. at 21190.)

Without flexibility built into the Solicitation, offerors could not have anticipated that TRANSCOM would abandon the 8-month phase-in schedule and monthly volume thresholds to adopt an approach where the GHC contractor's obligations would be determined based on conditions not mentioned in the Solicitation. Indeed, TRANSCOM did not even create the plan for the "Conditions-Based Phase-In," which provides factors TRANSCOM should consider when making ordering decisions, until August 21, 2024, nearly ***5 years*** after proposals were due under the Solicitation and ***6 months*** after adopting the conditions-based approach in Modification 13. (*See* AR, Tab 405.) Nor did anything in the Solicitation hint that DPM phase-in was optional. Thus, TRANSCOM's modifications to the Phase-In Period were not of the nature offerors would have reasonably anticipated. *See Ian*, 136 Fed. Cl. at 417; *cf.*

[redacted]

*CWT/Alexander Travel Ltd. v. United States*, 78 Fed. Cl. 486, 495 (2007) (finding 2-year delay of base period was not a cardinal change because "the solicitation did not specify a definite start date for commencement of performance or specific dates between which the base performance period had to be completed"; the Court concluded that "[w]here flexibility has been incorporated into the solicitation, the court must respect that determination.").

*b. TRANSCOM holds a mistaken view that the modifications were permissible.*

During performance, TRANSCOM took the position that its sweeping changes were contemplated by the Solicitation. The Government maintained that it was "within its rights under an IDIQ contract to control the ordering"; that it "advertise[d] to the Offerors that the Government had the authority to revise the volume phase-in schedule"; and that the Appendix A reference that TRANSCOM "intends" to phase in the relocation services as stipulated somehow gave the Agency carte blanche to fundamentally alter the nature of the Phase-In Period. (AR, Tab 321 at 58951–52.) TRANSCOM is incorrect.

On this point, TMM and National concur with HomeSafe that the changes reflect "significant deviations in the contract scope" and that TRANSCOM's position was misinformed. (AR, Tab 357 at 59126.) As HomeSafe correctly articulated:

> The Contract requires TRANSCOM to provide 100% of its HHG moves to HomeSafe by 1 May 2024 after an 8-month phase-in period where HomeSafe would receive a guaranteed percentage of moves (increasing increments of 25% for 4 months for CONUS followed by the same OCONUS). . . . Therefore, ***HomeSafe is required to service and TRANSCOM is required to order moves in accordance with Appendix A***.

(AR, Tab 434 at 60325.) And particularly pertinent here, HomeSafe elaborated:

> ***TRANSCOM never communicated its interpretation during bidding*** that it could extend the Phase-In period by 12 months and reduce the guaranteed percentage of moves because the Phase-In

[redacted]

> period is an IDIQ type and that the Government had no intent on being bound by the Phase-In requirements in Appendix A. Even if TRANSCOM held this undisclosed subjective and unreasonable interpretation of the Contract at the time of award, TRANSCOM's failure to communicate its interpretation to HomeSafe ***pre-award*** renders this surprising interpretation "irrelevant in interpreting contract language."

(*Id*. at 60327 (citations omitted) (second emphasis in original).)[13]

The Government's position—that "[n]othing in Appendix A, or the contract overall, is binding on the Government to transfer responsibility" as stipulated under the phase-in schedule—is erroneous for several additional reasons. (*See* AR, Tab 321 at 58951.)

***First***, TRANSCOM's focus on the IDIQ nature of the procurement runs contrary to this Court's precedent. HomeSafe's January 2024 response to TRANSCOM highlighted a case that is instructive. (*See* AR, Tab 368 at 59205–07.) In *Vanquish Worldwide, LLC v. United States*, this Court rejected TRANSCOM's argument that it had satisfied its ordering obligations under an IDIQ once it met the minimum order requirement where the contract contained separate and independent contractual ordering obligations. 147 Fed. Cl. 390, 399 (2020). Specifically, the court determined that "USTRANSCOM was not free to ignore the [ordering] requirement once the [minimum order requirement] was satisfied." *Id.* (citing *Cmty. Consulting Int'l*, ASBCA No. 53489, 02-2 BCA ¶ 31,940 (explaining that "[w]hile the minimum quantity represents the extent of the Government's purchasing obligation ... it does not constitute the outer limit of all of the Government's legal obligations under an indefinite quantity contract").) Accordingly, separate

[13] Additionally, HomeSafe explained that this language was a commitment and implicated TRANSCOM's duty of good faith and fair dealing under the Contract. (AR, Tab 368 at 59205.) HomeSafe argued that it "reasonably expected [TRANSCOM] to honor its commitment. If USTRANSCOM were to abandon the phase-in schedule and the transition to a single-move manager HomeSafe would be deprived of the benefit of its bargain." (*Id.*)

[redacted]

from the IDIQ minimum, TRANSCOM had an additional obligation to adhere to the phase-in schedule as outlined in the Solicitation. *See id*. HomeSafe accurately observed:

> As was true of the contract at issue in *Vanquish Worldwide*, USTRANSCOM's contract with HomeSafe imposes on USTRANSCOM a contractual requirement to transition relocation services to HomeSafe in accordance with specific percentages separate and apart from the minimum order obligation.

(AR, Tab 368 at 59206.) TRANSCOM violated this contractual obligation, and CICA, when it issued an out-of-scope modification to the phase-in approach.

***Second***, even if the Court were to adopt TRANSCOM's strained interpretation that it had no ordering obligations beyond the IDIQ's minimum, (AR, Tab 321 at 58951), the Solicitation still mandated that the GHC contractor handle the move volumes and timeline outlined in the phase-in schedule. (*See* AR, Tab 140 at 21189.) Appendix A made clear that "[t]he Contractor ***shall*** be operational and able to begin performance [no later than] the specified timelines." (*Id*.) This was a material requirement of the Solicitation. Indeed, as HomeSafe pointed out:

> HomeSafe has consistently advised USTRANSCOM that the contract's volume phase-in approach setting forth a specified percentage of all moves to be placed with HomeSafe in accordance with the transition schedule is binding upon the Government and may not be ignored simply because the minimum ordering requirement under the IDIQ contract has been met.
>
> [T]he Performance Work Statement and Appendix A of the contract establish USTRANSCOM's express contractual commitment to transfer responsibility for "complete, global HHG relocation services" to HomeSafe.

(AR, Tab 368 at 59204.) In other words, offerors still bid on the Contract under the expectation that the contractor would be required to assume responsibility for 400,000 annual moves in an 8-month period.

[redacted]

***Finally***, to the extent there is confusion regarding whether TRANSCOM was permitted to disregard the parameters in Appendix A, then the Solicitation was latently ambiguous. A latent ambiguity is "a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *CGS-SPP Sec. Joint Venture v. United States*, 158 Fed. Cl. 120, 130 (2022). More to the point, "Courts apply the general rule of *contra proferentem* 'to construe ambiguities against the drafter." *Id*. Thus, TRANSCOM's interpretation cannot carry the day. Either way, this Court should adopt Co-Plaintiffs' (and HomeSafe's) interpretation that TRANSCOM and the GHC contractor were required to conduct phase-in as specified in the Solicitation, and that the procurement did not provide for the unbounded discretion that TRANSCOM points to. On this record, the Court should find that the sweeping changes to the Contract were not contemplated by the Solicitation, and thus not reasonably foreseeable by offerors. *Ian*, 136 Fed. Cl at 425.

* * *

In sum, a comparison of the Solicitation with today's version of the Contract proves that TRANSCOM has substantially changed the GHC's work, performance period, and price. When considering the totality of the changes and how those changes have fundamentally shifted the risk paradigm that was both central to the competition and a major barrier to prospective competitors, TRANSCOM has materially departed from the requirements of the Solicitation as originally competed and the modifications were not of a nature which potential offerors could have reasonably anticipated. *See IgniteAction JV*, 174 Fed. Cl. at 69. Accordingly, TRANSCOM has enacted a cardinal change to the Contract in violation of CICA, which was arbitrary, capricious, and contrary to law. The Court must sustain the protest.

[redacted]

**B. TMM and National Suffered Competitive Prejudice.**

If the agency action is found to be unlawful or otherwise irrational, the protester must also show that it was harmed. *See Weeks Marine, Inc.*, 575 F.3d at 1365. When a plaintiff protests an alleged illegality with respect to a "'proposed procurement,'" as Co-Plaintiffs allege here, "there is ordinarily 'no factual foundation for a but for prejudice analysis.'" *Magnum Opus*, 94 Fed. Cl. at 530 (quoting *Weeks Marine*, 575 F.3d at 1361) (internal quotations omitted). "[T]he court cannot, therefore, assess whether 'but for' a Government error, the plaintiff had a substantial chance of receiving a contract." *Id.* (quoting *Weeks Marine*, 575 F.3d at 1362.) The appropriate prejudice inquiry in such a protest, like here, "is whether the plaintiff has demonstrated a 'non-trivial competitive injury which can be redressed by judicial relief.'" *Id.* (quoting *Weeks Marine*, 575 F.3d at 1362.) Here, both TMM and National have suffered competitive injury from TRANSCOM's arbitrary decision to materially change the scope of the GHC, in violation of CICA.

TMM suffered a competitive injury because the Solicitation's arduous transition and phase-in requirements [redacted]. (Decl. of [redacted] ¶ 7.) Again, as competed, the GHC contractor was expected to stand up a complex IT system and complete transition tasks in 9 months, and then take on nearly all relocation services over the next 9 months. (AR, Tab 140 at 21187, 21189–90.) The rigorous schedule was [redacted]. (Decl. of [redacted] ¶ 7.)

However, the Government's requirements are now fundamentally different than the ones solicited. TRANSCOM thus should have ended its contract with HomeSafe and solicited for its substantially changed requirements. Had TRANSCOM competed the changed GHC requirements through full and open competition, as required by law, [redacted]. (*Id.* at 4.) TMM, [redacted]

[redacted]. (*Id.*) Thus, TRANSCOM's out-of-scope modifications to the Contract prejudiced TMM by depriving it of the opportunity to fully compete for the GHC. (*Id.* at 5); *see Piedmont Propulsion Sys., LLC v. United States*, 167 Fed. Cl. 72, 89 (2023) (finding prejudice in pre-award protest because "[b]ut for the inclusion of that restrictive requirement" in the solicitation, the protester "would have been able to compete for award of the propeller system repair contract").

National also suffered a non-trivial competitive injury and was prejudiced by TRANSCOM's arbitrary and capricious modifications. [redacted] because of the Solicitation's aggressive and seemingly inflexible transition schedule. (Decl. of [redacted] ¶ 9.) Had National known that TRANSCOM's actual requirements accommodated an extended transition (with additional funding and the support of a Tiger Team) and modified phase-in approach, [redacted] (*Id.* at 5.) If TRANSCOM competed the new GHC requirements, [redacted]. (*Id.* at 6.) Thus, National was prejudiced by TRANSCOM's violation of CICA and suffered a non-trivial competitive injury because it was deprived of the opportunity to fully and fairly compete for the GHC. (*Id.*); *see Mangum Opus*, 94 Fed. Cl at 531; *see also Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 169 (2012) ("Although [protester] was not guaranteed an award of the contract, rejection of its proposal denies it the opportunity to compete and any chance of receiving the award. ***The wholesale rejection from consideration is not a trivial injury***.").

[redacted]

## VI. INJUNCTIVE RELIEF IS WARRANTED

In addition to declaratory judgment in its favor, TMM and National are entitled to injunctive relief. The Court should issue a permanent injunction requiring TRANSCOM to cease performance under its unlawfully modified contract with HomeSafe and resolicit its modified global household goods relocation requirements.

To obtain permanent injunctive relief, a protestor must show that: "(1) it prevailed on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the balance of hardships weighs in favor of granting injunctive relief; and (4) injunctive relief is in the public interest." *Zolon PCS II, LLC v. United States*, 172 Fed. Cl. 742, 761 (2024) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). No one factor is dispositive and the "weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Co-Plaintiffs have satisfied all injunctive relief factors.

***First***, TMM and National should succeed on the merits. As detailed above, the Agency acted contrary to law when it fundamentally changed the nature of the Contract in violation of CICA. TRANSCOM's actions were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus satisfying the first element.

***Second***, TMM and National will suffer irreparable harm if TRANSOM is permitted to continue performance under the GHC. Most notably, Co-Plaintiffs will be deprived of the opportunity to compete fairly for the altered Contract and its substantially relaxed transition and phase-in requirements. "[W]hen a plaintiff shows that it was excluded from the bidding process, perhaps solely because of the government's improper conduct, the plaintiff has satisfied requirement for irreparable injury." *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. at 110; *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011) (acknowledging that

[redacted]

"the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury").

If performance under GHC is not enjoined and the modified work scope not resolicited, TMM and National will have lost out on a monumental business opportunity to provide relocation services to servicemembers and their families, not to mention the revenue and experience that comes with performance under this ten-year, nearly $20 billion procurement. *See IgniteAction*, 174 Fed. Cl. at 72 ("The fact that IgniteAction will lose *any* opportunity to participate in a competitive procurement process for the bridge contract is enough to show irreparable harm." (emphasis in original)). An injunction mandating solicitation of the Agency's actual requirements therefore is necessary to prevent permanent harm to TMM and National.

***Third***, the balance of hardships also heavily favors suspending performance and mandating resolicitation of the altered requirements. This Court "tends to weigh the balance of hardships factor in favor of the protester who has succeeded on the merits, unless specific facts counsel otherwise." *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 696 (2012). Again, TMM and National have established that continued performance of GHC violates the law.

Moreover, an injunction barring the Agency from proceeding with its arbitrary and unlawful Contract will not cause overwhelming hardship to the Agency. True, TRANSCOM will need to recompete the procurement, which will "cost the government some money and effort." *See Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. at 110. But TRANSCOM is at an inflection point: Minimal moves have occurred under GHC, and performance faces continued headwinds.[14] In the meantime, TRANSCOM's legacy DP3 program is still the widely

---

[14] As of December 4, 2024, HomeSafe had only completed 330 deliveries under GHC. (*See* ECF No. 35-12 (Dec. 5, 2024, TRANSCOM Press Release) at 3.) Additionally, military families have [redacted]

used program for military moves and performance under DP3 has substantially improved according to recent satisfaction scores.[15] That is to say, TRANSCOM has a viable alternative to GHC while it reassesses and resolicits for its next generation procurement approach. Conversely, absent an injunction, TMM and National will experience the hardship of being unfairly precluded from competing for the relaxed GHC work scope. Thus, the balance of hardships weighs in favor of a permanent injunction.

***Lastly***, the public interest weighs in favor of injunctive relief. "There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 158 (2020) (quotation marks omitted). "The public interest is, without doubt, served by ensuring that government officials follow applicable procurement statutes and regulations." *Magnum Opus*, 94 Fed. Cl. at 551 (2010). Here, the public's interest in

---

been extremely dissatisfied with the GHC, petitioning Congress to make changes. *Military Families Forced to New PCS Contract Amid Diminishing Self Move Rates*, Change.org, PBC (Jan. 6, 2025), https://www.change.org/p/military-families-forced-to-new-pcs-contract-amid-diminishing-self-move-rates. Military families highlight that the GHC has drastically lowered the reimbursement that families who elect to move themselves receive under a personally procured move ("PPM"). *See id.* The petition explains: "Instead of incentivizing the ability for families to move themselves, the military is trying to financially force families into using a program they have spent $20 billion on that has already seen numerous issues (no origin agents to pick up, delays, lack of program participation, asking families to pack themselves for what should be a full service move) since they began moving shipments in April 2024." (*Id.*)

Further, the House Committee on Armed Services has directed GAO to brief the Committee on the GHC, including implementation deficiencies and challenges, servicemember experience, and how the GHC's cost and performance compares to DP3. H.R. Rep. No. 118-529, at 122 (2d. Sess. 2024). And TRANSCOM is required to testify on the GHC later this year. Chairman of H.R. Comm. on Armed Services and Chairman of S. Comm. on Armed Services, 118th Cong., Joint Explanatory Statement to Accompany the Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025 (Comm. Print 2024). Suffice to say, GHC faces continued congressional scrutiny.

[15] *2024 Defense Personal Property Program Metrics*, USTRANSCOM, https://www.ustranscom.mil/dp3/tspinformation.cfm (last accessed Jan. 17, 2025).

[redacted]

maintaining the integrity of the procurement requires that TRANSCOM be enjoined from further performance under GHC. Continued performance of the unlawful Contract is precisely the type of arbitrary and capricious conduct that has the capacity to "destroy the public trust in government contracting." *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 246 (2012).

On this record, granting TMM and National's requests for a permanent injunction would further the public interest. Because the public's interest lies in "preserving the integrity and fairness of the procurement process," this factor supports an injunction. *CGS-SPP Sec. Joint Venture*, 158 Fed. Cl. at 135 (quotation marks omitted).

## VII. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Co-Plaintiffs request that the Court GRANT their Joint Motion for Judgment on the Administrative Record; enter judgment in Co-Plaintiffs' favors declaring that TRANSCOM's actions amounted to a cardinal change that violated CICA and were thus arbitrary, capricious, can contrary to law; issue a permanent injunction ordering TRANSCOM to end performance under the unlawful Contract, and remand the matter to TRANSCOM to re-compete its revised requirements using full and open competition, including issuing a revised solicitation that accurately reflects TRANSCOM's needs; and grant such other and further relief as the Court deems just and proper.

Dated: January 17, 2025

Respectfully submitted,

/s/ *Noah B. Bleicher*
Noah B. Bleicher (Counsel of Record)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6063
*nbleicher@jenner.com*

*Of Counsel*

Moshe B. Broder
Jennifer Eve Retener
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

*Counsel for Total Military Management, Inc., and National Holding Company, Inc.*

[redacted]