**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

NATIONAL HOLDING COMPANY, INC.,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

REDACTED VERSION

Case No.: _________________

**FILED WITH MOTION TO SEAL**

## BID PROTEST COMPLAINT

Plaintiff National Holding Company, Inc. ("National"), by its undersigned counsel, files this Complaint for declaratory and injunctive relief against the United States. National challenges the Department of Defense ("DOD"), U.S. Transportation Command's ("TRANSCOM" or "Agency"), out-of-scope modification to Contract No. HTC711-22-D-R002, which is referred to as the Global Household Goods Relocation Contract ("GHC" or "Contract"). TRANSCOM awarded the Contract to HomeSafe Alliance, LLC ("HomeSafe") more than three years ago, but the Agency has materially departed from the original procurement's demanding transition requirements, and in doing so, improperly circumvented the statutory requirements for competition.

## PARTIES

1. Plaintiff National, based in Broadview, Illinois, is the parent company of several subsidiaries that each provide relocation services to different markets and multiple audiences. (Exh. 18, Decl. of [redacted] ¶ 2.) Subsidiary National Van Lines ("NVL") provides domestic relocation services by offering both van line and move managing services to corporate accounts, individual private transferees, and non-DOD civilian government agencies. (*Id.* ¶ 3.) Since its [redacted]

founding nearly 100 years ago, NVL has evolved into a full-service moving company providing the best residential, commercial, warehouse, storage, and other moving services to its customers. (*Id.*) NVL performs around 5,000 shipments per year. (*Id.*) Subsidiary National Forwarding Co., Inc. ("NFC"), provides international relocation services for NVL, as well as both domestic and international relocation services for servicemembers under the predecessor to GHC, the Defense Personal Property Program ("DP3"). (*Id.* ¶ 4.) NFC's operations are dedicated to meeting the unique needs of military service members and providing the highest quality of customer service. (*Id.*) NFC is currently one of the largest participants in DP3, managing over 80 companies and performing around 15,000 domestic and 5,000 international shipments per year. (*Id.*) NFC is responsible for 10% of domestic moves under DP3. (*Id.*) Additionally, National owns 20 transportation providers actively participating in the DP3 program. (*Id.*) National also owns National Claims Services, Inc. ("NCS"), which specializes in military claims by handling customer negotiations, data entry, and settlements. (*Id.* ¶ 6). Additionally, National owns Mighty Moving & Storage ("Mighty Moving"), which provides comprehensive moving, warehousing, and storage services for local and long-distance commercial and residential moves. (*Id.* ¶ 7.) Through these entities, National has unmatched experience in both managing and executing complex military moves. (*Id.* ¶ 8.)

2. Defendant is the United States of America, acting by and through TRANSCOM. TRANSCOM provides DOD with air, land, and sea transportation. TRANSCOM is also responsible for moving and shipping services for DOD personnel.

**JUSTICIABILITY**

3. This Court has subject matter jurisdiction over this bid protest, and venue is proper, pursuant to 28 U.S.C. § 1491(b), because National alleges violations of law and arbitrary

[redacted]

action in connection with a procurement. *See Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (affirming that § 1491(b) provides a "broad grant of jurisdiction"); *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (explaining that "procurement or proposed procurement" as used in § 1491(b) "includes all stages of the process of acquiring goods or services" (citation omitted)).

4. Once this Court's bid protest jurisdiction attaches, the Court has broad statutory authority to "award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

5. National is an interested party with standing to maintain this action under 28 U.S.C. § 1491(b). *See CW Gov't Travel, Inc. v. United States*, 163 Fed. App'x 853, 856 (Fed. Cir. 2005). TRANSCOM's unlawful and arbitrary actions set forth herein cause National injury in fact that is likely to be redressed by a favorable judicial decision. Specifically, National is a qualified bidder whose direct economic interest has been affected by the unlawful "cardinal change" to the Contract. If TRANSCOM engaged in full and open competition as required by the law, National [redacted]. Thus, National protests an illegality with respect to a procurement and has demonstrated a non-trivial competitive injury because National was wrongly deprived of the opportunity to fully and fairly compete. *See Magnum Opus Techs., Inc. v. United States*, 94, Fed. Cl. 512, 531 (2010). "A deprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing." *Id.* at 533.

[redacted]

## FACTUAL ALLEGATIONS

### A. The GHC Procurement

Solicitation Background

6. On September 13, 2019, TRANSCOM issued Request for Proposals No. HTC711-19-R-R004 ("Solicitation" or "RFP") seeking proposals for the GHC. The Solicitation contemplated the award of a single indefinite-delivery, indefinite-quantity ("IDIQ") contract, on a best-value basis, to provide global household goods relocation services for members of the U.S. military and their families. (Exh. 1, RFP[1] at 9, 10.)

7. TRANSCOM anticipated that the GHC procurement would replace its predecessor relocation services program, DP3, under which TRANSCOM contracts with numerous TSPs to perform military moves and storage services. By awarding to a single contractor, TRANSCOM planned a sweeping consolidation from the predecessor DP3 program, which was supported by over 900 entities. (*See* Exh. 5, Movement of Household Goods: DOD Should Take Additional Steps to Assess Progress Towards Achieving Program Goals, GAO-20-295 at 4 (Apr. 2020).) In other words, the purpose of the GHC was to have a single contractor manage all military relocations for the foreseeable future.

8. Relevant here, the Solicitation contemplated a 9-month transition period, a 3-year base period, three 1-year option periods, two 1-year award terms, and an option to extend the contract for 6 months. (Exh. 1, RFP at 3–7, 25.) Thus, the total effort spanned nearly a decade, but transition was limited to 9 months.

[1] Unless otherwise specified, all citations to the Solicitation are to Amendment 9, which finalized the Solicitation's instructions and evaluation criteria.

[redacted]

The GHC Transition and Volume Phase-In

9. Transition was critically important given the enormous undertaking of consolidating more than 900 geographically dispersed contractors to a single contractor managing all military moves. The contractor was to assume complete responsibility of all TRANSCOM domestic and international household moving requirements following an aggressive Transition period and Volume Phase-In period, which were described in Appendix A, Transition & Phase-In Phase-Out Plan.

10. As originally awarded, the Transition period was to span 9 months (between October 1, 2021 through June 30, 2022) and thereafter the Volume Phase-In period would begin on September 1, 2022 (after the summer busy season) and conclude by May 1, 2023. (Exh. 2, RFP Amend. 12, App'x A at A-1–A-4.) Meeting these deadlines was a threshold requirement for the GHC competition. Offerors were required to submit a Transition Plan that clearly identified "activities required and the timeframe for accomplishing each Performance Work Statement (PWS) requirement to begin contract performance, in accordance with the parameters [in Appendix A]." (*Id.* at A-1.)

11. During the 9-month **Transition Period**, the contractor was to perform a range of complex technical tasks to stand up a fully compliant and integrated solution, particularly in developing compliant and fully integrated information technology ("IT") systems. (*See id.* at A-1–A-2.) This included personnel administration; developing compliant information systems; fully integrating the contractor's IT system with Government-managed IT systems and being able to accept task orders no later than contract base period start date; fully integrating the contractor's invoicing system with Government-managed invoicing systems; developing a compliant shipment management IT system no later than contract base period year one start date;

[redacted]

and conducting a range of IT security audits, penetration testing, and training, among other requirements. (*Id.*)

12. The contractor also was expected to submit monthly Transition Reports to the contracting officer detailing the contractor's progress toward accomplishing the tasks necessary to begin full performance. (*Id.* at A-2.)

13. The **Volume Phase-In Period** would involve the Government transferring responsibility for "complete, global HHG relocation services" under a phased approach. (*Id.* at A-3.) The Solicitation materials were unequivocal that the contractor "shall be operational and able to begin performance [no later than] the specified timelines." (*Id.*)

14. The Solicitation dictated consecutive schedules for domestic and then international relocations. Specifically, beginning September 1, 2022, and continuing each month toward December 1, 2022, the contractor was required to meet progressive thresholds of responsibility for the domestic service areas listed in the Solicitation, such that the first month required a minimum of 25%, the second month 50%, the third month 75%, until achieving 100% in the fourth month. (*See id.* at A-3–A-4.) By January 1, 2023, the contractor was also required to assume responsibility for 100% of domestic household goods, unaccompanied baggage, and short-term storage or storage-in-transit ("SIT"). (*Id.* at A-4.)

15. After transferring full responsibility for domestic relocation services in a 5-month period, the procurement contemplated a similarly demanding progression for transfer of responsibility for international relocation services. (*Id.* at A-4.) Beginning on February 1, 2023, and continuing for four months, the contractor was required to progress a minimum of 25% each month until 100% of all international service areas was reached on May 1, 2023. (*See id.*) In other words, within the 9 months between September 2022 and May 2023, the GHC contractor

[redacted]

would rapidly assume full responsibility for all domestic and international service areas—support [redacted], among others, on the DP3 program.

16. In addition to the domestic and international volume phase-in discussed above, the Agency would transfer responsibility for shipment volume currently performed by various worldwide Direct Procurement Method ("DPM") contracts. (*Id.* at A-4.) In this regard, the Solicitation identified a series of specific military installations worldwide and identified dates certain by which time the contractor must complete phase-in and assume shipment volume responsibility. (*See id.* at A-4–A-8.)

17. Getting the Contract underway without delay or disruption was critical to GHC program success. Thus, the Solicitation included an evaluation criterion focused on the offerors' approaches to meet the arduous Transition and Volume Phase-In requirements. In evaluating proposals under the RFP's Transition/Volume Phase-In subfactor, TRANSCOM scrutinized how the offeror would "accomplish transition requirements according to the elements required by" the Solicitation instructions for Transition and Volume Phase-In. (*See* Exh. 1, at 11.) These requirements specifically included "implementation and transition for establishment of successful IT system connections between the Offeror's IT system and the Government's system," as well as the "timelines to be fully operational for complete global HHG relocation services. . . ." (*Id.* at 5–6.)

**B. National's Experience and Participation in the GHC Competition**

18. The Solicitation's aggressive transition timelines and demanding IT requirements precluded National from bidding on its own.

[redacted]

19. National's portfolio of companies includes several moving entities, each devoted to providing relocation and storage services to different markets and multiple audiences. (Exh. 18, Decl. of [redacted] ¶ 2.)

20. National's subsidiary, NVL, provides van line and move managing services to provide domestic relocation services to non-DOD civilian government agencies. (*Id.* ¶ 3.) NVL has agents across the country who provide their local expertise to ensure seamless, personalized, and stress-free moves. (*Id.*) NVL is a full-service moving company that performs around 5,000 shipments per year. (*Id.*)

21. National actively supports the DP3 program through its subsidiary NFC, which provides domestic and international relocation services for military servicemembers and their families. (*Id.* ¶ 4.) NFC is also responsible for handling NVL's international relocation services for commercial and non-DOD civilian government employees. (*Id.*) NFC's operations are dedicated to meeting the unique needs of military servicemembers and providing the highest quality of customer service. (*Id.*) NFC is currently one of the largest participants in DP3, managing over 80 companies and performing around 15,000 domestic and 5,000 international shipments per year. (*Id.*) NFC is responsible for 10% of all domestic moves under DP3. Additionally, NFC controls 20 transportation service providers ("TSPs") actively participating in the DP3 program today. (*Id.*) NFC's providers have some of the highest customer satisfaction ratings on DP3, exceeding TRANSCOM's reported average customer satisfaction surveys for both domestic and international moves. (*Id.*)

22. Both NVL and NFC are 100% employee owned, ensuring stability of ownership and continuity of management. (*Id.* ¶ 5.)

[redacted]

23. National also owns NCS, which specializes in military claims. (*Id.* ¶ 6.) Since 1991, NCS has been the industry leader in the settlement of military household goods loss and damage claims. (*Id.*) NCS settle claims for its DP3 customers by efficiently handling all customer negotiations, data entry, arrangement of furniture repair estimates and inspections, and settlement packages. (*Id.*) NCS also advises other TSPs on how to successfully settle claims with their customers. (*Id.*)

24. Mighty Moving is also part of National's portfolio. (*Id.* at ¶ 7.) Mighty Moving provides comprehensive moving, warehousing, and storage services for local and long-distance commercial and residential moves. (*Id.*) Mighty Moving offers efficient and reliable moving services for individuals, families, and businesses. (*Id.*)

25. Through these entities, National has unmatched experience in both managing and executing complex military moves. (*Id.* ¶ 8.) Indeed, National has experience in every aspect of the moving process and has built a reputation for honesty, transparency, and excellence. (*Id.*) As National continues to grow, National remains dedicated to innovation, service excellence, and building strong partnerships to offer customers the best moving experience possible. (*Id.*).

26. Beyond having the relocation expertise, experience, and capabilities, National also understood the time and resources necessary to develop the specific IT solution required for GHC. (*Id.* at ¶ 10.) [redacted]. (*Id.*) [redacted] (*Id.*) Additionally, [redacted]

[redacted]

[redacted] (*Id.*) The GHC Solicitation required the contractor to develop a customer-facing application that customers could use to manage their moves. (*Id.*; *see* Exh. 1, RFP at 6.) TRANSCOM, however, has long discouraged DP3 contractors from developing technology to interact with the customer. (Exh. 18, Decl. of [redacted] ¶ 10.) Instead, TRANSCOM strictly requires TSPs to communicate using only standard channels such as email and phone communications. (*Id.*)

27. Even though National has unmatched moving experience though its diverse moving operations and [redacted] (*Id.* ¶¶ 9–10.) [redacted]. (*Id.* ¶ 10.) Thus, [redacted]. (*Id.* ¶ 11). [redacted], timely submitted a proposal by the December 23, 2019, due date.

**C. Contract Award and Bid Protests**

28. The GHC award was the subject of several highly contested bid protests before the Government Accountability Office ("GAO") and the U.S. Court of Federal Claims. These protests delayed the beginning of transition.

29. In May 2020, TRANSCOM initially attempted to award the Contract to a company named American Roll-On Roll-Off Carrier Group ("ARC"), but those awards were

[redacted]

scuttled by multiple successful GAO protests. Eventually, following an evaluation of revised proposals, the Agency changed course and selected HomeSafe as the best-value offeror and awarded the company Contract No. HTC711-22-D-R002 on November 4, 2021. (Exh. 6, HomeSafe Award Notice). HomeSafe's total evaluated price was $17,908,768,040, and as re-awarded, the period of performance was to run from December 1, 2021, to August 31, 2025. (*Id.*)

30. HomeSafe's award was the subject of additional bid protest activity by CGSL and ARC, first at GAO and then at COFC. On March 3, 2022, GAO denied the protests. *Connected Global Sols., LLC*, B-418266.10, .12, Mar. 3, 2022, 2022 CPD ¶ 74; *Am. Roll-On Roll-Off Carrier Grp.*, B-418266.9, .11, Mar. 3, 2022, 2022 CPD ¶ 72. Upon issuance of the GAO decisions, the mandatory stay of performance was lifted and the transition period commenced.

31. ARC and CGSL next turned to COFC. In response to the protest complaints, TRANSCOM implemented a voluntary stay of performance on March 23, 2022, thus pausing the transition period after only three weeks. (Exh. 7, Mar. 23, 2022, TRANSCOM Press Release.) The Court denied the protests on October 28, 2022. *See Connected Glob. Sols., v. United* States, 162 Fed. Cl. 720 (2022).

**D. GHC Transition and Volume Phase-In**

Contract Transition and Phase-In Requirements

32. Following the Court's denial of the protests, TRANSCOM reinitiated HomeSafe's transition under the Contract.[2] (Exh. 8, Oct. 28, 2022, TRANSCOM Press Release.) TRANSCOM wasted no time in relaxing the rigorous transition requirements.

[2] TRANSCOM briefly started transition in March 2022 in the 19-day interim period between the denial of the GAO protest and the beginning of the COFC protest.

[redacted]

33. The Agency first modified the Contract to extend the RFP's initial 9-month transition period by 73 days, resulting in a transition period of nearly 1 year. (Exh. 3, HomeSafe GHC Contract at 5.) As modified, the extended transition period was scheduled to end on September 30, 2023, (*id.*), which meant that phase-in was scheduled to start on October 1, 2023.[3] (Exh. 4, Contract App'x A. at A-3.) Even with the expanded transition period, the Contract still contemplated that phase-in for domestic services would take place within a 5-month time period from October 1, 2023, through February 1, 2024, and phase-in for international services would take place within a 4-month time period from March 1, 2024, through June 1, 2024. (*Id.* at A-3–A-4.)

34. Moreover, although the RFP specified phase-in dates for the DPM portion of transition, TRANSCOM entirely removed these dates from the Contract. The Agency, instead, committed to "identify revised GHC Phase-In Dates for DPM locations in a forthcoming modification." (*Id.* at A-4.) This was just the first of many times TRANSCOM moved the goalposts.

TRANSCOM Doubles the GHC Transition Period through an Out-of-Scope Modification

35. Beginning in September 2023, when the transition period was supposed to end, TRANSCOM began announcing delays in moving shipments from DP3 to the GHC. (Exh. 9, Sept. 11, 2023, TRANSCOM Press Release.) TRANSCOM "adjusted the timeline under which shipments will be ordered under the [GHC]" because of difficulty with the IT system integration required by the Contract. (*Id.*; *see also* Exh. 2, RFP Amend. 12, App'x A at A-1). Specifically, the program experienced problems with the interoperability between "MilMove," the DOD

[3] Accordingly, this modified the period of performance for the 3-year base period to run from October 1, 2023, to September 30, 2026. (*See id.* at 9–10.)

[redacted]

system for customers to request a move, and "HomeSafe Connect," HomeSafe's software for managing moves. (Exh. 9, Sept. 11, 2023, TRANSCOM Press Release; *see also* Exh. 15, June 4, 2024, DOD Article.) As a result, TRANSCOM pushed back the beginning of the domestic phase-in initially scheduled to begin in October 2023. (Exh. 9, Sept, 11, 2023, TRANSCOM Press Release; *see also* Exh. 4, Contract App'x A. at A-3.)

36. TRANSCOM announced further delays in December 2023, again because of IT system integration issues. (*See* Exh. 10, Dec. 7, 2023, TRANSCOM Press Release.)

37. In February 2024, 5 months after the transition period was supposed to end, TRANSCOM announced that it was issuing a modification to extend the transition period by an ***additional 12 months***. (Exh. 13, DOD Contracts for Feb. 12, 2024). The modification pushed transition through February 11, 2025—and added an ***additional $60 million*** to the Contract.[4] (*Id.*; *see also* Exh. 14, Feb. 21, 2024, FIDI Focus Article.) Accordingly, the transition period of 9 months initially contemplated by the RFP has now been modified to nearly ***2.5 years***.

TRANSCOM Extends the Volume Phase-In Period by Several Years

38. Extensions continue to flow freely. Seven months after the scheduled date for domestic phase-in, TRANSCOM announced in April 2024 that it "selected 14 initial domestic [military] installations to be the first to award shipments under the new GHC program." (Exh. 11, Apr. 2, 2024, TRANSCOM Press Release.) But these domestic installations encompass just five geographical areas across four states, and a minimal portion of the overall requirement. (*See id.*) Specifically, compared to the total monthly average of domestic DOD

[4] Apparently, TRANSCOM is obligating this additional $60 million thorough $5 million monthly payments to HomeSafe for "Transition Services Phase 2." (*See* Exh 16, USASpending.)

[redacted]

shipments based on the past 3 years, the phase-in for these 14 installations would "total less than 1% [of all military moves] through July 2024 and less than 2% in August 2024." (*Id.*)

39. This news came with another change to the contract. TRANSCOM further extended the schedule for domestic phase-in to continue "into 2025, until domestic phase-in is complete." (*Id.*). In other words, TRANSCOM did not have a specific end-date for reaching 100% domestic phase-in. Further, TRANSCOM revealed that ***international shipments would not even begin until September 2025***. (*Id.*)

40. As of the filing of this bid protest, TRANSCOM has added 94 installations to the GHC, representing only a little more than ***half*** of domestic installations. (*See* Exh. 12, Dec. 5, 2024, TRANSCOM Press Release.) But to be certain, according to TRANSCOM, HomeSafe has completed only 330 total deliveries—a fraction of what is anticipated under GHC. (*Id.*) In any event, whereas the Solicitation required offerors to complete domestic phase-in within 5 months, TRANSCOM has required HomeSafe to complete only a fraction of that volume in a 9-month period from April 2024 through December 2024. (*See id.*) In other words, TRANSCOM has dramatically changed the Contract from the rigid requirements presented to offerors in the GHC RFP.

41. TRANSCOM admitted that it plans to "activate all installations in the continental U.S. by spring 2025" and "[i]nternational shipments under GHC are expected to begin no earlier than September 2025"—a far cry from what was relayed during the competition. (*Id.*) Further demonstrating the mismatch from what was solicited, DOD announced that the "full transition to GHC is scheduled to span ***several years***, with new installations routinely phased in over time." (Exh. 17, *Military OneSource*, "Installations Where GHC Is Available," (Dec. 3, 2024) (emphasis added).)

[redacted]

42. In sum, GHC offerors competed under the Solicitation's rigid, demanding transition requirements, including a 9-month transition period and a 9-month volume phase-in period. Now, TRANSCOM has modified the contract such that the GHC contractor will have at least ***2.5 years*** to complete transition and ***several years*** for volume phase-in. Had National known that the seemingly inflexible transition timeframes would be materially relaxed after all, [redacted]. (Exh. 18, Decl. of [redacted] ¶ 12.) In turn, [redacted]. (*See id.* ¶ 13)

43. For these reasons, this protest follows.

**CAUSE OF ACTION**

**COUNT I:**
**TRANSCOM'S EXTENSION OF THE TRANSITION AND PHASE-IN PERIODS IS AN OUT-OF-SCOPE MODIFICATION THAT VIOLATES CICA**

44. National incorporates the foregoing paragraphs of this Complaint by reference.

45. When exercising its bid protest jurisdiction, this Court applies the Administrative Procedure Act ("APA") standard of review, under which this Court sets aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); 28 U.S.C. § 1491(b)(4). Applied in the context of a bid protest, this Court determines "if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

[redacted]

46. The Competition in Contracting Act ("CICA") requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a)(1). "Modifying the contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating or competing for what should be a new procurement." *HDM Corp. v. United States*, 69 Fed. Cl. 243, 253 (2005) (citing *AT&T Comm., Inc. v. Wiltel,* 1 F.3d 1201, 1205 (Fed. Cir. 1993); *CW Gov't Travel, Inc. v. United States,* 61 Fed. Cl. 559, 573 (2004); *CESC Plaza Ltd. P'ship v. United States,* 52 Fed. Cl. 91, 93 (2002)).

47. "Because CICA does not define whether a modification of an existing contract is beyond or within the scope of the original competitive procurement, the Federal Circuit has at times analogized to the cardinal change doctrine as the test to ascertain whether the modification is in-scope or violates the competition requirements of CICA." *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 415 (2018) (citing *AT&T*, 1. F.3d at 1205). "[A] cardinal change . . . occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *AT&T*, 1 F.3d at 1205 (internal quotations and citations omitted).

48. This inquiry "focuses on whether the Government modifications change the contract so profoundly as to circumvent the statutory requirement of competition." *CW Gov't*, 61 Fed. Cl. at 574. "Just as the cardinal change doctrine prohibits an agency from compelling a contractor to perform contract terms that are not within the scope of the original bargain, [] CICA prevents an agency from modifying a contract to such an extent that the modified contract is 'materially different' from the contract for which a competition was held." *Ian*, 136 Fed. Cl. at 415.

[redacted]

49. Bid protest decisions offer even more specific guidance to determine "whether a modification 'materially departs' from the scope of the original procurement." *Id.* Specifically, the Court is to consider "(1) whether the modification is of a nature which potential offerors would reasonably have anticipated; and (2) whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract." *Id.* (citation omitted). "The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified." *HDM Corp.*, 69 Fed. Cl. at 254 (internal citations omitted).

50. The Agency's wholesale relaxation of the GHC transition and phase-in periods constitutes an out-of-scope modification that materially departs from the scope of the original procurement and violates CICA.

51. The Solicitation contemplated an aggressive transition period of 9 months, during which the contractor was required to develop and integrate a complex IT solution and prepare for rapidly increasing responsibility. Following the transition period, the GHC contractor was expected to complete phase-in for <u>domestic</u> services within 5 months and phase-in for <u>international</u> services within 4 months. These were mandatory requirements, and nothing in the Solicitation hinted at any flexibility in the aggressive schedule.

52. [redacted]. Indeed, National understands the vital role technology plays in successful moving operations, [redacted] (Exh. 18, Decl. of [redacted] ¶ 10.)

53. Even with National's broad experience as both a mover and move manager, [redacted]

[redacted]. (*Id.* ¶ 9.) The GHC solicitation required the contractor in just 9 months to stand up a global network of quality TSPs capable of handling more than 300,000 annual moves and to simultaneously develop an IT solution to integrate with TRANSCOM's new technology application, MilMove, which was still in the developing stages. (*Id.*) [redacted]. (*Id.* ¶ 10.) The Solicitation's strict 9-month transition period was [redacted]. (*Id.*) Accordingly, [redacted]. (*Id.* ¶ 11.)

54. After awarding the Contract to HomeSafe, however, TRANSCOM's modifications materially departed from the Solicitation's transition and phase-in requirements. TRANSCOM first modified the Contract to extend the transition period from 9 months to nearly 1 year. TRANSCOM then issued another substantial change: a ***$60 million modification that added an additional year***. In total, TRANSCOM's modifications will result in a transition period of nearly ***2.5 years***—more than double the time contemplated by the Solicitation and expected by National.

55. Additionally, TRANSCOM has materially departed from the Solicitation's phase-in schedule. Instead of requiring the GHC contractor to complete phase-in for domestic services within 5 months, TRANSCOM has extended the schedule indefinitely. The Agency has currently modified the contract such that phase-in for domestic services will take ***more than a year***, ***if not longer***, from February 2024 and continuing "into 2025, until domestic phase-in is complete."

[redacted]

56. TRANSCOM also has drastically altered the Solicitation's requirements for the phase-in for international services. Instead of completing international phase-in within the 4-month period required by the Solicitation, the Agency has modified the Contract such that "full transition to GHC is scheduled to span ***several years***." This is an extreme departure from the 9-month total phase-in contemplated by the Solicitation.

57. Not only has TRANSCOM loosened the schedule and provided additional funding, it also reduced the quantity of requirements. The Agency has entirely removed phase-in dates for DPM locations and even reduced the number of locations requiring transfer. (Exh. 4, Contract App'x A. at A-4–A-8.)

58. These modifications substantially and materially deviated from the scope of the original procurement. Offerors could not have reasonably anticipated that TRANSCOM was going to so drastically modify the GHC period of performance or progress required for phase-in. Indeed, prospective offerors, [redacted], had every reason to believe that transition timelines were non-negotiable based on the explicit and detailed instructions requiring progress on a series of aggressive transition milestones, and the evaluation criteria mandating an assessment of compliance with these demanding requirements. To be sure, nothing in the RFP materials even hinted at any schedule flexibility. Yet TRANSCOM has more than ***doubled*** the transition period and all but thrown out the window the phase-in schedule.

59. TRANSCOM has modified the Contract such that HomeSafe's transition and phase-in are materially different from what TRANSCOM initially bargained for. The transition/phase-in, as modified, is nearly unrecognizable from the requirement under the original Solicitation—a quintessential cardinal change. TRANSCOM thus has violated CICA by

[redacted]

procuring services through other than full and open competition and preventing qualified bidders, [redacted], from participating in the procurement.

60. Had National known that TRANSCOM ultimately would provide the GHC contractor with multiple years of additional time and substantial funding increases to complete transition and phase-in requirements, [redacted]. (Exh. 18, Decl. of [redacted] ¶ 12.) National is [redacted]. (*Id.* ¶ 13)

61. If TRANSCOM issued a revised solicitation that accurately reflected TRANSCOM's needs, including a more flexible timeline for when the GHC program should be fully operational, [redacted]. (*Id.* ¶ 14.)

62. National has been wrongfully deprived of the opportunity to fully and fairly compete for TRANSCOM's actual GHC needs. (*Id.* ¶ 15.)

**INJUNCTIVE RELIEF**

63. National incorporates each of the foregoing paragraphs of this Complaint by reference.

64. Pursuant to 28 U.S.C. § 1491(b)(2), this Court has the authority to "award any relief that the court considers proper, including declaratory and injunctive relief." *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 ("[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy."). "Injunctive relief is appropriate if it

[redacted]

enjoins the illegal action and returns the contract award process to the status quo ante." *Id.* (internal quotations omitted).

65. To determine whether a permanent injunction is warranted, this Court considers whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).

66. Here, National is entitled to a permanent injunction barring TRANSCOM from continuing the performance of the GHC.

67. ***First***, for all the reasons discussed above, TRANSCOM's actions violated CICA and were thus arbitrary and capricious. Without question, the Agency's newfound schedule flexibility, change in requirements, and substantial funding increases constitute a cardinal change to the Contract. And these modifications were not reasonably foreseeable to prospective offerors like National. The record supports that TRANSCOM has violated CICA by changing the contract so profoundly as to circumvent the statutory requirement of competition. On this record, National will succeed on the merits of its Complaint.

68. ***Second***, absent injunctive relief, National will be irreparably harmed because [redacted]. This Court has found that "when a plaintiff shows that it was excluded from the bidding process, perhaps solely because of the government's improper conduct, the plaintiff has satisfied [the] requirement for irreparable injury." *See Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004).

[redacted]

69. Indeed, but for the changed and relaxed requirements, [redacted] *See id.* (finding plaintiff "has shown irreparably injury sufficient to satisfy the requirement for a permanent injunction" where plaintiff "was excluded from th[e] bidding process because of the government's violation of CICA"); (Exh. 18, Decl. of [redacted] ¶ 12.) In this respect, "courts have consistently found that the loss of an opportunity to compete for a contract on a level playing laying field sufficiently establishes irreparable harm." *See RhinoCorps Co. v. United States*, 87 Fed. Cl. 673, 679 (2009); *Ian,* 136 Fed. Cl. at 427–28 (finding lost opportunity to compete for work contained in out-of-scope modification was irreparable harm to the plaintiff). Moreover, without injunctive relief, [redacted]. *See Cardinal*, 63 Fed. Cl. at 110 ("Irreparable injury includes, but is not limited to, lost profits which would flow from the contract."); (Exh. 18, Decl. of [redacted] ¶ 16.)

70. ***Third***, the balance of hardships favors National. Although TRANSCOM's changes to GHC constitute an impermissible cardinal change, TRANSCOM continues to successfully obtain the required services under the legacy DP3 program. An injunction preventing TRANSCOM from circumventing statutory competition requirements and requiring it to revisit its procurement approach will not frustrate the Agency in any way from procuring critical move services for military members and their families. Nor does TRANSCOM have a compelling argument that it suffers harm; the GHC program has not progressed beyond the most preliminary stage of transition despite years of delays and relaxation of requirements. *See id.* (balance of harms favored protester where recompeting services "will not completely disrupt the procurement process" even though it would "cost the government some money and effort").

[redacted]

71. ***Fourth***, and finally, granting an injunction would promote the public interest of full and open competition. In this respect, the public "has a strong interest in preserving the integrity of the procurement process." *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998). The only way to restore the integrity to the procurement is to enjoin HomeSafe's continued performance under the unlawfully changed GHC. *See Ian*, 136 Fed. Cl. at 430–31 (finding "the integrity of the federal procurement process is served by enjoining the [Agency's] out-of-scope modification").

72. Accordingly, a permanent injunction is warranted.

[redacted]

## PRAYER FOR RELIEF

National, accordingly, respectfully requests that this Court grant judgment in its favor and grant the following relief:

A. Grant judgment in National's favor on all Counts.

B. Declare that the TRANSCOM's actions amounted to a cardinal change that violated CICA and were thus arbitrary, capricious, and otherwise contrary to law;

C. Issue a permanent injunction ordering TRANSCOM to terminate the GHC to HomeSafe, and remand the matter to TRANSCOM to re-compete is revised requirements using full and open competition, including issuing a revised solicitation that accurately reflects TRANSCOM's needs;

D. Provide such other and further relief as the Court deems just and proper, including, without limitation, bid and proposal costs.

Dated: December 23, 2024

Respectfully submitted,

*Of Counsel*

Moshe B. Broder
Jennifer Eve Retener
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

/s/ *Noah B. Bleicher*
Noah B. Bleicher (Counsel of Record)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
(202) 639-6063
*nbleicher@jenner.com*

*Counsel for National Holding Company, Inc.*

[redacted]