**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Redacted Version**

| | | |
|---|---|---|
| THE SUDDATH COMPANIES,<br>Plaintiff,<br><br>and<br><br>TOTAL MILITARY MANAGEMENT, INC.,<br>Consolidated Plaintiff,<br><br>and<br><br>THE NATIONAL HOLDING COMPANY, INC.,<br>Consolidated Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant,<br><br>and<br><br>HOMESAFE ALLIANCE, LLC,<br>Defendant-Intervenor. | ) | No. 24-1836C<br>(Judge Somers)<br><br>**BID PROTEST** |

**DEFENDANT'S MOTION TO DISMISS, CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

DOUGLAS K. MICKLE
Assistant Director

AMANDA L. TANTUM
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-8131
Attorneys for Defendant

OF COUNSEL:

PETER RIES
Chief, Acquisition Law
ROBERT DEPKE
Attorney
WALTER C. MULLEN
Attorney
USTRANSCOM

February 14, 2025

# TABLE OF CONTENTS

Page


INTRODUCTION ........................................ 1

STATEMENT OF ISSUES ........................................ 3

STATEMENT OF THE CASE........................................ 4

I. Nature Of The Case ........................................ 4

II. Statement Of The Facts........................................ 4

A. The Solicitation And Submission Of Proposals........................................ 4

B. Contract Award And Protests ........................................ 5

C. The Modification Of The GHC To Account For HomeSafe's Increased Costs Due To New Department Of Labor (DOL) Wage Determinations ........................................ 6

D. The Modification Of The Contract To Account For Delays And Costs Resulting From The Protests Before GAO And This Court ........................................ 7

E. Contract Modifications Accounting For Performance Difficulties........................................ 8

ARGUMENT........................................ 12

I. Standard Of Review........................................ 12

A. Standard Of Review Of Motions To Dismiss For Failure To State A Claim .... 12

B. Standard For Review Of Motions For Judgment On The Administrative Record........................................ 13

II. Plaintiffs Lack Standing To Seek A Re-Competition For The GHC – Through A Protest Of The 2021 Contract Award – As Opposed To A Competition For Purportedly Out-Of-Scope Work And The Court Cannot Grant Such Relief......... 14

III. If The Court Concludes That Plaintiffs Have Standing And State A Claim For Relief, Plaintiffs Nonetheless Fail To Demonstrate Any Out-Of-Scope Work Added To The GHC ........................................ 19

A. Suddath Misconstrues The Standards Applicable To Cardinal Change Protests........................................ 20

B. The Challenged Extensions To The Transition Period And Added IT Requirements Do Not Constitute A Cardinal Change .....23

1. Extensions To A Transition Period Do Not Reflect Work Outside Of The Contract's Period Of Performance And, Thus, Cannot Possibly Constitute Cardinal Changes .....23

2. Even Assuming That Extensions To The Transition Period Could Constitute A Cardinal Change, TRANSCOM's Specific Extensions In This Case Cannot Be Viewed As One .....25

a. Additional Time Due To Halting Transition Work During Bid Protests .....27

b. Additional Time To Work On Solutions To Performance Difficulties .....28

3. Modification 13's Added Requirements For IT System Testing Are Not Outside The Scope Of The Contract .....32

C. Increases In Prices And Funding Do Not Demonstrate That The Modifications Resulted In Work Outside Of The Contract .....35

1. Modification 13 .....35

2. Modification 6 .....36

3. Modifications 5 And 15 .....38

IV. Even If The Court Concluded That There Were Cardinal Changes, Plaintiffs Are Not Entitled To The Injunctive Relief That They Seek .....40

CONCLUSION .....42

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acuity-CHS Middle E. LLC v. United States*,
173 Fed. Cl. 788 (2024) .......... 18

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
988 F.2d 1157 (Fed. Cir. 1993).......... 17

*Allied Materials & Equip. Co. v. United States*,
569 F.2d 562 (Ct. Cl. 1978) .......... 21

*Am. Apparel, Inc. v. United States*,
108 Fed. Cl. 11 (2012) .......... 35

*Am. Fed'n of Gov't Emps. v. United States*,
258 F.3d 1294 (Fed. Cir. 2001) .......... 18, 19

*Am. Safety Council, Inc. v. United States*,
122 Fed. Cl. 426 (2015) .......... 20

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) .......... 13

*AT&T Commc'n, Inc. v. Wiltel, Inc.*,
1 F.3d 1201 (Fed. Cir. 1993) .......... *passim*

*Banknote Corp. of Am., Inc. v. United States*,
56 Fed. Cl. 377 (2003) .......... 13

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005) .......... 14, 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 12

*Bromley Contracting Co. v. United States*,
15 Cl. Ct. 100 (1988) .......... 13

*CACI, Inc.-Fed. v. United States*,
67 F.4th 1145 (Fed. Cir. 2023) .......... 18

*CCL, Inc. v. United States*,
39 Fed. Cl. 780 (1997) ........ 16

*CeleraPro, LLC v. United States*,
168 Fed. Cl. 408 (2023) ........ 20, 35

*Colsa Corp. v. United States*,
158 Fed. Cl. 333 (2022) ........ 18

*Connected Glob. Sols., LLC v. United States*,
162 Fed. Cl. 720 (2022) ........ 6

*Connected Global Solutions, LLC v. United States*,
159 Fed. Cl. 801 (2022) ........ 15

*Contact Int'l Inc. v. Widnall*,
106 F.3d 426 (Table) ........ 28, 38

*CWT/Alexander Travel Ltd. v. United States*,
78 Fed. Cl. 486 (2007) ........ 24

*Digitalis Educ. Solutions, Inc. v. United States*,
664 F.3d 1380 (Fed. Cir. 2012) ........ 18, 19

*Distributed Solutions, Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008) ........ 21

*eBay, Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ........ 41

*Fed. Data Corp. v. United States*,
911 F.2d 699 (Fed. Cir. 1990) ........ 19

*Figueroa v. United States*,
57 Fed. Cl. 488 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006) ........ 12

*Fortec Constructors v. United States*,
760 F.2d 1288 (Fed. Cir. 1985) ........ 22

*Furniture by Thurston v. United States*,
103 Fed. Cl. 505 (2012) ........ 41

*Glenn Defense Marine (Asia) PTE Ltd. v. United States*,
97 Fed. Cl. 568 (2011) ........ 20

*Green Mgmt. Corp. v. United States*,
42 Fed. Cl. 411 (1998) .......... 21

*HDM Corp. v. United States*,
69 Fed. Cl. 243 (2005) .......... 22, 29, 41

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) .......... 13, 14

*Int'l Mgmt. Servs., Inc. v. United States*,
80 Fed. Cl. 1 (2007) .......... 15

*McAbee Constr., Inc. v. United States*,
97 F.3d 1431 (Fed. Cir. 1996) .......... 22, 26

*MCI Telecommc'ns Corp. v. United States*,
878 F.2d 362 (Fed. Cir. 1989) .......... 18

*MCS Mgmt., Inc. v. United States*,
48 Fed. Cl. 506 (2001) .......... 13

*Mgmt. Solutions & Sys. v. United States*,
75 Fed. Cl. 820 (2007) .......... 13

*Northrop Grumman Corp. v. United States*,
50 Fed. Cl. 443 (2001) .......... *passim*

*Parcel 49C Ltd. Partnership v. United States*,
130 Fed. Cl. 109 (2016) .......... 20

*Phoenix Air Group, Inc. v. United States*,
46 Fed. Cl. 90 (2000), *appeal dismissed*, 243 F.3d 555 (Fed. Cir. 2000) .......... 14, 34

*Piedmont Propulsion Systems, LLC v. United States*,
167 Fed Cl. 72 (2023) .......... 20

*Rex Serv. Corp. v. United States*,
448 F.3d 1305 (Fed. Cir. 2006) .......... 18

*S.J. Groves & Sons Co. v. United States*,
661 F.2d 170 (Ct. Cl. 1981) .......... 35

*S.W. Aircraft v. United States*,
213 Ct. Cl. 206, 551 F.2d 1208 (1977) .......... 22

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) .......... 36

*Wright v. United States*,
81 Fed. Cl. 369 (2008) .......... 17

ADMINISTRATIVE DECISIONS

*Def. Sys. Group; Warren Pumps, Inc.; Dresser Indus., Inc.*,
B-240295, 1990 WL 293536 (Compl. Gen. Nov. 6, 1990) .......... 24, 35

*DOR Biodefense, Inc.; Emergent Biosolutions*,
B-296358.3, 2006 WL 279311 (Comp. Gen. Jan. 31, 2006) .......... 24, 25, 30

*Hallmark-Phoenix 3, LLC*,
ASBCA No. 61049, 17-1 B.C.A. (CCH) ¶ 36788 (June 23, 2017) .......... 38, 39

*Ingersoll-Rand*, B-225996,
87-1 CPD ¶ 474 (Comp. Gen. May 5, 1987) .......... 24, 30

*Saratoga Indus., Inc.*,
B-247141, 92-1 CPD ¶ 397 (Apr. 27, 1992) .......... 30

STATUTES AND REGULATIONS

5 U.S.C. § 702 .......... 13

5 U.S.C. § 706(2) .......... 13

5 U.S.C. § 5332 .......... 39

5 U.S.C. § 5341 .......... 39

10 U.S.C. § 2304(a) .......... 21

28 U.S.C. § 1491(b) .......... *passim*

Competition in Contracting Act ,
31 U.S.C. §§ 3551-56 .......... 18

41 U.S.C. § 3301(a) .......... 21

Service Contract Act,
41 U.S.C. § 6701, *et seq*. .......... 38

FAR 52.212-4 .......... 32, 37

FAR 52.212-4(c) .......... *passim*

FAR 52.212-4(c) (Oct. 2018) .......... 32, 37

FAR 52.222-41 .......... 6, 38, 39

FAR 52.222-42 .......... 6, 39

FAR 52.222-43 .......... *passim*

FAR 52.222-43(a) .......... 38

FAR 52.222-43(d) .......... 38

FAR 52.222-43(f) .......... 38

FAR 52.233-3 .......... *passim*

FAR 52.233-3 (Aug. 1996) .......... 7, 27, 37

FAR 52.233-3(b) .......... 8

FAR 252.243-7002 .......... 37

Defendant, the United States, respectfully submits (1) its motion to dismiss plaintiffs The Suddath Companies (Suddath), Total Military Management, Inc.'s (TMM), and National Holding Company, Inc.'s (National) complaints pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC); (2) its cross-motion for judgment on the administrative record; and (3) its opposition to plaintiffs' motions for judgment on the administrative record.

## INTRODUCTION

The United States Transportation Command's (TRANSCOM) awarded HomeSafe Alliance, LLC (HomeSafe) the Global Household Goods Contract (GHC) (Contract No. HTC711-22-D-R002) to obtain services to move military members' household goods, using information technology (IT) systems to schedule and invoice those moves. After unsuccessful offerors filed protests of the contract award with Government Accountability Office (GAO) and this Court, HomeSafe was unable to perform activities to transition into the contractor role while work was halted to allow for resolution of those protests. As required by the contract, TRANSCOM, through contract modifications, allowed HomeSafe additional time and costs resulting from these delays. In addition, TRANSCOM modified the contract to extend the time for transition activities after the parties experienced difficulties with performance – specifically, the [redacted], as required by the contract, [redacted] After [redacted], TRANSCOM modified the contract to add further testing requirements. And, when the United States Department of Labor (DOL), through wage determinations, required increased wages for certain HomeSafe employees and HomeSafe sought a price adjustment to cover those wages, TRANSCOM modified the contract to allow for a portion of the adjustment sought, based on contract requirements related to such DOL updates.

Plaintiffs contend that, through these modifications, TRANSCOM has added work to the contract that is outside of its scope and, thus, is a cardinal change to the contract. Plaintiffs, however, cannot prevail on this claim because the solicitation's language shows that the added IT work is within the scope of the contract and offerors considering whether to submit proposals in response to that solicitation could have reasonably anticipated these types of modifications. As noted above, the contract and the solicitation require extensions of time and payment of costs resulting from protest stop-work orders and require price increases to account for wage determinations, provided certain conditions are satisfied. Offerors certainly can reasonably anticipate the filing of post-award protests by disappointed offerors, resulting in stop-work orders and associated delays and costs. Likewise, offerors can reasonably anticipate that the DOL will update its wage determinations and that, as expressly provided in the contract and solicitation, the agency may allow price increases to cover a contractor's resulting wage increases. Further, the solicitation and contract expressly require testing of the contractor's IT system and, more fundamentally, call for an operational IT system; thus, it was hardly unexpected that work might be added to that contract to allow additional testing of that IT system. Offerors also expect to have flexibility to work out performance difficulties, not have such efforts automatically viewed as out-of-scope work for which other contractors have the opportunity to compete. Indeed, to contend that TRANSCOM's modifications are outside of the scope of the GHC, plaintiffs must willfully ignore these solicitation provisions and refuse to apply common sense. The Court should reject plaintiffs' request that it insert itself into the administration of the contract administration and dictate how TRANSCOM and HomeSafe resolve performance difficulties and issues involving wages and stop-work orders.

Notably, although plaintiffs characterize their claims as a challenge to cardinal changes, plaintiffs do not seek to compete for purportedly out-of-scope work assigned to HomeSafe through modifications, but instead ask this Court to end the entire GHC procurement – enjoining a contract award made over three years ago – and require a re-competition of *all* work under it. The Court cannot provide such relief, which is afforded only to protestors challenging the award of a contract. Moreover, plaintiffs lack standing to bring such a challenge, since they are not interested parties with regard to the procurement resulting in the November 4, 2021 contract award, given that they did not submit proposals in response to it.

The Court, therefore, should dismiss plaintiffs' protests because plaintiffs do not actually attempt to challenge allegedly out-of-scope work, but instead seek to overturn the entire procurement and contract. If the Court does not dismiss the protests, it should, in any event, reject plaintiffs' assertions that TRANSCOM's modifications reflect work that is outside of the scope of the contract and deny the protests.

## STATEMENT OF ISSUES

1. Whether plaintiffs lack standing to assert their protest and fail to state a claim upon which the Court may provide the relief sought, when plaintiffs seek a re-competition of the entire Global Household Goods contract (GHC) – not just a competition for allegedly out-of-scope work – and, thus, challenge the original award of the contract.

2. If the Court concludes that plaintiffs have standing, whether plaintiffs fail to demonstrate that contract modifications added work outside the scope of the contract as awarded and, therefore, are not entitled to the relief sought.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiffs challenge TRANSCOM's modifications to the GHC allowing time extensions and price adjustments and adding requirements that were within the contract's scope.

### II. Statement Of The Facts

#### A. The Solicitation And Submission Of Proposals

On September 13, 2019, TRANSCOM issued a solicitation for proposals (numbered HTC71119RR004). Administrative Record (AR) Tab 416(a) at AR59657. The solicitation was amended six times. Tabs 417-19, 421-23. The administrative record includes a conformed copy of the solicitation that includes all amendments to it. Tab 7 at AR119.

The solicitation sought proposals from offerors to provide "complete, global household goods relocation services as detailed in th[e] [solicitation's] Performance Work Statement (PWS)." Tab 7(b)(1) at AR462. The contractor awarded the contract was to "provide all personnel, supervision, training, licenses, permits and equipment necessary to perform tasks as identified herein for household goods relocation transportation and Storage-In-Transit (SIT) warehouse services worldwide for Department of Defense (DoD) Service Members, DoD civilians, and U.S Coast Guard members[.]" *Id.* One contractor duty was to "provide and maintain an easy to use, secure, web-based, mobile-device compatible IT system able to manage complete household goods relocation services globally during peak (surge) and non-peak seasons" and which "shall interface with a government managed system for the purposes of issuing and receiving task orders, third party payment system (TPPS) payment requests, shipment ITV [in-transit visibility], government data access, and claims management/filing." Tab 7(b)(1) at AR462-63. Appendix A to the PWS contained requirements for the transition of services to the new contractor. Tab 7(a)(1).

Seven offerors – including HomeSafe, Connected Global Solutions, LLC (CGSL), and American Roll On Roll Off Carrier Group, Inc. (ARC), but not including the plaintiffs – submitted proposals in response to the solicitation. Tab 20 at AR3567-58.

**B. Contract Award And Protests**

TRANSCOM awarded the GHC (Contract No. HTC71120DR044) to HomeSafe effective November 4, 2021. Tab 71(a) at AR15877. The GHC is a Fixed Price with Economic Price Adjustment (EPA), Indefinite Delivery Indefinite Quantity (IDIQ) contract. Tab 314 at AR58918. Appendix G of the PWS incorporates the terms of the EPA stating, in part, "[i]n order to protect the contractor and government against significant market fluctuations, all prices other than the shipment management services and counseling services, will be adjusted prior to the start of Base Period 2, Base Period 3, the extension of every option year, and award terms (if applicable) thereafter." Tab 314 at AR58918.

After the award, two disappointed offerors (CGSL and ARC) each filed GAO protests. Tab 212 at AR35304; Tab 213 at AR35306; Tab 214; Tab 252 at AR37541; Tab 253. TRANSCOM subsequently modified the contract (in Modification 1) on December 1, 2021, to issue a stop-work order to HomeSafe under Federal Acquisition Regulation (FAR) 52.233-3 (Protest After Award). Tab 212(a) at AR35305. The solicitation and subsequent contract incorporate FAR 52.233-3 by reference. The Government successfully defended both GAO protests, and on March 3, 2022, GAO issued decisions upholding the Government's award to HomeSafe. Tabs 251, 267. Subsequently, TRANSCOM issued Modification 2, rescinding the stop-work order. Tab 270 at AR58523.

HomeSafe briefly began transition services as described in Appendix A to the PWS, working for 20 days. Tab 314 at AR58919; Tab 304 at AR58865. On March 23, 2022, the same

disappointed offerors (CGSL and ARC) filed two protests of the contract award before this Court, which resulted in USTRANSCOM voluntarily issuing another stop-work order (through Modification 3) on that date. *Id.* After the Government successfully defended the protests. TRANSCOM lifted the stop-work order (though Modification 4) on November 3, 2022, and HomeSafe resumed performance. *Id.* TRANSCOM issued another stop-work order (through Modification 3) to HomeSafe under FAR 52.233-3 (Protest After Award), Tab 300 at AR58855, and there was no performance while these protests were litigated. On October 28, 2022, the Court denied the CGSL and ARC protests. *See Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720, 729 (2022). Therefore, on November 3, 2022, TRANSCOM lifted the stop-work order (through Modification 4), and HomeSafe, once again, resumed transition as described in Performance Work Statement Appendix A. Tab 304 at AR58864.

### C. The Modification Of The GHC To Account For HomeSafe's Increased Costs Due To New Department Of Labor (DOL) Wage Determinations

The solicitation included provisions requiring TRANSCOM to reimburse the contractor for increased costs in some situations, incorporating by reference FAR 52.222-41, Service Contract Labor Standards, and FAR 52.222-43, Fair Labor Standards Act And Service Contract Labor Standards – Price Adjustment (Multiple Year And Option Contracts), and included FAR 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 2014). Tab 7 at AR129, 179.

On January 23, 2023, TRANSCOM issued Modification 5, revising wage determinations. Tab 308 at AR58876. HomeSafe subsequently requested an increase in due to increased wages resulting from DOL wage determinations and noted that "labor rates have increased significantly since HomeSafe submitted the Global Household Goods Contract (GHC) Final Proposal Revision (FPR)." Tab 389 at AR59310-11. On April 23, 2024, TRANSCOM issued another modification (Modification 15) related to wage determinations, "adjust[ing]" the GHC's "Pricing

Rate Table [i]n [a]ccordance with the Service Contract Act and the Wage Determinations incorporated into the contract on 23 Jan 2023 for the Move Management Fee only," explaining that it "[wa]s unable to approve an increase to all remaining rates." Tab 393 at AR59403.

### D. The Modification Of The Contract To Account For Delays And Costs Resulting From The Protests Before GAO And This Court

After TRANSCOM lifted the first stop-work order related to GAO protests in Modification 2, HomeSafe "asserted its right to an adjustment stemming from the stop-work order within the 30-day timeline outlined in FAR 52.233-3." Tab 314 at AR58919. FAR 52.233-3 – incorporated into the solicitation and contract, Tab 7 at AR128-29; Tab 71(a) at AR15885-87 – states that, after the filing of a protest, "the contracting officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract" through a "stop-work order" and "shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly, if" the contractor makes a request for equitable adjustment, within 30 days, due to "an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract" resulting from the stop-work order. FAR 52.233-3 (Aug. 1996) (emphasis added). Similarly, upon receipt of the notice that the second stop-work order (issued through Modification 3) would be lifted, on October 31, 2022 and again on December 5, 2022, HomeSafe asserted its right to an adjustment stemming from that stop-work order within the 30-day timeline in FAR 52.233-3. Tab 314 at AR58919. In its December 5 and subsequent December 22, 2022 requests for adjustment, HomeSafe requested modification application of the EPA, including an increase to Base Period 1 rates by [redacted] percent, based on "the delays caused by the [Stop Work Orders] and the changing worldwide economic conditions." Tab 314 at AR58920, 58922.

In response to HomeSafe's requests for adjustment, TRANSCOM's contracting officer conducted fact-finding and substantial discussion of the matter with HomeSafe for over three months. Tab 314 at AR58921. Subsequently, TRANSCOM and HomeSafe agreed upon an equitable adjustment (made through Modification 6) "applied pursuant to FAR 52.233-3(b) . . . , not Appendix G" of the contract, of "an [redacted]% increase to Base Period 1 rates, inclusive of the 48-day transition period extension at no additional cost to the Government." Tab 314 at AR58928; *see also id.* at AR58919 n.1 ("The adjustment is being made under the authority provided in FAR 52.233-3 Protest After Award, [and] it does not result in a change to the terms and conditions outlined in Appendix G."). Modification 6 states that it

> settles Homesafe's request for a price adjustment under FAR 52.233-3 (Protest After Award) stemming from two (2) stop-work orders issued under this contract, effective 1 December 2021 and 23 March 2022, for costs properly allocable to the performance of this contract. This modification represents the full satisfaction of Homesafe's claim against the Government for costs associated with the delay from both rounds of postaward protests, at the Government Accountability Office and the Court of Federal Claims.

Tab 316 at AR58934.

### E. <u>Contract Modifications Accounting For Performance Difficulties</u>

The solicitation anticipated that the transition would take nine months to accomplish. Tab 7 at AR122. After the final stop-work order was lifted, transition was set to end on July 13, 2023, Tab 304 at AR58866 (Contract Line Item Number (CLIN) 0002); Tab 7 at AR122 (CLIN 0002), after which time, Base Period Year 1 would commence on September 1, 2023, and the contractor would "go live" – that is, begin moving household goods. Tab 304 at AR58865-66 (CLIN 0001); Tab 7 at AR121 (CLIN 0001); Tab 355 at AR 59121.

Due to IT system development and integration delays, TRANSCOM extended the transition period various times – at no cost – under Modifications 8 through 12. Tab 364 at AR59176; Tab 351 at AR59101 (memorandum for record explaining Modification 11). TRANSCOM issued Modification 8 – an extension of one month to the transition period, through September 30, 2023, Tab 332 at AR59006 – when, [redacted]," but HomeSafe "[redacted]." Tab 329 at AR59001. TRANSCOM issued Modification 9, another one-month extension, following HomeSafe's statement that it "[redacted]." Tab 336 at AR59025. The contracting officer explained that Modification 10 (a 14-day extension of time to the transition period) was "necessary to continue transition of the GHC." Tab 343 at AR59055; Tab 344 at AR59056-58. Modification 11 extended the transition period by 53 days, moving its end date from November 14, 2023, to January 7, 2024, Tab 352 at AR59102-04, and Modification 12 extended the transition period by another 28 days, to February 4, 2024. Tab 362 at AR59159.

The IT system development and integration delays are well documented throughout the administrative record. TRANSCOM's November 2, 2023 [redacted] found that [redacted]." Tab 347 at AR59075. This [redacted] that [redacted]

[redacted]. *Id.*; Tab 71(b)(11) at AR16092 (PSW § [redacted]); Tab 71(b)(1) at AR15920 (PWS [redacted] [redacted]). These capabilities were also part of the solicitation. Tab 7(b)(1) at AR463 (PWS [redacted] Tab 7(a)(1) at AR208 (PWS Appendix [redacted]).

The report also explained that there had been [redacted]. Tab 347 at AR59075. The solicitation, and subsequent contract, required testing of the contractor's IT system, noting, for example, that the requirement that contractor's IT system "shall be fully integrated with the Government managed IT system and able to accept task orders[,]" "process invoices for payment," and "execute an end-to-end, origin to destination" move "not later than (NLT) contract base period year one (1) start date" was "based on successful testing completed no later than 30 days prior to the contract base period year one (1) start date." Tab 7(a)(1) at AR208 (§§ A.2.2.2, A.2.2.3, A.2.2.4); Tab 71(b)(1) at AR15920 (§§ A.2.2.2, A.2.2.3, A.2.2.4).

Government Acceptance Testing (GAT) in support of the GHC was conducted virtually between [redacted] Tab 327 at AR58998. This testing [redacted] with each tester "[redacted]." *Id.* at AR58999. [redacted]. *Id.* The August 7, 2023 [redacted]

[redacted] *Id.*

On October 25, 2023, HomeSafe provided the Government [redacted], but HomeSafe subsequently [redacted] *Id.* The contracting officer noted in the report that, [redacted] *Id.*; *see also* Tab 348 at AR59077 (October 25, 2023 email describing TRANSCOM request for [redacted]).

Due to the severity of these issues, on November 27, 2023, TRANSCOM [redacted] Tab 355 at AR59121 [redacted] The [redacted] *Id.* The [redacted] Tab 355 at AR59122.

On February 12, 2024, TRANSCOM issued Modification 13, which extended the period for transition of services by 12 months, Tab 377 at AR59246, determining that this extension was "required to ensure a smooth and successful phase-in of the GHC contract." Tab 374 at AR59231. The revised PWS issued with Modification 13 added requirements, within existing

duties, for "technical and user acceptance testing and participat[ion] in Government Operational Test and Evaluation (OT&E) events," systems integration, surveillance, and oversight, "discussions with the Government" in "Technical Exchange Meetings," "accommodat[ion] [of] changes to source data" by "[t]he [c]ontractor's IT system" "to ensure accurate and timely communication between Contractor, Government, and customers." AR378 at AR59251-55 (highlighted additions). Modification 13 "settle[d] HomeSafe's request for a price adjustment under FAR 52.212-4(c) Changes stemming from any and all costs related to the volume phase-in and delays relating to [redacted] and [redacted]" Tab 377 at AR59246.

On May 9, 2024, TRANSCOM issued Modification 16, extending the transition period again. Tab 397 at AR59411; Tab 399 at AR59445. TRANSCOM also issued Modification 17, effective September 19, 2024, which updated certain contract attachments and appendices; plaintiffs have not asserted is out of the scope of the contract. Tab 407 at AR59484.

## **ARGUMENT**

### I. Standard Of Review

#### A. Standard Of Review Of Motions To Dismiss For Failure To State A Claim

To survive a challenge pursuant to RCFC 12(b)(6), a plaintiff must plead more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted, interpreting Federal Rule of Civil Procedure 12(b)(6)). "Legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Figueroa v. United States*, 57 Fed. Cl. 488, 497 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006). Stating "a claim requires a complaint with enough factual matter (taken as true) to suggest" an entitlement to relief. *Bell Atl.*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level

on the assumption that all of the complaint's allegations are true." *Id.* The Court should begin its analysis by identifying and rejecting conclusory allegations, because allegations not supported by specific facts "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). The Court should next consider all "well-pleaded factual allegations," "assume their veracity," "then determine whether they plausibly give rise to an entitlement to relief" and dismiss them pursuant to RCFC 12(b)(6) if they do not. *Id.*

### B. Standard For Review Of Motions For Judgment On The Administrative Record

If the Court concludes that plaintiffs have stated a claim upon which relief may be granted, the inquiry is whether the agency's award decision was arbitrary, capricious, unsupported by substantial evidence in the administrative record, or contrary to law. 28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. §§ 702, 706(2)(A). Procurement decisions are entitled to a "presumption of regularity," *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001), and this Court can grant relief only where "the procurement official's decision lacked a rational basis," *id.* at 1332. This deferential standard limits judicial review and "recognizes the possibility that there exists a zone of acceptable results in a particular case." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003). If the Court finds a reasonable basis for the agency's action, it should stay its hand even though, with the same evidence, the Court might have reached a different conclusion. *MCS Mgmt., Inc. v. United States*, 48 Fed. Cl. 506, 511 (2001). A decision is "reasonable" when there is a rational connection between the facts and the decision made. *Id.* The disappointed offeror's heavy burden to demonstrate an irrational decision is not met by "conclusory allegations and generalities," *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988), or by merely demonstrating that the record can support a different decision, *Mgmt. Solutions & Sys. v. United*

*States*, 75 Fed. Cl. 820, 827-28 (2007). When a protester claims that the agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333 (internal quotation marks omitted).

Finally, if the protestor can show any errors in the procurement process, the protestor must then show that it was "significantly prejudiced" by those errors. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005) (citations omitted). To establish significant prejudice, the protestor must show that "there was a 'substantial chance' it would have received the contract award but for the errors." *Id.* (citations omitted).

## II. Plaintiffs Lack Standing To Seek A Re-Competition For The GHC – Through A Protest Of The 2021 Contract Award – As Opposed To A Competition For Purportedly Out-Of-Scope Work And The Court Cannot Grant Such Relief

Although plaintiffs claim that they are protesting the lack of competition for allegedly out-of-scope work performed under the GHC, it is apparent that they want the Court to overturn the 2021 award of the GHC to HomeSafe and allow plaintiffs to compete for *that* contract work – not simply the purportedly out-of-scope work. The Court cannot grant such relief, and plaintiffs lack standing to bring a protest seeking such relief – which is, in essence, is a challenge to the award of the entire project in 2021 and not to added work. The Court should, therefore, dismiss plaintiffs' complaints for failure to state a claim upon which relief may be granted.

"If the court finds that a cardinal change has occurred on th[e] contract," as alleged by plaintiffs, "the result is the existence of contract work that has never been competed." *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 456 (2001). A protestor asserting a cardinal change "has standing, therefore, if it shows that it would participate as a bidder for, and have an economic interest in, *only that new uncompeted work*, *not* the work as contemplated by the original procurement." *Id.* (citing *Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90, 102

(2000)) (emphasis added). When, like in the present case, a protestor instead challenges the award through the original procurement, the Court should consider whether it was an interested party with regard to the original procurement for purposes of evaluating standing. *See Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 6-8 (2007).

In this latest protest of the GHC contract award, plaintiffs now challenge TRANSCOM's November 2021 contract award to HomeSafe, *more than two years* after this Court confirmed the propriety of the HomeSafe award in its decision in *Connected Global Solutions, LLC v. United States*, 159 Fed. Cl. 801 (2022). In this earlier decision, the Court noted the GHC's extensive and litigious protest history. *Id.* at 802. Plaintiffs did not submit a proposal in response to the solicitation and did not participate directly in either the contract competition or the prior litigation over this contract award. *See* Suddath PMJAR at 37-45; Tab 20 at AR3567-58 (list of the offerors that submitted proposals in response to the solicitation). Nevertheless, plaintiffs now ground their protests and requests for a re-competition of the entire GHC program on a hypothetical assumption that they would have directly participated in the original GHC contract competition had they known then how the contract would have morphed over the ensuing years. Suddath PMJAR at 37-45. These suppositions are not adequate as a matter of law, and plaintiffs' complaints therefore should be dismissed for lack of standing to now bring these unusual challenges.

Plaintiffs' dilatory filing is not only extraordinary for its odd timing but also for the relief it now seeks. Suddath hopes to overturn the fundamental contract award from 2021 based on its characterization of certain contract modifications – effecting a delayed implementation schedule and the addition information technology (IT) services beyond those specifically called for in the original contract – as cardinal changes. Protests of contract modifications as cardinal changes,

however, seek competition for the work *added* through the contract modification, not the original contract work. If the Court concludes that such work is outside of the contract's scope, the remedy is a competition for that specific, additional work – not *all* of the contract work.

In *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001), the Court explained the proper standing analysis when a party asserts that contracting modifications are outside of the contract's scope and, thus, are cardinal changes. As the Court explained in *Northrop*, when a plaintiff brings a bid protest alleging a cardinal change to a contract, that plaintiff essentially argues that new contract work has been awarded without competition. This argument is grounded in an assertion that the changes to the previously-awarded contract represent work that is completely separate from the work that has already been awarded in that contract, as the new work is outside the scope of the original competition. *Id.* at 456 (citing *CCL, Inc. v. United States*, 39 Fed. Cl. 780,789 (1997)). A protest of an alleged cardinal change does not assail the propriety of the award of the original contract or seek to end that contract's performance, but instead demands competition for the new and purportedly out-of-scope work. *Id.* The Court instructed in *Northrop* that

> a party's standing depends on its interest *only in the proposed initial solicitation for the new work*. The court will determine standing based on whether the protesting contractor could compete for the *new contract work* and whether it has an economic interest in such work, unhindered by the restrictions applicable when a bidder protests a solicitation that has already taken place.

*Id.*

Here, to the contrary, despite grounding their complaints on the application of the cardinal change doctrine, *see* Suddath Compl. ¶¶ 60-73, Case No. 24-1836, ECF No. 1; TMM Compl. ¶¶ 37-55, Case No. 24-2029, ECF No. 1, plaintiffs do not seek a solicitation only for the allegedly out-of-scope work. Rather, they hope to cause re-solicitation of the entire contract

bringing the entire program to a halt and requiring TRANSCOM to start its procurement over from the beginning. TMM PMJAR at 36 (seeking the "opportunity to compete fairly for the altered *Contract*" (emphasis added)); *id.* at 37, 39 (seeking "injunction barring the Agency from proceeding with its arbitrary and unlawful *Contract*" and "ordering TRANSCOM to *end performance* under the unlawful *Contract*" (emphasis added)); Suddath PMJAR at 36-37 (requesting that the Court "enjoin TRANSCOM from proceeding with further *performance* under the materially changed and illegal GHC" *contract* (emphasis added)). This overreach is a fundamental flaw in Suddath's purported protest of out-of-scope work and shows that plaintiffs cannot obtain the relief sought based on the legal doctrine on which their complaints rely – the cardinal change doctrine. *See Wright v. United States*, 81 Fed. Cl. 369, 375 (2008); *see also Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) ("The purpose of [RCFC 12(b)(6) is to allow the court to eliminate actions that are fatally flawed in their legal premises[.]"). The relief sought by plaintiffs – a re-competition of the entire contract – is a remedy available only if plaintiffs protested the original 2021 contract award, something plaintiffs did not do at the time of the award, do not do now through their complaint allegations, and lack standing to do now.

The Tucker Act gives the Court

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). The Tucker Act also states that the Court may grant any relief that it considers proper including injunctive relief. *Id.* § 1491(b)(2).

To have standing necessary to bring a bid protest, a plaintiff must demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006). Although the term "interested party" is not defined by the statute, the United States Court of Appeals for the Federal Circuit has construed this term in accordance with the definition provided in the Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551-56, as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1299 (Fed. Cir. 2001) (*AFGE*) (quoting 31 U.S.C. § 3551(2)). Thus, to demonstrate that it has standing, Suddath must demonstrate both that it is (1) an actual or prospective offeror, and (2) that it has a direct economic interest. *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). "A protest brought by a plaintiff without statutory standing must be dismissed under RCFC 12(b)(6)." *Acuity-CHS Middle E. LLC v. United States*, 173 Fed. Cl. 788, 796 (2024) (citing *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023)).

The record in this case is clear that plaintiffs were not actual offerors in the subject procurement, since they did not submit proposals. *See* Tab 20 at AR3567-58; Suddath PMJAR at 40-45 (noting that Suddath decided against submitting a proposal); *Rex*, 448 F.3d at 1307-08. And since the solicitation has closed and contract award has been made, plaintiffs were not prospective offerors either. *MCI Telecommc'ns Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) ("[T]he opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends."); *Rex*, 448 F.3d at 1308 (concluding protestor was not a "prospective bidder" because it "did not submit a bid"); *see also Colsa Corp. v. United States*, 158 Fed. Cl.

333, 339-42 (2022). Plaintiffs' claims of standing, therefore, founder on the first step of the standing test in *Digitalis* and *AFGE*.

Since the opportunity to qualify either as an actual or a prospective offeror ends when the proposal period ends, plaintiffs' stated intention to submit a proposal in response to any re-solicitation, and its efforts to secure re-solicitation by filing a protest, can do nothing to create the necessary interested party status. The "reference to a 'prospective bidder' in the definition of interested party in the statute does not include one," like plaintiffs, "who only intends to bid in the event of a reprocurement." *Fed. Data Corp. v. United States*, 911 F.2d 699, 704 (Fed. Cir. 1990). By the close of the proposal period, therefore, plaintiffs had placed themselves outside the categories of contractors who could be "interested parties" with an interest in the award of the GHC to HomeSafe and, thus, with standing to seek to overturn that award.

Accordingly, the Court should dismiss plaintiffs' protests because they lack standing to seek the requested relief – an injunction requiring a re-solicitation of the entire GHC, as opposed to specific additional work – and to bring the protest of the 2021 GHC contract award that underlies what is nominally a protest of work outside the scope of that contract.

## III. If The Court Concludes That Plaintiffs Have Standing And State A Claim For Relief, Plaintiffs Nonetheless Fail To Demonstrate Any Out-Of-Scope Work Added To The GHC

If the Court determines that plaintiffs have standing to bring their protests, the Court should nonetheless dismiss the protests. The additional work under the GHC does not constitute a cardinal change of the contract awarded in 2021, meaning that Suddath's protest cannot succeed.

### A. Suddath Misconstrues The Standards Applicable To Cardinal Change Protests

Suddath grounds its protest on an assertion that the GHC solicitation included "[r]estrictive provisions or conditions" and "overstat[ed] requirements" for which "TRANSCOM did not have an actual minimum need." Suddath MJAR at 2-3; *id.* at 17. These purportedly overstated requirements were the "expedited 9-month transition period with contemporaneous full integration of [the contractor's] IT System and the Agency's MilMove system" and transfer of all responsibility for domestic relocation services within seven months following transition and for international services in the three months after that. *Id.* at 2. However, the judicial decisions Suddath relies on are entirely unrelated to the standard for reviewing alleged cardinal changes and, thus, cannot support Suddath's claim of CICA violations.

The decisions cited by Suddath – *Glenn Defense Marine (Asia) PTE Ltd. v. United States*, 97 Fed. Cl. 568, 578 (2011); *Piedmont Propulsion Systems, LLC v. United States*, 167 Fed Cl. 72, 82-83 (2023); *Parcel 49C Ltd. Partnership v. United States*, 130 Fed. Cl. 109, 125 (2016); and *American Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435 (2015) – all involve pre-award protests challenging solicitation terms, not protests of purported out-of-scope contract work during contract administration that constitutes cardinal changes. Suddath PMJAR at 3, 17. Indeed, contrary to Suddath's representation, *CeleraPro, LLC v. United States*, 168 Fed. Cl. 408 (2023), includes *no discussion whatsoever* of "an agency's actual minimum needs" when analyzing the alleged cardinal change, let alone any support for Suddath's attempt to extend pre-award protest considerations of such needs to post-award claims of cardinal changes, like those here. Suddath PMJAR at 18. There is no basis for Suddath's extension of pre-award challenges to solicitation terms to periods years after award, when – during contract performance – events may understandably require changes to the needs expressed in the solicitation. This is why there

is a different standard for protests to alleged "cardinal changes" than the standard applied in the four pre-award decisions cited by Suddath.

That is, although when contracting, an agency is required to "obtain full and open competition through the use of competitive procedures,"[1] TMM PMJAR at 22, this requirement "does not prevent modification of a contract by requiring a bid procedure for every change." *AT&T Commc'n, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993); *see also Green Mgmt. Corp. v. United States*, 42 Fed. Cl. 411, 429 (1998) ("Parties may modify a government contract at any time, including after execution") (citation omitted). "Case law and statutory authority ensure the right of the government to modify its procurement contracts at any time." *Northrop*, 50 Fed. Cl. at 465 n.43 (citing *Wiltel*, 1 F.3d at 1205 n.1; *Green*, 42 Fed. Cl. at 429). "[O]nly modifications outside the scope of the original competed contract" violate CICA by preventing potential offerors from participating or competing for work that should be sought through a new procurement and, thus, "fall[s] under the statutory competition requirement," rather than obtained from the contractor by adding work to the contract. *Wiltel*, 1 F.3d at 1205; *see also Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008) ("[A]dding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under [28 U.S.C.] § 1491(b)(1).").

A modification is outside the scope of the contract and considered a cardinal change when there is "an alteration of work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Wiltel*, 1 F.3d at 1205 (quoting *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978)).

---

[1] Although CICA, 41 U.S.C. § 3301(a)(1), includes this requirement, for the Department of Defense, including TRANSCOM, the requirement is found in 10 U.S.C. § 2304(a)(1)(A) – which is the equivalent of CICA.

To determine whether a modification falls within the statutory competition requirement, the Court must examine "whether the contract as modified materially departs from the scope of the original procurement." *Id.* (citations omitted). "A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." *Id.* (citation omitted).

Whether a modification outside the scope of the original procurement has occurred involves questions of contract interpretation, *see*, *e.g.*, *Northrop*, 50 Fed. Cl. at 458, which is a question of law for the Court. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985). Contract interpretation begins with the plain meaning of the provision in question. *Id.* (citing *S.W. Aircraft v. United States*, 213 Ct. Cl. 206, 212, 551 F.2d 1208 (1977)). Thus, "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning,' . . . and the court may not resort to extrinsic evidence to interpret them." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citations omitted).

The Federal Circuit has recognized that "a broad original competition may validate a broader range of later modifications without further bid procedures." *Wiltel*, 1 F.3d at 1205. Where the statement of work contains language that "alerts prospective offerors to the possibility of subsequent changes in the specific work required to accomplish the contract's broad objectives," then "simply because a task is not included in the original contract does not mean that it is not within the permissible scope of modifications." *HDM Corp. v. United States*, 69 Fed. Cl. 243, 257-58 (2005). Conversely, a modification may be outside the scope of a contract if the solicitation *expressly* prohibited modifications of that sort, meaning that they would not be reasonably anticipated. *See Northrop*, 50 Fed. Cl. at 466. However, there is no support for Suddath's attempt to stretch *Northrop's* conclusion – like *CeleraPro's*, as discussed above –

beyond its actual language about express prohibitions in the solicitation to "an Agency['s] express[] reject[ion]" of "requests to amend restrictive requirements" in a solicitation or "reject[ion] [of] offers based upon an assessment that they would not meet restrictive requirements." Suddath PMJAR at 19; *id.* at 33.

### B. The Challenged Extensions To The Transition Period And Added IT Requirements Do Not Constitute A Cardinal Change

Plaintiffs assert that a cardinal change occurred because the solicitation referenced a nine-month transition period, but "TRANSCOM materially enlarged the transition period by three-fold[.]" Suddath MJAR at 20 (capitalization omitted); *see also* TMM PMJAR at 24-25. Plaintiffs fail, however, to demonstrate that the concept of a cardinal change – that is, a change in the *work* anticipated under a contract – has any application to an extension to a *transition period*, as opposed to a set period for performance. Even if the rubric of a cardinal change fit these circumstances, the Court has clearly rejected similar claims that extensions of time for contract performance were outside the scope of the contract. Moreover, although TRANSCOM modified the contract to add requirements related to the contractor's IT system, these requirements – mainly related to testing the contractor's IT system – could be reasonably anticipated by an offeror based on the solicitation's requirement of a contractor IT system that was operational and could interface with Government IT systems.

#### 1. Extensions To A Transition Period Do Not Reflect Work Outside Of The Contract's Period Of Performance And, Thus, Cannot Possibly Constitute Cardinal Changes

Extensions to the time spent on performance of a contract can reflect out-of-scope contract work "when such time is extended in order to add significantly more quantity or new requirements to the contract" – that is, additional work. *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 466 (2001). However, the Court has explained that, "[i]n general,

extensions of the time period for performance of a contract do not" *on their own* "amount to actions outside the scope of a competition, unless time is *the* critical element in defining the obligation of the government contract (e.g., a contract for a service for a specific period of time)," *id.* at 467 (emphasis added) (citing *Def. Sys. Group; Warren Pumps, Inc.; Dresser Indus., Inc.*, B-240295, 1990 WL 293536 (Compl. Gen. Nov. 6, 1990)) – that is, when the contract "confine[s] the base period of performance to a set time period expiring" on a specific date. *CWT/Alexander Travel Ltd. v. United States*, 78 Fed. Cl. 486, 494-95 (2007) (quoting *Ingersoll-Rand*, B-225996, 87-1 CPD ¶ 474 (Comp. Gen. May 5, 1987)). For example, when the Government enters into a requirements contract to obtain all its requirements from a contractor through a specific date, and a modification extends that end date, the work that will occur after the planned end date of performance might be considered work outside the contract's scope that should be the subject of a competition. *See DOR Biodefense, Inc.; Emergent Biosolutions*, B-296358.3, 2006 WL 279311, at *8 (Comp. Gen. Jan. 31, 2006). There is "a significant difference between" that situation and "those situations where a contractor is given additional time to perform a contractual obligation," which do not reflect cardinal changes. *CWT/Alexander*, 78 Fed. Cl. at 494-95.

Plaintiffs fail to demonstrate that the challenged time extensions to the transition period have any effect on the period of performance and, thus, that the concept of a cardinal change could even apply here. As TMM and National note, "the Solicitation contemplated award of a nearly *10-year* contract," including a transition period, base period, option years, and other time periods, and the awarded contract anticipates performance through August 31, 2030. TMM PMJAR at 4 (emphasis added); *id.* at 8; Tab 7 at AR121-28; Tab 211 at AR35262-69. And although the Court need not reach this question, plaintiffs do not demonstrate – let alone allege –

that there is a set end date for performance or that the challenged extensions have moved any such fixed end date. As in *Northrop*, which also involved a "window of ten years to complete the contract, this specific time period was not crucial to [the contractor's] obligations pursuant to the solicitation or the contract." 50 Fed. Cl. at 467. Because the Court should consider "the modification in the context of the contract as a whole," *Wiltel*, 1 F.3d at 1207, extension of the period in which the contractor performs transition activities cannot be considered a change outside the scope of the entire contract.

**2. Even Assuming That Extensions To The Transition Period Could Constitute A Cardinal Change, TRANSCOM's Specific Extensions In This Case Cannot Be Viewed As One**

Even if the Court could find a cardinal change in these circumstances, involving a transition period, the extensions here cannot be considered outside the scope of the contract.

Suddath contends that the transition period could not be extended beyond nine months and that performance had to begin on February 1, 2021. *See* Suddath PMJAR at 20-21 (citing Tab 7(a)(1) at AR208, 210). However, the solicitation's language does not support Suddath's interpretation since it does not set rigid deadlines for completion of the transition period, phase-in period, or other performance. Although the contract included a date on which the transition was to be completed, *see* Tab 7(a)(1) at AR208 (Performance Work Statement, Appendix A), GAO has not found a cardinal change in a similar situation – when a contract included a delivery date for a vaccine to be developed under a particular CLIN, based on the expected CLIN exercise date identified in the request for proposals (RFP), but a modification extended that delivery date. *DOR Biodefense*, 2006 WL 279311, at *8. Moreover, the solicitation acknowledged that there could be "issues which would impact the Transition schedule/plan" and required that the contractor notify the Government if it learned of any. Tab 7(a)(1) at AR210. Although the

solicitation stated that the contractor's IT system "shall be fully integrated with the Government managed IT system and able to accept task orders[,]" "process invoices for payment," and "execute an end-to-end, origin to destination" move "not later than (NLT) contract base period year one (1) start date," it also explained that each of "[t]h[ese] requirement[s] is based on successful testing completed no later than 30 days prior to the contract base period year one (1) start date." Tab 7(a)(1) at AR208 (§§ A.2.2.2, A.2.2.3, A.2.2.4). An offeror, thus, could reasonably anticipate that [redacted] – and issues of any kind – could result in extensions to the transition period and, correspondingly, to the start of the volume phase-in period. And, addressing the volume phase-in period, the solicitation only stated that "[t]he Government *intends* to transfer responsibility for complete, global HHG relocation services [in accordance with] the phased approach outlined" in Appendix A, including "specified timelines" within which the contractor "shall be operational and ready to begin performance." Tab 7(a)(1) at AR210 (emphasis added). Because Suddath does not contend that there is any ambiguity in the solicitation's language, the Court should not, when interpreting it employing standard tenets of contract interpretation, *see* Section III.A, above, consider the material extrinsic to the solicitation on which Suddath relies. *See McAbee Constr.*, 97 F.3d at 1435; *see* Suddath PMJAR at 20-22 (relying on statements in Tabs 9(j) 153(a)(1), 154(a)(1), 201, 412, and 413 – a 2019 market research report, the Combined Acquisition and Source Selection Plan, questions and answers during the procurement, evaluations of offerors during proposal review, and Source Selection Decision Document). Moreover, as described below, an offeror would reasonably anticipate that the transition period would be extended in the situations at issue in this case.

**a. Additional Time Due To Halting Transition Work During Bid Protests**

First, there is no basis for plaintiffs' challenge to time extensions that accounted for periods of time in which work was stopped to allow for the GAO and this Court to consider protests to the award of the GHC. Modifications 2 and 4 are among the 17 modifications that plaintiffs claim "substantially changed the GHC's required work, performance period, and price." TMM PMJAR at 23. Yet TMM and National explain that Modifications 1 and 3 (about which they raise no complaint) respectively "direct[ed] HomeSafe to stop work" "[i]n light of the November 2021 GAO protests" and, later, "implement[ed] a stay of performance" due to protests before this Court. TMM PMJAR at 8. Modifications 2 and 4 lifted the stop work orders in Modifications 1 and 3 following the denials of the GAO protests and the Court's denial of the protests before it. *Id.* at 8-9.

An offeror would reasonably anticipate that the transition period would be extended in this situation, based on the solicitation language. As noted above, the solicitation and subsequent contract incorporated by reference FAR 52.233-3, Protest After Award (AUG 1996), which states that, after the filing of a protest, "the contracting officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract" through a "stop-work order" and "*shall make an equitable adjustment in the delivery schedule or contract price, or both*, and *the contract shall be modified*, in writing, accordingly, if" the contractor makes a timely request for equitable adjustment due to "an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract" resulting from the stop-work order. FAR 52.233-3 (Aug. 1996) (emphasis added).

Moreover, the Federal Circuit has concluded that uncertainty in the duration of a contract resulting from a "protest and the events which followed, including [] later protests" – "a not

unknown occurrence in the world of government contracts" – cannot make "the government . . . potentially liable for a cardinal change." *Contact Int'l Inc. v. Widnall*, 106 F.3d 426 (Table), at *4 (Fed. Cir. 1997) (unpublished). Moreover, since plaintiffs do not contend that the Government acted unreasonably in stopping work after the protests were lodged, there is even less reason to view the delay due to the protests as a cardinal change. *Id.*

**b. Additional Time To Work On Solutions To Performance Difficulties**

Moreover, an offeror would reasonably anticipate extensions of time for a transition period to allow time for the Government and the contractor to try to resolve performance difficulties, like those that arose during the transition period here.

TRANSCOM explained that "both parties agreed to extend the [nine-month] transition period, at no cost, for a total of five months (1 SEP 2023 – 4 FEB 2024)," through Modifications 8 through 12, because "technical challenges surfaced [redacted] as a result of complex relocation business processes and creation of the new technical environment established to support GHC." Tab 375 at AR59241; Tab 332 at AR59006; Tab 338 at AR59032; Tab 344 at AR59056; Tab 352 at AR59102; Tab 362 at AR59159. Specifically, TRANSCOM issued Modification 8 – an extension of one month to the transition period, through September 30, 2023, Tab 332 at AR59006 – when, "[a]s a result of the [redacted], [redacted] but HomeSafe [redacted] Tab 329 at AR59001. TRANSCOM issued Modification 9, another one-month extension, following HomeSafe's statement that it "believe[d] the month of

October [redacted]."
Tab 336 at AR59025.

Modification 13 extended the period for transition of services by 12 months. Tab 377 at AR 59246. TRANSCOM concluded that this extension was "required to ensure a smooth and successful phase-in of the GHC contract." Tab 374 at AR59231. The revised PWS issued with Modification 13 added requirements for "technical and user acceptance testing and participat[ion] in Government Operational Test and Evaluation (OT&E) events," along with other requirements. AR378 at AR59251-55. Modification 13 "settle[d] HomeSafe's request for a price adjustment under FAR 52.212-4(c) Changes stemming [redacted]." Tab 377 at AR59246.

Schedule adjustments, such as those made by TRANSCOM, providing additional time for performance of a contract are within the scope of the contract, especially when the adjustments are due to problems with the completion of performance. *See HDM*, 69 Fed. Cl. at 256 (citing *Northrop*, 50 Fed. Cl. at 466). In *Northrop*, the Court determined that extensions of the contract period were not cardinal changes when – as demonstrated above – the extensions were related to performance difficulties, the contractor and the Government "[we]re working on solutions to the[se] performance difficulties, . . . the delays are a direct result of those problems that were not anticipated by the parties[,]" and "this specific time period [during which there was an extension] was not crucial to [the awardee's] obligations pursuant to the solicitation or the contract." *Northrop*, 50 Fed. Cl. at 467. The Court explained that "[i]t is within the prerogative of the parties to make continuous efforts to comply with the requirements of a solicitation and

contract when problems arise," that "[a]ny reasonable bidder would expect to engage in the same efforts." *Id.* The Court concluded, in *Northrop*, that it "w[ould] not punish [the awardee] and [the Government] for causing delays by attempting to complete the contract requirements in the face of adversity." *Id.* Indeed, if the Court accepted plaintiffs' invitation to insert itself into the contracting parties' attempts to deal with the performance difficulties, it would improperly intrude into matters of contract administration best left to the procuring agency. *See id.* at 467, 469.

Moreover, the time extensions could have been reasonably anticipated by offerors, given the complexity involved in the development of the contractor's IT system and interface with the Government IT system. *DOR Biodefense*, 2006 WL 279311, at *8. The Performance Work Statement's Appendix A described the detailed requirements for the contractor's IT system and its ability to interface with Government IT system. Tab 7(a)(1) at AR208-10 (§ A.2.2).

Suddath's apparent assertion that delays resulted from the Government's development of its MilMove system does not alter the applicability of *Northrop's* reasoning related to attempts to overcome adversity described above. Suddath PMJAR at 23. GAO has concluded that, when "a delay in production is caused by the agency's inability to provide a contractor with adequate specifications, a resulting adjustment to the delivery schedule does not constitute an out-of-scope modification to the contract." *Saratoga Indus., Inc.*, B-247141, 92-1 CPD ¶ 397 (Apr. 27, 1992) (citing *Ingersoll-Rand*, B-225996, 87-1 CPD ¶ 474 (May 5, 1987)). Similarly, GAO has also found that time extensions are not evidence of a cardinal change when "the delay resulted in part from the [Government's] inability to meet its contractual duty to provide adequate drawings to the contractor." *Ingersoll-Rand*, B-225996 (May 5, 1987). Here, the solicitation's Performance Work Statement explained that "[t]he contractor's IT system shall interface with a government

managed system for the purposes of issuing and receiving task orders, third party payment system (TPPS) payment requests, shipment ITV, government data access, and claims management/filing" and that "[t]he contractor shall interface its system with government-managed system(s) for the purpose of receiving customer shipment requirements via task orders and requesting modifications." Tab 7(b)(1) at AR463. In this situation, offerors could reasonably anticipate time extensions if development of the Government-managed systems was "behind schedule," as Suddath claims it was. Suddath PMJAR at 23 (quoting Tab 444 at AR60578).

That alleged difficulties with "the Government's development of its MilMove system" discussed "at the time of the Modification 8 negotiations" in 2023 "were . . . unknown to . . . offerors" at the time they considered bidding in 2019, Suddath PMJAR at 23; Tab 329 at AR59001-02, is irrelevant. Plainly, the Government is not required to be clairvoyant when it enters into a contract and, instead, has the ability to modify contracts to respond to unexpected occurrences and difficulties with contract performance – which an offeror should reasonably anticipate. Further, HomeSafe's statement that MilMove's development [redacted] does not indicate that there was a significant change in the *work ultimately required* by the GHC – creation of the contractor's "easy to use, secure, web-based, mobile-device compatible IT system." Tab 7(b)(1) at AR463.

Finally, an offeror could reasonably anticipate, based on the solicitation language, that, in a scenario like that occurring during the transition period, [redacted] to extend the transition period, [redacted], resulting in Modification 13. "[A] modification generally falls within the scope of the original procurement if bidders would have expected it to fall within the contract's changes clause." *WilTel*, 1 F.3d at 1205. The solicitation

and subsequent contract incorporated by reference FAR 52.212-4, Contract Terms and Conditions – Commercial Items (OCT 2018), *see* Tab 7 at AR128-29; Tab 71a at AR15885-86 – which contains a changes clause, FAR 52.212-4(c). This clause states that "[c]hanges in the terms and conditions of this contract may be made only by written agreement of the parties." FAR 52.212-4(c) (Oct. 2018).

Plaintiffs, thus, have not demonstrated that the extensions to the transition period alone can constitute cardinal changes.

### 3. **Modification 13's Added Requirements For IT System Testing Are Not Outside The Scope Of The Contract**

Finally, plaintiffs claim that, through Modification 13, TRANSCOM "materially changed" the "IT System requirements" associated with the Transition Period and the Volume Phase-In Period. Suddath PMJAR at 5; *see id.* at 24. However, the requirements added to ensure compliance and operability of the contractor's IT system are plainly within the contract's scope.

Although Suddath takes issue with Modification 13's "add[ed] testing requirements," Suddath PMJAR at 27, it is illogical to assert that TRANSCOM exceeds the scope of the contract by requiring that HomeSafe test – and assist TRANSCOM in testing – the IT system that is part of the contractor's work under the contract. The solicitation's Performance Work Statement required the contractor to

> provide and maintain an *easy to use, secure,* web-based, mobile-device compatible IT system *able to manage* complete household goods relocation services globally during peak (surge) and non-peak seasons. The contractor's IT system *shall interface with a government managed system* for the purposes of issuing and receiving task orders, third party payment system (TPPS) payment requests, shipment ITV, government data access, and claims management/filing. The contractor's IT system(s) shall permit the customer to coordinate all phases of their move, *be accessible* from a commercial or government network using common browsers and include the ability to upload attachments.

Tab 7(b)(1) at AR463 (emphasis added). In addition, as described above, the solicitation expressly stated that the contractor would perform testing of its IT system's capability to perform order acceptance, invoicing, and shipment management – the first two of which required interfacing with the Government IT system. Tab 7(a)(1) at AR208 (§§ A.2.2.1-2.2.3); *see also id.* at AR209 (§ A.2.2.4.3) (requiring testing of IT system security).

Modification 13's added requirements, in a revised Performance Work Statement, merely require *testing* of this IT system, by mandating, for example, that "[t]he Contractor shall support technical and user acceptance testing and participate in Government Operational Test and Evaluation (OT&E) events[,]" and "[p]rior to Government testing, the Contractor shall have completed thorough end-to-end testing on all components of its IT system, interfaces, and integrations confirming that all functions are working in accordance with all contract documents." Tab 378 at AR59254-55. (Although Suddath relies on a summary of proposed requirements in an internal TRANSCOM Final Price Negotiation Memorandum, Suddath PMJAR at 24 (quoting Tab 374 at AR59234-35), the Court should consider the actual requirements added to the contract through Modification 13 and the attached revised Performance Work Statement, Tabs 377 & 378). Plainly, testing the IT system to determine if it meets the requirements stated in the solicitation cannot be outside the scope of the contract. And, given that the solicitation contained requirements for testing the IT system, an offeror could reasonably anticipate modifications of the contract to test that system in additional ways.

Notably, the *Northrop* Court rejected a protestor's claim that "further testing of [a contractor's] system during the performance of the contract . . . [is] outside the scope of the competition." 50 Fed. Cl. at 467. The Court noted that "[i]t is difficult to understand how these changes, while perhaps not to be specifically anticipated by the reasonable bidder on the

solicitation, somehow expand the scope of the competition such that a new solicitation is necessary" since, "[i]n terms of the product being delivered, and the work expected of [the contractor], there is no change effected by these testing and production decisions." *Id.* More fundamentally, since the modification called for HomeSafe to test *its own* IT system, it would have been impractical for this testing to be performed by another contractor; this indicates that an offeror would not have reasonably anticipated that such work would be separately competed.

Likewise, other requirements added through Modification 13 – like "discussions with the Government" and "accommoda[tion] [of] changes to source data" – relate to the capability of the contractor's IT system required by the solicitation and contract. AR378 at AR59251-55. The fact that these requirements were added to PWS sections detailing existing duties indicates that they do not constitute work outside of those existing duties. *Id.* (highlighted additions).

Suddath confusingly asserts that "the negotiation and execution" of Modification 13 "with HomeSafe explicitly acknowledged that these are material changes." Suddath MJAR at 5. TRANSCOM did not, however, make any statement to this effect; all of the statements quoted by Suddath were made by HomeSafe. *Id.* In any event, "[t]he inquiry with respect to scope is an objective one viewed from the perspective of potential bidders for the original procurement" – meaning that HomeSafe's opinion about the materiality of changes is irrelevant. *Phoenix Air Grp.*, 46 Fed. Cl. at 104. And, moreover, material changes are not necessarily outside the scope of the contract.

The Court should, therefore, conclude that neither the time extensions nor testing requirements in Modification 13 evidence cardinal changes

### C. Increases In Prices And Funding Do Not Demonstrate That The Modifications Resulted In Work Outside Of The Contract

Plaintiffs further base their claims of cardinal changes on TRANSCOM's increases in funding for the GHC contract work and price adjustments. Suddath PMJAR at 26-28, 30-32; TMM PMJAR at 23. We demonstrated above that the time extensions and added requirements for IT system testing are not outside of the contract's scope, and the increased funding alone cannot establish a cardinal change.

Suddath contends that "TRANSCOM doubled the anticipated funding under the transition period to accommodate the out-of-scope enlargements of time and additions to the IT system requirements." Suddath MJAR at 26 (capitalization omitted); *see id.* at 26-28. However, "[i]n cases that apply the cardinal change doctrine, even a substantial price increase alone is not enough to establish that modifications are beyond the scope of a contract, as long as the nature and purpose of the contract has not changed." *Am. Apparel, Inc. v. United States*, 108 Fed. Cl. 11, 38 (2012) (citing *S.J. Groves & Sons Co. v. United States*, 661 F.2d 170, 173 (Ct. Cl. 1981)). The Court has relied on a GAO decision concluding that a "more than 120 percent increase in price" could not, alone, "establish that the modifications are beyond the scope of the original contract" when "the nature and purpose of the contract have not changed." *CeleraPro*, 168 Fed. Cl. at 431 (quoting *Def. Sys. Grp.*, B240295, 1990 WL 293536, at *4 (Comp. Gen. Nov. 6, 1990)).

We demonstrate below why plaintiffs' specific challenges are unsupported.

#### 1. Modification 13

Plaintiffs assert a cardinal change based on fees allowed by Modification 13 for additional IT work. TMM PMJAR at 28. Suddath identifies no reason that the Court should treat a "restructur[ing] [of] the expected compensation scheme" through Modification 13

differently than it has treated price increases in the decisions discussed above. Suddath PMJAR at 6; *see also id.* at 28-29.

We explained in Section III.B above why the additional IT requirements, including testing of HomeSafe's IT system (HomeSafe Connect), were within the contract's scope, based on the solicitation language. The Court should reject plaintiffs' attempt to undermine the plain language of the solicitation and offerors' reasonable anticipation related to the contract work based on additional funding to perform requirements within the contract's scope.

**2. <u>Modification 6</u>**

Suddath challenges Modification 6, which granted HomeSafe's equitable adjustment and adjusted prices (through Economic Price Adjustments), contending that it is outside of the schedule for price adjustments provided in the solicitation at Appendix G. Suddath PMJAR at 30-31 (citing Tabs 314 and 315). Although TMM and National note in their Statement of Relevant Facts that, under Modification 6, price adjustments applied as part of a settlement of HomeSafe's request for equitable adjustment, TMM PMJAR at 10-11, TMM and National do not raise any claim that these price adjustments reflect out-of-scope work; thus, they have waived any such argument. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006). In any event, the price adjustments in Modification 6 do not constitute cardinal changes because an offeror would have reasonably anticipated, from the solicitation, that funding could be provided "to compensate [HomeSafe] for . . . delays" attributable to stop-work orders resulting from bid protests. Suddath PMJAR at 5.

Modification 6 makes clear that it "settles Homesafe's request for a price adjustment under FAR 52.233-3 (Protest After Award) stemming from [the] two (2) stop-work orders issued under this contract . . . for costs properly allocable to the performance of this contract" and

"associated with the delay from both rounds of postaward protests[.]" Tab 316 at AR58934. "[A] modification generally falls within the scope of the original procurement if bidders would have expected it to fall within the contract's changes clause." *WilTel*, 1 F.3d at 1205. The solicitation and subsequent contract incorporated by reference FAR 52.212-4, Contract Terms and Conditions – Commercial Items (OCT 2018), *see* Tab 7 at AR128-29; Tab 71a at AR15885-86 – which contains a changes clause, FAR 52.212-4(c). This clause states that "[c]hanges in the terms and conditions of this contract may be made only by written agreement of the parties." FAR 52.212-4(c) (Oct. 2018). Further, the solicitation and subsequent contract included FAR 252.243-7002, which allows a contractor to submit requests for equitable adjustment seeking costs, Tab 7 at AR193-94; Tab 71(a) at AR15914-15, so offerors could reasonably anticipate that the successful offeror and contract awardee could make a request for equitable adjustment. Finally, the solicitation and subsequent contract incorporated by reference FAR 52.233-3, Protest After Award (AUG 1996), which, as described above, required the payment of costs to the contractor (and associated contract modification) if a stop-work order issued due to a protest "results in an increase . . . in the Contractor's cost properly allocable to, the performance of any part of this contract" and the contractor timely requests an adjustment for such costs. FAR 52.233-3 (Aug. 1996).

These solicitation and contract provisions show that TRANSCOM's price adjustments in response to HomeSafe's requests for equitable adjustments based on the stop-work orders, Tab 314 at AR 58918-28; Tab 316 at AR58934, were not outside the scope of the competition conducted to achieve the original contract. *Wiltel*, 1 F.3d at 1205. Since a "protest and the events which followed, including [] later protests" are "not unknown occurrence[s] in the world of government contracts," an offeror could reasonably anticipate increased prices due to

equitable adjustments resulting from stop-work orders issued during protests, meaning that TRANSCOM cannot be liable for a cardinal change. *Contact*, 106 F.3d 426 (Table), at *4.

### 3. Modifications 5 And 15

Finally, Suddath challenges TRANSCOM's approval, in Modifications 5 and 15, of wage determination updates. Suddath PMJAR at 31-32; Tab 308 at AR58876; Tab 393 at AR59403. Such wage determination updates are plainly within the scope of the contract.

The updates in wage determinations challenged by Suddath are required by the Service Contract Act, 41 U.S.C. § 6701, *et seq*. This act is implemented in Government contracting through FAR 52.222-41, Service Contract Labor Standards, and FAR 52.222-43, Fair Labor Standards Act And Service Contract Labor Standards – Price Adjustment (Multiple Year And Option Contracts). The solicitation incorporated both of these provisions by reference. Tab 7 at AR129 (including the August 2018 version of each).

The Department of Labor (DOL) issues wage determinations under the Service Contract Labor Standards statute, 41 U.S.C. chapter 67. *See* FAR 52.222-43(a). A contractor has a "duty under FAR 52.222-41 . . . to compensate its workers, and provide fringe benefits, in accordance with the minimums stated in the then applicable [DOL] wage determination." *Hallmark-Phoenix 3, LLC*, ASBCA No. 61049, 17-1 B.C.A. (CCH) ¶ 36788 (June 23, 2017)). FAR 52.222-43 requires the contractor to notify the contracting officer of any increase in contract price or labor rates that the contractor claims due to the new wage determination. FAR 52.222-43(f). The Government then has an obligation under FAR 52.222-43(d) to adjust the "'contract price or contract unit price labor rates, or fixed hourly labor rates . . . to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent that' the change is made as a result of the [DOL] applicable wage determination." *Hallmark-Phoenix 3*, 17-1

B.C.A. (CCH) ¶ 3678 (quoting FAR 52.222-43(d)). TRANSCOM explained its ability to adjust contract prices under the Service Contract Act and FAR 52.222-43, in the decision adjusting the Move Management Fee cited by Suddath. Suddath PMJAR at 31-32 (quoting Tab 391 at AR59400).

The solicitation also included FAR 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 2014), which states that,

> [i]n compliance with the Service Contract Labor Standards statute and the regulations of the Secretary of Labor (29 CFR part 4), this clause identifies the classes of service employees expected to be employed under the contract and states the wages and fringe benefits payable to each if they were employed by the contracting agency subject to the provisions of 5 U.S.C. 5341 or 5332[.]

Tab 7 at AR179. The solicitation provides "a sampling of potential equivalent labor categories that could be employed in the contractor's transportation network" and "[a]pplicable fringe benefits . . . in Attachment 3, Wage Determinations." *Id.*; Tab 7(b)(5) at AR506-604.

The plain language of the solicitation, thus, made clear that TRANSCOM could and, likely would be required to, adjust contract prices to account for updates in DOL wage determinations, as described in the GAO's decision in *Hallmark-Phoenix 3*. An offeror would reasonably anticipate that TRANSCOM would do so. Suddath's reliance on TRANSCOM's answer to an offeror's question during the period for submitting proposals is, once again, misplaced, since the Court cannot resort to such extrinsic evidence to interpret the solicitation when its language is unambiguous. In any event, TRANSCOM's statement that it "d[id] not expect 'significant changes'" – presumably in the contract work – "that would require a contract modification resulting in an increased Management Fee" has no relationship to standard modifications to recompense a contractor for wage increases mandated by DOL under FAR 52.222-41 and 52.222-43. Suddath PMJAR at 31-32 (quoting Tab 9(j) at AR912 (Question

#287)) . Even if a contractor's own changes to its fees could be one of the vague "significant changes" that were the subject of the question and answer, Suddath does demonstrate that the Move Management Fee increase was "significant." *Id.* at 32.

Because TRANSCOM's actions do not amount to cardinal changes, plaintiffs have failed to demonstrate that TRANSCOM acted arbitrarily or capriciously by not competing work added to the contract. Because plaintiffs have not made this showing, the Court need not consider plaintiffs' claims that they were prejudiced by the modifications. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The Court should deny plaintiffs' protests and reject their requests for injunctive relief and judgments declaring that the agency's actions violate CICA. Suddath MJAR at 36; TMM MJAR at 39.

## IV. Even If The Court Concluded That There Were Cardinal Changes, Plaintiffs Are Not Entitled To The Injunctive Relief That They Seek

Even if the Court concluded that the contract modifications challenged by plaintiffs were cardinal changes, plaintiffs are not entitled to the injunctive relief sought because plaintiffs seek permanent injunctions of the entire contract (not just the allegedly out-of-scope work) and because, in any event, the balance of harms weighs against this injunctive relief.

TMM and National request that the Court "issue a permanent injunction ordering TRANSCOM to end performance under the unlawful Contract and remand the matter to TRANSCOM to recompete its revised requirements using full and open competition, including issuing a revised solicitation that accurately reflects TRANSCOM's needs." TMM PMJAR at 39. Suddath similarly requests that the Court "enjoin TRANSCOM from proceeding with further performance under the materially changed and illegal GHC" contract. Suddath PMJAR at 36-37. As we explained in Sections II and III.A, however, the remedy for a cardinal change is a

competition for the added, out-of-scope work, not the entire contract. Thus, plaintiffs have failed to demonstrate that they are entitled to the relief sought.

Even assuming that plaintiffs could obtain injunctions of the performance of the GHC contract in its entirety, denial of injunctive relief is in the public interest of improving the process for moving servicemembers and their families. The continued progress of the GHC program serves Congress's interest in changing how the Department of Defense performs such moves. Issuing the injunction sought by Suddath would make it extremely difficult for TRANSCOM to comply with this Congressional direction. *See HDM*, 69 Fed. Cl. at 261.

Further, the United States and HomeSafe have made substantial investments in the GHC program. *Cf. id.* 69 Fed. Cl. at 262. Moreover, as noted by TMM and National, TRANSCOM began placing orders under the GHC in April 2024, TMM PMJAR at 19, meaning that the modifications challenged by plaintiffs have already been performed by HomeSafe and that it would be unnecessary and wasteful for another contractor to perform the same work, were it to be competed. *Cf. HDM*, 69 Fed. Cl. at 261.

Although the public has an interest in "preserving the integrity and fairness of the procurement process," Suddath MJAR at 39, this cannot dominate the analysis of public interest without creating a presumption in favor of an injunction, rejected by the Supreme Court in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "[P]rotecting the public fisc [is a] strong public interest" that would not be advanced by an injunction requiring performance of unnecessary work. *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 521 (2012) (citations omitted).

Thus, the balance of harms and consideration of the public interest in this case favors the Government and requires denial of plaintiffs' requests for permanent injunctions.

## CONCLUSION

For the reasons stated above, we respectfully request that the Court grant our motion to dismiss and motion for judgment on the administrative record and deny plaintiffs' motions for judgment on the administrative record.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

s/ Amanda L. Tantum
AMANDA L. TANTUM
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-8131
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

PETER RIES
Chief, Acquisition Law
ROBERT DEPKE
Attorney
WALTER C. MULLEN
Attorney
USTRANSCOM

February 14, 2025