[redacted]

# In the United States Court of Federal Claims
**Bid Protest**

| | |
|---|---|
| THE SUDDATH COMPANIES,<br><br>Plaintiff,<br><br>and<br><br>TOTAL MILITARY MANAGEMENT, INC.,<br><br>Consolidated Plaintiff,<br><br>and<br><br>NATIONAL HOLDING COMPANY, INC.,<br><br>Consolidated Plaintiff<br>v.<br><br>THE UNITED STATES,<br>Defendant,<br><br>and<br><br>HOMESAFE ALLIANCES LLC,<br><br>Defendant-Intervenor. | Nos: 1:24-cv-01836, 1:24-cv-02029, 1:24-cv-02112<br><br>Judge Zachary N. Somers<br><br>**AGREED REDACTED VERSION** |

**PLAINTIFF THE SUDDATH COMPANIES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND DEFENDANT-INTERVENOR'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

[redacted]

[redacted]

Per Rule 52.1 of the United States Court of Federal Claims and this Court's Amended Scheduling Order (ECF 42), The Suddath Companies respectfully files this timely response to Defendant's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (ECF 50) and Defendant-Intervenor HomeSafe Alliance, LLC's Cross-Motion for Judgment on the Administrative Record (ECF 48-1) and Reply in Support of Plaintiff's Motion for Judgment on the Administrative Record (ECF 44).

Suddath respectfully requests that the Court grant its Motion and deny Defendant and Defendant-Intervenor's Motions, permanently enjoin TRANSCOM from proceeding with further performance under the improper Global Household Goods Contract awarded to HomeSafe Alliance, LLC, and direct TRANSCOM to conduct a full and open competition to meet TRANSCOM's actual minimum needs.

Dated: February 26, 2025

Respectfully submitted,

/s/ *Jeffery M. Chiow*
Jeffery M. Chiow (attorney of record)
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3149
Jeff.Chiow@gtlaw.com
*Counsel for The Suddath Companies*

*Of Counsel:*

Shirin Afsous
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 749-1300
Shirin.Afsous@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP

[redacted]

[redacted]

101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
Cassidy.Kim@gtlaw.com

Yongho Lee
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202) 533-2318
Andrew.Lee@gtlaw.com

Olivia Bellini
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 903-7514
Olivia.Bellini@gtlaw.com

[redacted]

[redacted]

## TABLE OF CONTENTS

I. INTRODUCTION ........ 5

II. ADDITIONAL QUESTIONS PRESENTED ........ 6

III. STATEMENT OF THE CASE ........ 7

IV. ARGUMENT ........ 10

A. Dismissal is Not Appropriate. ........ 10

B. Plaintiffs Are Interested Parties and Have Standing to Bring this Cardinal Change Protest. ........ 10

C. Plaintiffs Are Not Limited to Protesting Only the Changed Portion of the GHC Contract and May Seek Relief Through Re-solicitation of the Agency's Actual Needs. ........ 14

D. The Post-Award Modifications Fundamentally Altered the Nature of HomeSafe's Work Under the GHC Contract and Evinced a Cardinal Change. ........ 16

E. Suddath is Entitled to a Permanent Injunction. ........ 22

V. CONCLUSION AND RELIEF REQUESTED ........ 28

[redacted]

[redacted]

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ABF Freight Sys., Inc. v. United States*,
55 Fed. Cl. 392 (2003) ....... 8, 10

*AGMA Sec. Serv., Inc. v. United States*,
152 Fed. Cl. 706 (2021) ....... 23

*Am. Safety Council, Inc. v. United States*,
122 Fed. Cl. 426 (Fed. 2015) ....... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 6

*Cardinal Maint. Serv., Inc. v. United States*,
63 Fed. Cl. 98 (2004) ....... 7, 11

*CeleraPro, LLC v. United States*,
168 Fed. Cl. 408 (2023) ....... 4, 9, 12, 17

*Colsa Corp. v. United States*,
158 Fed. Cl. 333 (2022) ....... 10

*Furniture by Thurston v. United States*,
103 Fed. Cl. 505 (2012) ....... 20

*Golden Mfg. Co. v. United States*,
107 Fed. Cl. 264 (2012) ....... 7, 22

*Hosp. Klean of Tex., Inc. v. United States*,
65 Fed. Cl. 618 (2005) ....... 23

*Ian Evan & Alexander Corp. v. United States*,
136 Fed. Cl. 390 (2018) ....... 15, 16

*IgniteAction JV LLC v. United States*,
174 Fed. Cl. 62 (2024) ....... 15

[redacted]

[redacted]

*Lindsay v. United States*,
295 F.3d 1252 (Fed. Cir. 2002)....................6

*Magnum Opus Technologies, Inc. v. United States*,
94 Fed. Cl. 512 (Fed. Cir. 2010)....................8

*Mangi Env't Grp., Inc. v. United States*,
47 Fed. Cl. 10 (2000)....................23

*MCI Telecommunications Corp. v. United States*,
878 F.2d 363 (Fed. Cir. 1989)....................9, 10

*Navistar Def., LLC v. United States*,
146 Fed. Cl. 499 (2019)....................5

*Northrop Grumman Corp. v. United States*,
50 Fed. Cl. 443 (2001).................... *passim*

*Phx. Air Grp., Inc. v. United States*,
46 Fed. Cl. 90 (2000)....................7

*Rex Serv. Corp. v. United States*,
448 F.3d 1305 (Fed. Cir. 2006)....................9, 10

*Rumsfeld v. Freedom N.Y., Inc.*,
329 F.3d 1320 (Fed. Cir. 2003)....................17

*Sommers Oil Co. v. United States*,
241 F.3d 1375 (Fed. Cir. 2001)....................6

*Sys. Studies & Sim., Inc. v. United States*,
146 Fed. Cl. 186 (2019)....................23

**Statutes, Rules, and Regulations**

28 U.S.C. § 1491(b)....................12

Fed R. Civ. P. 12(b)(6)....................6, 12

**Administrative Record**

AR208....................13

AR210....................13

[redacted]

[redacted]

AR3594 ..... 5, 13

AR35238 ..... 1

AR58832 ..... 5

AR59126 ..... 4

AR59132 ..... 21

AR59189 ..... 14

AR59190 ..... 14

AR59192 ..... 16

AR59202 ..... 16

AR59218 ..... 14

AR59219 ..... 14

AR59230 ..... 4

AR59234 ..... 16

AR59235 ..... 16

AR59279 ..... 5

AR59546 ..... 13

AR60270 ..... 4

AR60325 ..... 6

**Other Authorities**

Daniel Hilton, Executive Director of American Trucking Associations, Letter to Robert Dawson, USTRANSCOM Director of DP3 Program (Dec. 12, 2024), https://www.trucking.org/sites/default/files/2024-12/ATA-MSC%20Letter%20to%20Andy%20Dawson%2C%20RE_%20Advisory%2025-0024%2C%20Dec.%2012%2C%202024%201.pdf ..... 21

[redacted]

[redacted]

Jared Serbu, *DoD Raises Formal Performance Concerns on Multibillion Dollar Moving Contract*, FED. NEWS NETWORK (Jan 30, 2025), https://federalnewsnetwork.com/defense-news/2025/01/dod-raises-formal-performance-concerns-on-multibillion-dollar-moving-contract/ ..........19, 20, 22, 23

CHANGE.ORG., *Military Families Forced to New PCS Contract Amid Diminishing Self Move Rates*, https://www.change.org/p/military-families-forced-to-new-pcs-contract-amid-diminishing-self-move-rates ..........23

MILITARY ONESOURCE, *Installations Where GHC is Available* (Jan. 15, 2025), https://www.militaryonesource.mil/moving-pcs/moving-personal-property/global-household-goods-contract-installations/ ..........19

Press Release, USTRANSCOM, *Twenty Additional Installations Authorized for Domestic GHC Shipments* (Dec. 5, 2024), https://www.ustranscom.mil/cmd/panewsreader.cfm?ID=E95A49F0-ECC0-2051-292303CDCBF34311&yr=2024 ..........19

[redacted]

[redacted]

# I. INTRODUCTION

The Government's brief (ECF 50) and HomeSafe's brief (ECF 48-1) (together, the cross-MJARs) are incomplete and unconvincing attempts to defeat Plaintiffs' Motions for Judgment on the Administrative Record. The cross-MJARs try to divert the Court's attention away from the core tenets of Plaintiffs' cardinal change protest and focuses, instead, on speculative musings about the incentives underlying the protest. Critically, the Government and HomeSafe Alliance, LLC (HomeSafe) (together, Defendants) do not—and cannot—dispute the plain fact that performance under the Global Household Goods Contract (GHC Contract) since contract performance began more than two years ago has changed in ways that GHC competitors under Solicitation No. HTC711-19-R-R004 (Solicitation or RFP) could not have expected.[1] Nor can they deny that the parties have had to execute multiple and significant modifications to meet the actual needs of the United States Transportation Command (Government, Agency, or TRANSCOM). These modifications effected changes to the entire schedule, [redacted], [redacted], and PWS requirements—this transformed the nature of the competed moving services contract to a cooperative development and prototype effort for a new household goods moving solution. *See* ECF 44 at 32.

The cross-MJARs now argue (and not without inconsistencies between each other) that the undisputed contract modifications are in-scope changes, are not significant enough deviations, or otherwise do not measure up to a cardinal change. In so arguing, the cross-MJARs maintain a myopic focus on the characterization of the end product being (or trying to be) rendered as largely reflecting what was originally solicited—namely, global household relocation services. From this,

[1] The actual award to HomeSafe dates back to November 4, 2021. *See* Tab 205 at AR35238. (Cites to the Administrative Record (AR) are referenced by document tab number, as specified on the Index to the Correction to the Administrative Record (ECF 39), and pincite(s) to the bates labeled page number for each document.)

[redacted]

[redacted]

the Government and HomeSafe leap to the conclusion that there could not have been a cardinal change and that this is merely a matter of contract administration where two parties are trying to resolve performance issues. Wholly absent from this narrative is the direct conflict between the requirements that the Agency imposed on prospective offerors in the Solicitation and its actual needs, as reflected in the contract-as-modified. In this regard, Defendants are plainly wrong that Plaintiffs' protest is simply a challenge to regular extensions of time, equitable cost adjustments, relaxation of standards, or adding more granular task specifications. Rather, Plaintiffs properly challenge TRANSCOM's out-of-scope modifications to the GHC Contract as an impermissible cardinal change, warranting re-solicitation.

As an interested party in a proper GHC procurement, Suddath has standing. And this Court is empowered to order a new procurement for the GHC Contract that remedies the Agency's arbitrary, capricious and unreasonable application of unduly restrictive requirements that previously excluded qualified offerors, like Suddath, from competing. Suddath has already suffered non-trivial economic harm and competitive prejudice due to the Agency's improper solicitation and will continue to suffer irreparable harm without the injunctive relief it seeks. Suddath respectfully requests that the Court grant its Motion for Judgment on the Administrative Record, deny Defendants' opposing motions, permanently enjoin TRANSCOM from proceeding with further performance, and direct TRANSCOM to conduct a full and open competition based upon a reasonable assessment of TRANSCOM's actual minimum needs.

## II. ADDITIONAL QUESTIONS PRESENTED

1. Whether Suddath has standing to bring a cardinal change protest and seek re-solicitation where TRANSCOM's actual minimum needs are so different from the requirements stated in the GHC Solicitation that a new and proper solicitation would attract a different field of competitive offerors, including Suddath?

[redacted]

[redacted]

## III. STATEMENT OF THE CASE

Suddath brought this cardinal change bid protest due to significant post-award contractual modifications. Defendants cannot explain away either the cardinal change or the fundamental defect in TRANSCOM's GHC procurement that it reveals. Suddath is an interested party with standing to bring its claims. The Plaintiffs are not limited to protesting just the changed portion of the GHC Contract, but rather, may seek relief in the form of re-solicitation based on the Agency's actual needs. Suddath has met the high bar to establish irreparable harm and entitlement to the extraordinary remedy of a permanent injunction.

Defendants' cross-MJARs present differing stories about why the large majority of the global household goods relocation services program is not yet in place more than two years after contract performance began in earnest. *Compare e.g.*, ECF 50 at 19 [redacted]) *with* ECF 48-1 at 20 (HomeSafe casting blame on "TRANSCOM roll[ing] out expanded capabilities in MilMove that required further [redacted]"). While HomeSafe tries to downplay these problems and the resulting modifications as efforts to "realign performance with overall contract needs," ECF 50 at 21, it cannot deny that TRANSCOM delayed, prolonged, and fundamentally changed the mandatory Transition Period, including the associated IT System requirements, and subsequent Volume Phase-In Period. Indeed, by HomeSafe's own words, Modification 13:

- "provided for an additional twelve (12) months of transition services";
- "update[d] the PWS to more accurately reflect new technological developments";
- "shift[ed] the phase-in schedule from a volume-based to a conditions-based approach … reflect[ing] the deliberate decision to shift from a time-definite schedule to a lower-risk, conditions-based phase-in approach"; and
- "provided for $60 million … for HomeSafe's [redacted]"

[redacted]

[redacted]

*Id*. at 21-22.

And yet, HomeSafe concludes that these out-of-scope modifications, even in their totality, do not amount to a cardinal change. *See id*. at 22-23 (referencing the Agency's decision that a FAR Part 6 justification and approval memo was not needed based on the conclusory rationale that "[e]xtending the transition period is within the scope of the current contract and extending it to another vendor is unrealistic[.]") (citing Tab 373 at AR59230). *But see* ECF 44 at 37 (Suddath explaining that the Agency's explanation falls short of the requirement for documented evidence of agency's analysis and consideration of "the type of work, performance period, and the cost between the contract as awarded and modified") (citing *CeleraPro, LLC v. United States*, 168 Fed. Cl. 408, 432 (2023)).

Whatever it says now, HomeSafe considered these to be out-of-scope modifications that warranted various cost reimbursements and rate adjustments during its own prior negotiations with the Agency. *See e.g.*, Tabs 357 at AR59126 (HomeSafe describing [redacted]); 425 at AR60270 (even before Modification 13, HomeSafe arguing that [redacted]) (emphasis added). HomeSafe cannot now credibly claim that the post-award contract modifications were in-scope changes that all offerors could have foreseen.

Furthermore, Defendants' reliance on FAR 52.212-4(c) is misplaced. For example, HomeSafe contends that "[u]nlike a typical changes clause in a fixed price contract [ ], which only permits changes 'within the general scope of this contract,' the GHC's changes clause contains no such limitation" and "conveys to potential bidders that the parties to the GHC may make a broad set of post-award changes within the permissible scope of contract modifications, so long as both parties agree in writing." ECF 48-1 at 42. The implication that changes that are outside the general

[redacted]

[redacted]

scope of the contract's requirements are permissible so long as they are bilateral is not supported by law. Indeed, the permissible scope of contract modifications referenced in HomeSafe's qualification above is informed by whether "potential bidders would have expected [a change] to fall within the contract's changes clause" under the original procurement. *Navistar Def., LLC v. United States*, 146 Fed. Cl. 499, 510 (2019). It does not then follow that "[g]iven the broad scope of the contractual changes clause, a reasonable potential bidder necessarily could foresee the possibility that TRANSCOM and the GHC Contractor could modify the transition period requirements." ECF 48-1 at 42-43. *See also* ECF 50 at 39 ("[A]n offeror could reasonably anticipate, based on the solicitation language, that, in a scenario like that occurring during the transition period, a contractor could seek an equitable adjustment to extend the transition period, as HomeSafe did, resulting in Modification 13.").

This framing mischaracterizes the Transition Period changes as simple extensions when, in fact, Defendants enlarged the relevant time for completion by three-fold. *Compare* Tab 297 at AR58832 (9-month transition period) *with* Tab 380 at AR59279 (15-month and 12-month transition periods). It also cannot be squared with the fact that the significant changes under Modification 13 completely eliminated the longstanding Volume Phase-In Period, which was a critical factor that defined the initial competitive range. *See* ECF 44 at 41 (citing Tab 20 at AR3594). Defendants now argue that offerors could have reasonably anticipated the ambit of the post-award modifications, which included significant relaxation of the RFP's articulation of the Agency's purported needs regarding strict schedule-based deadlines. This is *post-hoc* rationalization that is unsupported by law or the facts.

There was a clear disconnect between the Solicitation's stated requirements and TRANSCOM's actual needs. The post-award modifications were significant, as admitted by both HomeSafe and Defendant, and amounted to a cardinal change. Soliciting based upon extremely restrictive and inflexible timelines, and without announcing the Agency's need for a risk-managed

[redacted]

[redacted]

cooperative development and prototyping effort, violated the Competition in Contract Act's (CICA) prohibition on unduly restrictive requirements. These violations further deprived Plaintiffs of the opportunity to intelligently compete to meet the Agency's actual minimum needs and therefore imposed a non-trivial competitive injury that can only be remedied by the relief sought.

## IV. ARGUMENT

### A. Dismissal is Not Appropriate.

Dismissal is not warranted based on Suddath's well-plead Complaint and Motion for Judgment on the Administrative Record. Under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims, dismissal at the pleadings stage "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). In resolving a Rule 12(b)(6) motion, the Court must both accept as true Suddath's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of Suddath. *See Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). Suddath has alleged facts "plausibly suggesting (not merely consistent with)" a showing that it is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Suddath has met its burden and dismissal is not appropriate at this stage.

### B. Plaintiffs Are Interested Parties and Have Standing to Bring this Cardinal Change Protest.

The cross-MJARs argue that Plaintiffs do not have standing to bring their respective protests. *See, e.g.*, ECF No. 50 at 22; ECF No. 48-1 at 24. While each of the Plaintiffs participated in the original solicitation as a team member to another prime contractor offeror, there is no dispute

[redacted]

[redacted]

that Plaintiffs were not themselves actual bidders. *See* ECF 44 at 13 (Suddath "elected not to submit a proposal because they could not realistically meet the restrictive requirements set forth in the Solicitation").

Nevertheless, Suddath is an "interested party" under this cardinal change protest because it is a prospective offeror to a proper GHC solicitation, one that accurately reflects the Agency's actual needs, and therefore Suddath has standing to challenge TRANSCOM's out-of-scope modifications that violated CICA. *See, e.g.*, *Phx. Air Grp., Inc. v. United States*, 46 Fed. Cl. 90, 102 (2000) ("Phoenix would be an 'interested party' under either the plain meaning of the phrase in the Tucker Act or under the GAO statutory definition…because it was and is a 'prospective bidder.'"). Moreover, the proper standing question where, as here, a protester alleges a cardinal change, is whether the protester has alleged a non-trivial competitive injury that caused prejudice—it has—which is capable of being redressed by this Court, such as by issuing a new solicitation that accurately reflects TRANSCOM's needs—it can be. *See Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 273 (2012) (where the protester "seeks a change in the procurement vehicle chosen by the government … the 'non-trivial competitive injury' test or standing must be employed")[2]; *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 109-110 (2004) (holding that "the government cardinally changed the contract [ ] without resoliciting the contract," which violations of CICA warranted injunctive relief in the form of "resolicit[ation of] the procurement … which adequately reflected the actual needs of the Government.").

The relevant question is whether the protestor "would have a substantial chance of receiving the award" under a re-solicitation. *Northrop Grumman Corp. v. United States*, 50 Fed.

[2] The pre-award prejudice standard properly applies to this cardinal change protest where Plaintiffs seek a re-solicitation in conformance with CICA and "the 'but for' world that would follow the issuance of a new solicitation is not documented in the administrative record." *Golden Mfg.*, 107 Fed. Cl. at 273.

[redacted]

[redacted]

Cl. 443, 456 (2001). Here, Suddath has the capability to perform the global household relocation services and would have a substantial chance to win a resolicited GHC that accurately represents TRANSCOM's needs. *See* ECF 44 at 23-28 (illustrating the GHC landscape that Suddath could have competed under). *See also generally* cross-MJARs at ECF 48-1 and 50 (Defendants do not challenge any aspect of Suddath's purported capabilities).

Indeed, non-bidders are prospective bidders where they had both the intention and capability to bid had the solicitation been made competitive. *See ABF Freight Sys., Inc. v. United States*, 55 Fed. Cl. 392, 399 (2003). Defendants rely significantly on *Northrop*, yet they ignore a key holding in that case, namely that non-bidder Lockheed is an interested party. Defendants remarkably ignore the Court's holding that, "Lockheed would be a serious bidder on the proposed resolicitation, and that it would have a substantial chance of receiving the award."

> In this way, a protest alleging cardinal change is similar, regarding standing analysis, to a protest by a prospective bidder that was excluded from an allegedly improper sole-source procurement: in both cases, the contractor never had a chance to make a proposal on the contract work at issue.

*See id.* at 456, n.21. Suddath never had a fair chance to make a proposal because of express solicitation requirements that were revealed, by the cardinal change, to be unduly restrictive and not reflective of the Agency's actual minimum needs. Defendants ignore well-established case law that says a cardinal change plaintiff need <u>only</u> prove that it is a "qualified bidder" for standing purposes. *See Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 531-32 (2010). There, the Court held that the non-bidding plaintiff was a prospective bidder for the following reasons: (1) plaintiff argued that it "has a long history of providing health care personnel to the Federal Government"; (2) it is "in the business of staffing medical service providers"; (3) "it has 'the requisite experience to bid on this type of work'"; and (4) "there is 'greater than an insubstantial chance' that Magnum Opus … could secure a contract in a re-competition." *See id.*

[redacted]

[redacted]

Similarly, Suddath has the requisite experience to bid for GHC and could have won a GHC with a longer transition, volume phase-in and cooperative development contract for IT services. *See generally* ECF 2 (Michael Brannigan Declaration); 44-1 (Scott Kelly Declaration of Harms). Suddath would submit a bid and has a substantial chance of winning a resolicited GHC. "TRANSCOM continues to receive high-quality household goods moving services from hundreds of companies, including Suddath, operating under the legacy DP3 procurement system." *See* ECF 44-1 at ¶ 3. Just as Defendants ignore well-established case law on this point, they provide no rebuttal concerning Suddath's wealth of experience to succeed on a bid that reflects TRANSCOM's true minimum needs. Nor do they challenge Suddath's capabilities to meet the Agency's actual needs.[3] Suddath is an "interested party" (therefore with standing) because Suddath "would bid on this [resolicited] contract[,]" and "[t]hus, it is well-established that under these circumstances the plaintiff has a substantial chance of receiving the award." *CeleraPro, LLC*, 168 Fed. Cl. at 425 (2023) (internal quotation marks removed).

Defendants' reliance on *Rex Serv. Corp. v. United States*, 448 F.3d 1305 (Fed. Cir. 2006) and *MCI Telecommunications Corp. v. United States*, 878 F.2d 363 (Fed. Cir. 1989) to argue against Plaintiffs' status as prospective bidders is also unavailing. ECF 48-1 at 25; ECF 50 at 26. For one, neither case involved a cardinal change protest. *See MCI Telecommunications*, 878 F.2d

---

[3] To the extent that HomeSafe alleges that "the Agency would not need a longer transition period" anymore because the MilMove related delays "have already happened," they ignore the fact that the Agency very recently issued a Request for Information (RFI) for a separate contractor to "provide software development support and expertise for the MilMove Program" that "continues and builds on current MilMove development to support [GHC]." ECF 1, Exh. V (citing to TRANSCOM's RFI for "MilMove Development and Sustainment"). *See also* RFI Technical Summary v.2, Sep. 23, 2024 (explaining that "there are still several remaining features needed for customers, office users, admins, ***and GHC prime*** to build prior to orders integration") (emphasis added). ECF 1-2 at 113. Neither this Court nor any prospective bidder knows what the Agency's actual minimum needs would be if this Court were to enforce the CICA mandate and enjoin the Agency's performance under the current flawed GHC Contract.

[redacted]

[redacted]

at 364 (non-awardee subcontractor challenge to contract award based on awardee's alleged inability to meet certain mandatory contract requirements);[4] *Rex*, 448 F.3d at 1306 (protest challenging contract award based on alleged deviations from the process specified in the RFP). *See also* ECF 50 at 26-27 (citing to *Colsa Corp. v. United States*, 158 Fed. Cl. 333 (2022) (also not a cardinal change protest)). The facts and circumstances here are inapposite to these cases, where Plaintiffs are not challenging the GHC Contract award to HomeSafe—rather, the core protest is that the Solicitation never reflected TRANSCOM's actual needs, which unduly restricted the competitive pool of offerors and prejudiced would-be bidders like Suddath that were qualified and would have submitted bids had the Agency issued a proper RFP.

Application of the proper standard leads directly to the conclusion that Suddath is an interested party as a prospective bidder to the GHC Contract that suffered non-trivial competitive injury and is entitled to a re-solicitation of the procurement at hand, which the Court may duly grant. Defendants' challenge to Suddath's standing must be denied.

### C. Plaintiffs Are Not Limited to Protesting Only the Changed Portion of the GHC Contract and May Seek Relief Through Re-solicitation of the Agency's Actual Needs.

In its cross-MJAR, the Government further tries to limit Plaintiffs' entitlement to relief, arguing that the appropriate remedy for cardinal change protests is only "competition for that specific, additional work – not *all* of the contract work." ECF 50 at 24 (emphasis in original). The Government relies on *Northrop* for this proposition and asserts that "[a] protest of an alleged cardinal change does not assail the propriety of the award of the original contract or seek to end that contract's performance, but instead demands competition for the new and purportedly out-of-

[4] "The Brooks Act provisions construed in *MCI Telecommunications Corp*. have since been superseded by the [Administrative Dispute Resolution Act of 1996]," which "explicitly imports the Administrative Procedure Act standards of review into the Court of Federal Claims' review of agency decisions." *ABF Freight Sys*., 55 Fed. Cl. at 395, 398.

[redacted]

[redacted]

scope work." ECF 50 at 24 (citing *Northrop*, 50 Fed. Cl. at 456). The Government's application of *Northrop* to Plaintiffs' claims is, again, misplaced. There, the protest was based on the alleged relaxation or waiver of certain requirements for non-developmental items, which were initially deemed to be too stringent by non-bidder protesters. 50 Fed. Cl. at 464. *See also id.* at 456 (plaintiff challenged two delivery orders that were placed without certain contractual requirements, rather than attacking the terms of the solicitation and original contract). Accordingly, the plaintiff in *Northrop* sought different relief than Suddath does. Moreover, in *Northrop*, time was not deemed to be a "critical element in defining the obligation of the government contract." *Id.* at 467.

Here, by sharp contrast, Suddath challenges the original procurement as fundamentally flawed because the terms and requirements inaccurately represented TRANSCOM's actual minimum needs and remedying that defect would have attracted an entirely different pool of competitive offerors. While the Government is trying to limit Plaintiffs' relief, it has not meaningfully contended with the fact that the out-of-scope GHC Contract modifications called out by Plaintiffs demonstrate what should have been disclosed as TRANSCOM's actual minimum needs. *See* ECF 44 at 16-18. In this regard, the findings and ruling under *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98 (2004) are more instructive than what the Government proffers. While that protest arose out of a slightly different posture and contractual terms, it stands for the proposition that under a cardinal change protest, it is proper to grant injunctive relief to "terminate the contracts awarded [] or, alternatively, order the government to refrain from exercising any further contract options" and is an example of this Court granting relief "to resolicit the procurement [ ] 'utilizing a [sic] RFP which adequately reflects the actual needs of the Government.'" *Id.* at 110. It is simply not true that Plaintiffs are limited to a protest of only the alleged out-of-scope portion(s) of the Solicitation as a matter of law.

Notably, the Government does not strictly deny that "a re-competition of the entire contract [ ] is a remedy available" under the Tucker Act. As a matter of blackletter statutory law, in a bid

[redacted]

[redacted]

protest under the Tucker Act, "the courts may award ***any relief*** that the court considers proper, including declaratory and injunctive relief[.]" 28 U.S.C. § 1491(b)(2) (emphasis added). Instead, the Government argues that Plaintiffs here lack standing to seek re-solicitation of the entire contract as a form of relief. ECF 50 at 25. *But see* Sec. IV.B. *supra*, (explaining why Plaintiffs are appropriate, interested parties and have standing to bring the claims herein); *CeleraPro, LLC*, 168 Fed. Cl. at 421 (explaining that in the CICA context, "where the plaintiff claims that the government was obligated to rebid the contract," "the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive" and that protester "would have been a qualified bidder") (citations omitted). Suddath has indeed made such allegations against TRANSCOM and has further alleged that the resulting modifications, in their totality, rendered the initial Solicitation inconsistent with CICA because it was competed on unduly restrictive requirements that served no legitimate agency needs. *See* ECF 44 at 32-44 (Suddath); *see also* 43 at 30-34 (Consolidated Plaintiffs). Plaintiffs' success on the merits would confirm the Agency's current GHC Contract award was arbitrary, capricious, and the product of an abuse of discretion. *See Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435 (Fed. Cl. 2015) (finding that requirements that "do not properly reflect the agency's needs" are unduly restrictive).

Accordingly, Plaintiffs have alleged more than sufficient facts suggesting entitlement to the relief sought, and their claims withstand Defendant's challenge under Rule 12(b)(6). *See CeleraPro, LLC*, 168 Fed. Cl. at 420.

### D. The Post-Award Modifications Fundamentally Altered the Nature of HomeSafe's Work Under the GHC Contract and Evinced a Cardinal Change.

This Court should also reject Defendants' piecemeal analysis of the post-award modifications and overly simplistic comparison of the work that was solicited—and competed against—and the work HomeSafe is now undertaking.

[redacted]

[redacted]

***First***, as Plaintiffs described in their opening briefs, from the inception of the Solicitation, the Agency envisioned an accelerated ramp-up period that was associated with strict NLT deadlines that needed to be fully met by the start of Base Period Year 1. *See* ECF 44 at 32-33 (citing Market Research Report, Tab 412 at AR59546, and Solicitation, 7(a)(1) at AR208, 210). Indeed, offerors' ability to strictly meet these deadlines were a critical part TRANSCOM's assessment of potential deficiencies during the procurement process. *See id*. at 34 (citing the Agency's Evaluation Notices at Tabs 153(a)(1), 154(a)(1), and 155(a)(1)).

Despite the overwhelming evidence to the contrary, the Government and HomeSafe now argue that time was not a "critical element in defining the obligation of the [GHC] contract." ECF 48-1 at 35 (citing *Northrop*, 50 Fed. Cl. at 467); ECF 50 at 37 (citing *Northrop* for the same proposition). This argument is plainly contradicted by the record and the Agency's own actions. Nor is it supported by Defendants' reliance on *Northrop*. There, the court found that "[w]hile there was a window of ten years to complete the contract, this specific time period was not crucial to [the contractor]'s obligations pursuant to the solicitation or the contract." 50 Fed. Cl. at 467. Relevant to the court's analysis was the fact that the IDIQ contract in question expressly permitted the agency to order "***a minimum of zero systems*** and a maximum of 213 systems" over the life of the contract. *Id*. at 448 (emphasis added). Obviously, under this rubric where offerors and the agency both contemplated the possibility of no orders at any particular point during the period of performance, time was not a critical element of contractual obligations.

These facts stand in stark contrast to the strict, schedule-based obligations under the GHC Contract. In fact, the Agency rejected an offeror from the competitive range based on concerns about that offeror's ability to meet Volume Phase-In milestones. *See* Tab 20 at AR3594. Defendant makes the naked assertion that this Court should ignore the plain facts of how the Agency responded to Q&A and evaluated offerors, and instead rely upon the plain language of the Solicitation. *See e.g.*, ECF 50 at 47 (discounting Suddath's cite to the Agency's own Q&A

[redacted]

[redacted]

responses, which set offeror expectations on fees, and alleging that "the Court cannot resort to such extrinsic evidence to interpret the solicitation when its language in unambiguous"). It is not clear what legal theory the Agency relies upon to contend that its own Q&A responses are extrinsic to the Solicitation and GHC contract and that applying the APA standard of review to Agency *action* prohibits the Court from examining all evidence in the contemporaneous record.

Accordingly, there is no basis for Defendants' *post-hoc* rationalization that the unanticipated enlargement of the Transition Period, in conjunction with the complete elimination of the Volume Phase-In schedule, were in-scope modifications.

***Second***, the Government unreasonably downplays the significance of the PWS changes under the post-award modifications. *See* ECF 50 at 41 (characterizing "Modification 13's added requirements" as "merely requir[ing] *testing* of this IT system") (emphasis in original). The Government argues that the original PWS terms "expressly stated that the contractor would perform testing of its IT system's capability to perform order acceptance, invoicing, and shipment management" and that, accordingly, the PWS changes cannot amount to out-of-scope modifications. *Id*. (citing Tab 7(a)(1)). The Government's argument is belied by the fact that the original PWS testing requirements were within TRANSCOM's scope of work, not the GHC contractor's. Indeed, the Government's own cross-MJAR explains that [redacted] *Id*. at 19 (emphasis added). Furthermore, the record demonstrates that the Agency considered the potential [redacted] that would certainly be associated with the additional testing tasks. *See* Tab 365 at AR59189-190 (Agency's [redacted]); *compare with* Tab 369 at AR59218-219 (HomeSafe's [redacted]). The [redacted] support a finding of cardinal

[redacted]

[redacted]

change. *See e.g.*, *IgniteAction JV LLC v. United States*, 174 Fed. Cl. 62, 70-2 (2024) (comparing the labor categories of the protested contract with those under the prior task order and reasoning that the differences support a finding that the added support services are out of scope).

Similarly, HomeSafe tries to downplay the scope of the foregoing modifications. *See* ECF 48-1 at 48 (arguing that "the parties inserted various operational and technical requirements meant to overcome performance challenges and successfully achieve the procurement's (unchanged) objectives"). In doing so, HomeSafe tries to distinguish Modification 13 from the protested changes in *Ian Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390 (2018)—HomeSafe's reading is wrong. There, in granting protester's motion for judgment on the administrative record, the court found persuasive the following rationale for cardinal change:

> [Protester] asserts that the terms of the Solicitation and Xcelerate Solutions' Contract are not broad enough to include Modification No. P00002 because 'it does not include any language about validating the flagged records once they are received, or providing any other analytical or policy support to the Continuous Evaluation program' [Protester] also alleges that 'no offeror could have anticipated that the PSMO-I contract would be required to provide support in the form of validation and analytical and policy support.' According to [Protester], that no offeror could have anticipated such a change is confirmed by the fact that none of the proposals submitted to the DSS in response to the Solicitation 'discussed validating flags, providing feedback to DoD on potential efficiencies, or advising DoD on policies for the Continuous Evaluation program[.] Additionally, [Protester] contends that the increase in the dollar value of Xcelerate Solutions' Contract and the number of full-time equivalents Xcelerate Solutions needed to provide under Xcelerate Solutions' Modified Contract demonstrates that Modification No. P00002 of Xcelerate Solutions' Contract is an out-of-scope modification.'

*Id.* at 417-18. Similarly, here, in conjunction with Modification 13's significant extension of the Transition Period, the parties added the following key requirements:

> i. Specificity regarding IT systems integration for MilMove, Advana, and TPPS;

[redacted]

[redacted]

> ii. Handling of new Contractor-generated IT system capabilities;
> iii. Ad hoc IT system testing and enhanced Government surveillance and evaluation of Contractor performance;
> iv. IT system accommodation regarding changes to source data;
> v. Ongoing training requirements by way of a Learning Management System (LMS) with respect to Contractor's IT system;
> vi. Contractor participation in the Government's Integrated Master Schedules (IMS); and
> vii. Participation in IT system Government Operational Test and Evaluation (OT&E) events, ordered on an as-needed basis by the Government (i.e., optional CLIN).

Tab 374 at AR59234-235. *See also* Tab 365 at AR59192 ([redacted]). Contrary to HomeSafe's cursory assertion, then, *Ian Evan & Alexander Corp.* is instructive in outlining not only the factors that delineate performance tasks outside of the original solicitation, but also the combination of increased labor efforts and costs[5] that strongly influence a finding of cardinal change—all such factors exist here.

The various calculations asserted by Defendant and HomeSafe, such as comparing the $60 Million funding to the overall contract value, are also disingenuous and irrelevant where the hard part is transitioning from the legacy DP3 program to centralized GHC performance globally. By changing the entire timeline, compensation scheme, and nature of the transition and volume phase-in TRANSCOM fundamentally changed the nature of the GHC Contract, without competition.

---

[5] HomeSafe's further attempt to downplay the cost impact of Modification 13's increased funding of $60 Million—which [redacted]—is undercut by its own inconsistent negotiating posture with the Agency and understanding of the GHC Contract. *See e.g.*, Tab 368 at AR59202 (noting the significance of "government-cause delays (i.e., MilMove delays) … under the firm fixed price Transition Period"); ECF 48-1 at 43-44 ("HomeSafe disagreed with TRANSCOM's errant position that the slower phase-in pacing TRANSCOM proposed did not change the Contract given the Contract's IDIQ nature") (citing Tab 434 at AR60325-326 ("disagreeing with TRANSCOM's position that 'the Contract is IDIQ[.]'")).

[redacted]

[redacted]

***Third***, in their cross-MJARs, the Government and HomeSafe both fail to meaningfully contend with Suddath's allegation that the out-of-scope modifications fundamentally "transformed the nature of the GHC Contract from a simple transition and rapidly phased-in performance of moving services to a cooperative development effort with the Government of a new household goods moving solution." ECF 44 at 32. In doing so, the cross-MJARs conveniently ignore that TRANSCOM also issued a Request for Information (RFI) for an entirely separate contractor to develop and build out the MilMove Development and Sustainment services that will depend on "several remaining features needed for customers, office users, admins, and GHC prime to build prior to orders integration." ECF 1-2 at 113. The totality of these changes confirms that HomeSafe's "undertaking" has drastically changed. *See Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) ("A cardinal change can occur ***even when there is no change in the final product*** because 'it is the entire undertaking of the contractor, rather than the product, to which we look.'") (emphasis added).

Even assuming, *arguendo*, that "the nature and purpose of the contract remain[ed] substantially the same," ECF 48-1 at 29, HomeSafe reliance on *CeleraPro, LLC* does not advance its argument against cardinal change. The court in *CeleraPro* found material that the agency "conducted and documented a thorough analysis of whether proposed modification to the [ ] contract, including costs, triggered CICA" and that "[a]s required …, [the agency] considered whether 'there was a material difference between the modified contract and the contract that was originally awarded.'" *CeleraPro, LLC*, 168 Fed. Cl. at 430, 433. Here, the Agency expressly declined to issue a justification and approval memo. The Agency's only rationale was that "[e]xtending the transition period is within the scope of the current contract and extending it to another vendor is unrealistic" and, therefore, "[FAR] 6.001(c) would apply." *Id.*

[redacted]

[redacted]

To narrowly apply the cardinal change doctrine here would not correct the sweeping disconnect between what was solicited and the revised procurement of TRANSCOM's actual minimum needs.

**E. Suddath is Entitled to a Permanent Injunction.**

The Government gives short shrift to the range of considerations that factor into a proper analysis of the relevant harms. *See* ECF 50 at 49 (dedicating less than a single page to its entire discussion of the potential harms to Defendant, HomeSafe, and the public interest). Indeed, the Government's discussion does not include even a cursory acknowledgement of the irreparable harms that Plaintiffs and similarly situated businesses will face. Defendants' description of harms is misleading and unavailing. For example, the Government states that "TRANSCOM began placing orders under the GHC in April 2024, [ ] meaning that the modifications challenged by plaintiffs have already been performed by HomeSafe and that it would be unnecessary and wasteful for another contractor to perform the same work[.]" *Id*. This is plainly false.

As Suddath noted in its initial Complaint and reiterated in its Motion (ECF 44), TRANSCOM very recently issued an RFI for a separate contractor to "provide software development support and expertise for the MilMove Program" (ECF 1, Exh. V), in part because "there are still several remaining features needed for customers, office users, admins, ***and GHC prime*** to build prior to orders integration") (ECF 1-2 at 113) (emphasis added). Both the Government and HomeSafe ignore this fact in their cross-MJARs. Nevertheless, the work that was contemplated under the Transition Period—*i.e.*, to set up a secure, web-based and mobile-compatible IT System that would interface with TRANSCOM's own systems, including MilMove—and for which TRANSCOM impermissibly enlarged the relevant time for completion, under Modification 13, remains outstanding.

[redacted]

[redacted]

That TRANSCOM began issuing orders only in April 2024 also undermines the argument that "the United States and HomeSafe have made substantial investments in the GHC program" to such a degree that would render the requested injunctive relief inappropriate. ECF 50 at 41. *See also* ECF 48-1 at 53 (HomeSafe arguing that "[re]solicitation would jettison the substantial time and effort both parties have invested into performing the work to date"). As TRANSCOM publicly announced, the first orders were placed ***fifteen months after*** the beginning of contract performance (following the last bid protests), with "the goal for initial GHC phase-in across the selected locations [to] total less than 1% through July 2024 and less than 2% in August 2024." ECF 35-11 at 3 (April 2, 2024 press release). TRANSCOM also estimated that "[i]nternational shipments under GHC will begin no earlier than September 2025[.]" *Id*. To date, TRANSCOM is still adding installations in the contiguous United States, and there is no projected start date for international shipments.[6] Indeed, here, the time spent on contract performance has very little correlation with progress on the actual deliverables where the majority of the global household goods relocation requirements, as competed, remains outstanding.

---

[6] Press Release, USTRANSCOM, *Twenty Additional Installations Authorized for Domestic GHC Shipments* (Dec. 5, 2024), https://www.ustranscom.mil/cmd/panewsreader.cfm?ID=E95A49F0-ECC0-2051-292303CDCBF34311&yr=2024 (reporting 94 GHC-live installations, 777 task orders to HomeSafe, and 330 delivery completions); MILITARY ONESOURCE, *Installations Where GHC is Available* (Jan. 15, 2025), https://www.militaryonesource.mil/moving-pcs/moving-personal-property/global-household-goods-contract-installations/ ("The full transition to GHC is scheduled to span several years[.]"); Jared Serbu, *DoD Raises Formal Performance Concerns on Multibillion Dollar Moving Contract*, FED. NEWS NETWORK (Jan 30, 2025, 6:02 PM), https://federalnewsnetwork.com/defense-news/2025/01/dod-raises-formal-performance-concerns-on-multibillion-dollar-moving-contract/ (reporting on recent "show-cause" notice that TRANSCOM issued to HomeSafe and that "[a]t the beginning of December … only about 5% of moves were happening under the GHC contract" and by the end of January, "that figure had risen to 17%, and apparently occurred at a rate that outstripped HomeSafe's ability to recruit moving company subcontractors to perform the work.").

[redacted]

[redacted]

In this regard, the Government's reliance on *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 521 (2012) misses the mark. *See* ECF 50 at 49 (citing case for the proposition that "'protecting the public fisc is a strong public interest' that would not be advanced by an injunction requiring performance of unnecessary work.") (cleaned up). There, the court found that the agency had already accepted and rendered payment on the final delivery of furniture deliverables and corresponding services and, accordingly, "[t]he contract under dispute … has been substantially completed, albeit imperfectly." *Furniture by Thurston*, 103 Fed. Cl. at 521. In so finding, the court further held that "when a contract has been substantially completed, it is impossible, or at the least imprudent, for the court to order that the contract be rebid to a more desirable bidder." *Id.* (citation omitted). Those facts are completely incongruous with the nascent nature of HomeSafe's performance under the GHC contract here where the requirements under even the Transition Period have yet to be fully performed.

Indeed, the very nature of the evergreen need for household goods moving services here distinguish this case. If HomeSafe fails, as the recent TRANSCOM Show Cause Letter suggests is possible, then the Agency will have no choice but to reprocure a new GHC solution. *Serbu*, *supra* note 6. The new GHC contractor would need to integrate with MilMove and ramp-up its operations on whatever timeline TRANSCOM deems necessary. In the meantime, military families will still move and TRANSCOM will continue to rely upon its readily available DP3 contractors to serve military families. HomeSafe has been paid for its partial transition efforts—[redacted]. The substantial magnitude of a successful GHC program is no basis to bind TRANSCOM and military families to a contractor who was issued an award based upon a completely flawed statement of the Agency's actual minimum needs.

Nor is it true that Plaintiffs "ha[ve] raised no harm beyond the loss of potential profit" which "injury would be dwarfed by the economic harm to the government[.]" *Id.* *See* ECF 44 at 45-47 (Suddath describing irreparable harm and prejudice arising out of TRANSCOM's unduly

[redacted]

[redacted]

[redacted]

HomeSafe [redacted]:

[redacted]

Tab 358 at AR59132. A letter from American Trucking Associations to the Agency further explains, "[t]he imposition of CFAC in the domestic program has the greatest impact on the largest van lines and multi-location independent movers," such as Plaintiffs whose entire business models will be upended. *See* Letter from Daniel Hilton, Executive Director of American Trucking Associations to Robert Dawson, USTRANSCOM Director of DP3 Program (Dec. 12, 2024) (RE:

[redacted]

[redacted]

TRANSCOM Personal Property Advisory #25-0024 and DP3 Email Update – Dec. 2024).[7] Not only were Plaintiffs prejudiced as a result of being deprived of the opportunity to compete on the unduly restrictive GHC solicitation, they face significant forthcoming harms that could arise from changes that HomeSafe specifically proposed as a measure of mitigating its own risk under the GHC Contract. Plaintiffs thus continue to face imminent, non-trivial competitive injury that extends beyond their exclusion from the original procurement process. *Golden Mfg.*, 107 Fed. Cl. at 273 (2012).

By contrast, as Suddath averred in its Motion, "HomeSafe has negotiated substantial consideration from the Government even as its contract obligations have been substantially relaxed." ECF 44 at 47. HomeSafe does not deny this, although it does claim [redacted]. *See e.g.*, ECF 48-1 at 43 (acknowledging that HomeSafe received "an [redacted]% increase in Year 1 rates" pursuant to FAR 52.233-3 to account for bid protest related stop work orders); ECF 50 at 7-8 (Government also acknowledging that an equitable adjustment was made to compensate for delays caused by the stop work orders).[8] HomeSafe also does not deny that the out-of-scope changes under Modification 13 provide for [redacted] for transition and phase-in services that are not yet complete. Further, any potential economic harm to HomeSafe that might arise out of a re-solicitation is further outweighed by the potential costs that are sure to

---

[7] Available at https://www.trucking.org/sites/default/files/2024-12/ATA-MSC%20Letter%20to%20Andy%20Dawson%2C%20RE_%20Advisory%2025-0024%2C%20Dec.%2012%2C%202024%201.pdf (last visited Feb. 26, 2025).

[8] While HomeSafe points to "substantial resources prosecuting and defending protests" and [redacted] ECF 48-1 at 54-55, the record and its own statements demonstrate that HomeSafe has been appropriately compensated for these costs. Moreover, HomeSafe's legal contentions about its entitlement to recompense for out-of-scope modifications are some of the clearest evidence in the record evidencing the cardinally changed GHC Contract.

[redacted]

[redacted]

follow any termination of HomeSafe's contract for default.[9] Indeed, the plain facts of what has been performed under the GHC contract, to date, demonstrate fundamental shortcomings that still need to resolved and fail to serve the public interest.[10]

"[T]here is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations." *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). And violations of procurement regulations undercut the public's faith in the integrity of government acquisitions. *See AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 741 (2021). While there is a countervailing government interest in efficiency of operations, this cannot come at the expense of providing a fair and level playing field for all competitors in the federal marketplace and preserving the integrity of the public procurement process. *Mangi Env't Grp., Inc. v. United States*, 47 Fed. Cl. 10, 19–20 (2000); *Sys. Studies & Sim., Inc. v. United States*, 146 Fed. Cl. 186, 204 (2019) ("the public interest is best served by requiring the government to comply with federal procurement law—law that was intended to promote competition.").

There is no suggestion that government efficiency is being served under the current iteration and performance of the GHC contract. As a result of the Agency's materially changed transition, phase-in and performance method, TRANSCOM has had to continue operating dual programs under the GHC and DP3, the latter of which saw historically high activity to account for the GHC shortcomings and still garnered high customer satisfaction. *See* ECF 44-1 (Kelly Decl.)

---

[9] *Serbu*, *supra* note 6 (identifying a recent "show-cause" notice from TRANSCOM to HomeSafe "to explain hundreds of instances over the past month in which movers have failed to begin military families' moves on the agreed-upon dates, delivered their belongings late, or both, according to the command").

[10] *See Serbu*, *supra* note 7; CHANGE.ORG., *Military Families Forced to New PCS Contract Amid Diminishing Self Move Rates*, https://www.change.org/p/military-families-forced-to-new-pcs-contract-amid-diminishing-self-move-rates (last visited Feb. 26, 2025).

[redacted]

[redacted]

at ¶ 3. The public interest would best be served through a re-solicitation that reflects the Agency's actual needs, which would yield full and open competition amongst a pool of qualified offerors.

## V. CONCLUSION AND RELIEF REQUESTED

Suddath respectfully requests that the Court grant Suddath's Motion for Judgment on the Administrative Record, deny Defendants' motions, declare that TRANSCOM's substantial modification to the scope of the GHC without competition violates CICA, enjoin TRANSCOM from proceeding with further performance under the materially changed and illegal GHC Contract, order TRANSCOM to issue a new solicitation that accurately reflects TRANSCOM's needs; and grant any other relief as the Court deems just.

Dated: February 26, 2025

Respectfully submitted,

/s/ Jeffery M. Chiow
Jeffery M. Chiow (attorney of record)
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3149
Jeff.Chiow@gtlaw.com
*Counsel for The Suddath Companies*

*Of Counsel:*

Shirin Afsous
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 749-1300
Shirin.Afsous@gtlaw.com

Cassidy Kim
Greenberg Traurig, LLP
101 2nd Street, Suite 2200
San Francisco, CA 94105
(415) 590-5133
Cassidy.Kim@gtlaw.com

[redacted]

[redacted]

Yongho Lee
Greenberg Traurig, LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202) 533-2318
Andrew.Lee@gtlaw.com

Olivia Bellini
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22101
(703) 903-7514
Olivia.Bellini@gtlaw.com

[redacted]