**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

THE SUDDATH COMPANIES; TOTAL MILITARY MANAGEMENT, INC.; NATIONAL HOLDING COMPANY, INC.,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*,

and

HOMESAFE ALLIANCE, LLC,

*Defendant-Intervenor*.

**FINAL PUBLIC VERSION**

Case Nos.: 24-1836, 24-2029, 24-2112

Judge Zachary N. Somers

[redacted]

**PLAINTIFFS TOTAL MILITARY MANAGEMENT, INC.'S AND NATIONAL HOLDING COMPANY, INC.'S REPLY IN SUPPORT OF THEIR JOINT MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, OPPOSITION TO UNITED STATES' MOTION TO DISMISS, AND RESPONSE TO UNITED STATES' AND HOMESAFE ALLIANCE, LLC'S CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Dated: February 26, 2025

Respectfully submitted,

/s/ *Noah B. Bleicher*
Noah B. Bleicher (Counsel of Record)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6063
*nbleicher@jenner.com*

*Of Counsel*

Moshe B. Broder
Jennifer Eve Retener
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

*Counsel for Total Military Management, Inc., and National Holding Company, Inc.*

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. TMM and National Have Standing to Pursue this Protest .......... 3

III. TRANSCOM's Modifications to the GHC Violate CICA. .......... 8

A. TRANSCOM's Modifications Substantially Changed the GHC. .......... 9

1. TRANSCOM substantially changed the GHC's transition. .......... 9

2. TRANSCOM substantially changed the volume phase-in requirement. .......... 15

B. TRANSCOM's Modifications Were Not Foreseeable by Offerors. .......... 17

1. The GHC's changes clause does not allow TRANSCOM to violate CICA. .......... 17

2. Other language in the Solicitation did not put offerors on notice of TRANSCOM's out-of-scope modifications. .......... 19

3. Offerors could not have anticipated that TRANSCOM would switch to a conditions-based phase-in approach. .......... 21

IV. INJUNCTIVE RELIEF IS WARRANTED .......... 24

V. CONCLUSION AND RELIEF REQUESTED .......... 29


[redacted]

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Aircraft Charter Solutions, Inc. v. United States*, 109 Fed. Cl. 398 (2013) ............ 28

*American Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221 (Fed. Cir. 2019) ............ 3

*AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed. Cir. 1993) ............ 18

*Avtron Manufacturing, Inc.*, B-229972, May 16, 1988, 88-1 CPD ¶ 458 ............ 10, 22

*BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677 (2012) ............ 25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............ 3

*B.H. Aircraft Co., Inc. v. United States*, 158 Fed. Cl. 750 (2022) ............ 10

*Cardinal Maintenance Service, Inc. v. United States*, 63 Fed. Cl. 98 (2004) ............ *passim*

*Clean Team Janitorial Service, Inc. v. United States*, 171 Fed. Cl. 1 (2024) ............ 26–27

*CW Government Travel, Inc., v. United States*, 154 Fed. Cl. 721 (2021) ............ 20

*CW Government Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004) ............ 28

*Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368 (2012) ............ 7

*Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008) ............ 3, 8

*Electra-Med Corp. v. United States*, 140 Fed. Cl. 94 (2018), *aff'd and remanded*, 791 F. App'x 179 (Fed. Cir. 2019) ............ 7, 24

*GAI Consultants, Inc.*, ENGBCA No. 6030, Apr. 4, 1995, 95-2 BCA ¶ 27620 ............ 18

*Global Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 52 (2009) ............ 26

*Google, Inc. v. United States*, 95 Fed. Cl. 661 (2011) ............ 8

*Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350 (2004) ............ 25

*Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390 (2018) ............ 2, 8, 9, 17, 18

*Leupold Stevens, Inc.*, B-417796, Oct. 30, 2019, 2019 CPD ¶ 397 ............ 10

*Magnum Opus Technologies, Inc. v. United States*, 94 Fed. Cl. 512 (2010) ............ 8

*Management & Training Corp. v. United States*, 137 Fed. Cl. 780 (2018) ............ 8

[redacted]

*Medline Industries, Inc v. United States*, 155 Fed. Cl. 522 (2021) ........ 6

*Meidinger v. United States*, 989 F.3d 1353 (Fed. Cir. 2021) ........ 5

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001) ........ 5, 6, 13

*Poly-Pacific Technologies, Inc.*, B-296029, June 1, 2005, 2005 CPD ¶ 105 ........ 10, 11

*SH Synergy, LLC v. United States*, 165 Fed. Cl. 745 (2023) ........ 7

*SEKRI, Inc. v. United States*, 166 Fed. Cl. 224 (2023) ........ 26

*Vasko v. United States*, 581 F. App'x 894 (Fed. Cir. 2014) ........ 3

*WaveLink, Inc. v. United States*, 154 Fed. Cl. 245 (2021) ........ 10

*Weeks Marine, Inc. v. United States*, 575 F.3d 1352 (Fed. Cir. 2009) ........ 6

*Western Pilot Serv. et al.*, B-415732 *et al.*, Mar. 6, 2018, 2018 CPD ¶ 10 ........ 10, 11

*Zolon PCS II, LLC v. United States*, 172 Fed. Cl. 742 (2024) ........ 24

**OTHER AUTHORITIES**

FAR 12.301(b) ........ 18

FAR 43.205 ........ 18

FAR 52.212-4 ........ 18

FAR 52.243-1 ........ 18

FAR 52.243-1(a) ........ 18

RCFC 52.1(c) ........ 1

*2024 Defense Personal Property Program Metrics*, USTRANSCOM, https://www.ustranscom.mil/dp3/tspinformation.cfm (last accessed Feb. 26, 2025) ........ 29

HomeSafe Alliance, *HomeSafe Alliance Services More than 1,400 Relocations, On Track for Full Phase-In of Modern and Digitized Military Move System* (Feb. 19, 2025), https://www.homesafealliance.com/newsroom/homesafe-alliance-services-more-1400-relocations-track-full-phase-modern-and-digitized ........ 26

Jared Serbu, *DoD Raises Formal Performance Concerns on Multibillion Dollar Moving Contract*, Federal New Network (Jan. 30, 2025), https://federalnews network.com/defense-news/2025/01/dod-raises-formal-performance-concerns -on-multibillion-dollar-moving-contract/ ........ 28

[redacted]

Military OneSource, *Global Household Goods Contract Moves*, https://www.militaryonesource.mil/resources/millife-guides/ustranscom-global-household-goods-contract/ (last visited Feb. 25, 2025)............................................ 27

Wyatt Olson, *Late Pickups, Deliveries Plague Startup of DOD's Streamlined Program for Military Moves*, Stars and Stripes (Jan. 31, 2025), https://www.stripes.com/theaters/asia_pacific/2025-01-30/service-member-hhg-moving-complaints-16659927.html.......................................................................................... 26, 28

[redacted]

Pursuant to the Court's Scheduling Orders (ECF Nos. 17 and 42) and Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiffs Total Military Management, Inc. ("TMM"), and National Holding Company, Inc. ("National"), (collectively, "Co-Plaintiffs"), through undersigned counsel, respectfully submit this Reply in Support of Their Joint Motion for Judgment on the Administrative Record ("MJAR"), Opposition to the United States' Motion to Dismiss, and Response to the United States' and HomeSafe Alliance, LLC's ("HomeSafe") Cross-Motions for Judgment on the Administrative Record.

## I. INTRODUCTION

A key feature of the global household goods contract, as solicited, was its short time frame for the contractor to complete transition and the aggressive schedule to phase-in all 400,000 domestic and international moves. (AR, Tab 140 at 21187–94.) These requirements were unambiguous and now undisputed. For **Transition**, the GHC contractor was required to complete transition services, including standing up a fully compliant and integrated IT solution, within 9 months.[1] (*Id.* at 21187.) For **Volume Phase-In** during Base Period 1, the GHC contractor was required to assume responsibility of all domestic and international shipments in 8 months. (*Id.* at 21189–90.) The GHC contractor was required to progressively service 25% of all domestic areas each month for 4 months until it was performing 100% of the domestic shipments, and the phase-in for international shipments would immediately follow under a similar schedule.[2] (*Id.*) In other words, after a quick transition, TRANSCOM expected the GHC contractor to assume full responsibility for 400,000 annual moves in an 8-month period. (*Id.*)

[1] Co-Plaintiffs continue to use the same acronyms and terms identified in their MJAR.

[2] The GHC contractor was also expected to perform DPM phase-in over a range of estimated dates. (*Id.* at 21190–93.)

[redacted]

These ambitious requirements served as a gatekeeping measure, [redacted].

But the Contract that HomeSafe is performing today does not have any of these daunting requirements. TRANSCOM has modified the GHC such that HomeSafe has had ***28 months—triple*** the amount of time—to complete transition, along with additional transition funding. (*See* TMM & NHC MJAR at 9–19 (describing modifications extending the Transition Period by 19 months and adding $[redacted] to the Contract).) TRANSCOM also replaced the strict and high-risk Volume Phase-In schedule with a flexible, "conditions-based phase-in approach" under which HomeSafe handles a ***fraction*** of the initially anticipated volume of shipments over an ***indefinite*** time period. (*Id.* at 16–18; *see also* AR, Tab 377 at 59247 (Modification 13 adopting condition-based phase-in approach).) These modifications are a stark departure from the rigid requirements announced in the Solicitation and materially change the performance of the GHC in a manner offerors could not have reasonably foreseen. *See Ian, Evan & Alexander Corp. v. United* States, 136 Fed. Cl. 390, 416 (2018); (TMM & NHC MJAR at 22–35.) Thus, TRANSCOM has made a cardinal change that violates the competition requirements of CICA.

The Government and HomeSafe raise an assortment of arguments in their MJARs to downplay the magnitude of the modifications. They argue that the changes were proper because the "underlying purpose" of the GHC remains the same and the flexibility was necessary to overcome unexpected performance difficulties. (USA MJAR at 28–32; HomeSafe MJAR at 21–31.) Further, they contend that offerors should have anticipated these modifications given the broad and complex scope of the GHC. (USA MJAR at 25–26; HomeSafe MJAR at 33–40.) None of these arguments justifies TRANSCOM's complete restructuring of the conditions under which the GHC contractor was required to perform, fundamentally transforming the bargain

[redacted]

agreed on by the parties at the time of contract award. As reiterated below, the changes were substantial and not foreseeable. Accordingly, TRANSCOM's modifications to the GHC were outside the scope of the contract and procurement, constituting an unlawful cardinal change. The Court must sustain this protest.

## II. <u>TMM and National Have Standing to Pursue this Protest.</u>

TMM and National are leading move managers that are capable and poised to fulfill TRANSCOM's relaxed requirements for relocation services. Nevertheless, the Defendant and Defendant-Intervenor assert that the Plaintiffs lack standing to challenge Agency action in connection with the GHC. These procedural objections are without merit.

The Government seeks dismissal pursuant to RCFC 12(b)(6). (USA MJAR at 14–19; *see also* HomeSafe MJAR at 17–20.) When considering a motion to dismiss pursuant to RCFC 12(b)(6), this Court will "take as true all undisputed facts alleged in the complaint and draw all reasonable inferences based on those allegations." *Vasko v. United States*, 581 F. App'x 894, 897 (Fed. Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). To avoid dismissal, the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief. *Bell Atl.*, 550 U.S. at 557.

Moreover, "[t]o establish standing in a bid protest case, the protestor must show that it is an 'interested party' under 28 U.S.C. § 1491(b)(1)." *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019) (quotation omitted). "To qualify as an interested party, a protestor must establish that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distributed Sols., Inc., v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).

[redacted]

The Government and HomeSafe argue that the Plaintiffs fail both prongs: that TMM and National were not actual or prospective offerors in the "original procurement"; that they "cannot bid on the GHC contract, even as modified"; and that they "lack a substantial chance of receiving a new contract award." (USA MJAR at 15, 18; HomeSafe MJAR at 18, 20 (capitalization omitted).) For its dismissal argument to work, the Government recasts the protests as routine post-award challenges to HomeSafe's November 2021 contract award. (USA MJAR at 14–15 ("[P]laintiffs now challenge TRANSCOM's November 2021 contract award to HomeSafe."[3]).) And HomeSafe goes so far to insist that the Agency's needs have not changed—seemingly ignoring Modification 13—and that, in any event, it would win any re-competition. (HomeSafe MJAR at 19–20.) From that questionable starting point, HomeSafe argues that no Plaintiff has a "substantial chance" of award, thus undercutting their status as interested parties. (*Id*. at 20.)

These specious dismissal arguments must fail. Co-Plaintiffs take no issue with TRANSCOM's 2021 GHC source selection. Rather, as the complaints and MJAR make clear, TMM and National challenge Agency action after the contract award—the profound changes made over the past couple of years—not the award itself. Simply put, the propriety of the GHC competition is not at issue. Further, Co-Plaintiffs are not asking for (and do not want) a second bite at the demanding 2019 GHC Solicitation; indeed, the unachievable requirements [redacted]. Instead, they seek a shot at the flexible, cardinally changed version of the GHC being performed. Stripped of its erroneous framing, the Government's dismissal motion falls flat.

[3] Two pages later the Government admits that Plaintiffs "do not [] now through their complaint allegations" "protest[] the original 2021 contract award." (USA MJAR at 17.)

[redacted]

Equally unavailing, HomeSafe's assumption that Plaintiffs cannot even meet a longer, relaxed transition time period is speculative and unconvincing.[4] (HomeSafe MJAR at 19.) To establish standing, TMM and National need not submit a several-hundred-page proposal for the Court (or opposing parties) to scrutinize; rather, the declared assertions by TMM's and National's principals suffice. Here, TMM and National have convincingly represented that the daunting GHC requirements—*as solicited*—[redacted]. (Decl. of [redacted] ¶¶ 7–11; Decl. of [redacted] ¶¶ 9–14.) They demonstrated that they each possess the [redacted]. (Decl. of [redacted] ¶¶ 3–7, 10; Decl. of [redacted] ¶¶ 2–10, 13.) Nothing more is required. "In deciding a motion to dismiss, a court is 'obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor.'" *Meidinger v. United States*, 989 F.3d 1353, 1357 (Fed. Cir. 2021) (quoting *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). The Court should find that Co-Plaintiffs' allegations and declarations demonstrate the requisite competitive interest to establish standing.

The Government and HomeSafe also spotlight *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001) to question TMM and National's standing. If anything, *Northrop* cuts the other way. As the Government observes, the *Northrop* Court held that plaintiff Lockheed "has standing . . . if it shows that it would participate as a bidder for, and have an economic interest in, only that new uncompeted work, not the work as contemplated by the original procurement." (USA MJAR at 14 (emphasis omitted) (quoting *Northrop Grumman*

[4] As is a theme throughout the cross-MJARs, HomeSafe ignores the cardinal change to the phase-in period specifically when objecting to Co-Plaintiffs' standing.

[redacted]

*Corp.*, 50 Fed. Cl. at 456).) Again, that is precisely what TMM and National seek here: an opportunity to compete for TRANSCOM's "new uncompeted" cardinally changed requirements and "not the work as contemplated by the original procurement." Indeed, Co-Plaintiffs are similarly situated to Lockheed: [redacted]. Just as the *Northrop* Court found that Lockheed was an interested party to challenge the out-of-scope modifications, so too should this Court find that TMM and National possess standing to raise comparable claims.[5]

In any event, the *Northrop* decision was issued nearly a decade before the Federal Circuit in *Weeks Marine* endorsed a more nuanced interested party assessment in protests where "there is no factual foundation for a 'but for' prejudice analysis," such as here. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009). In these cases—where "there have been neither bids/offers, nor a contract award"—the correct lens to assess a protester's "economic interest" in a procurement is whether the protester "has demonstrated a ***non-trivial competitive injury*** which can be addressed by judicial relief"—not the "substantial chance" test applicable in most post-award protests.[6, 7] *Id.* at 1361–62 (internal quotation marks omitted). The standard

[5] Like many cardinal change cases that address the extent of a change to a manufactured product, *Northrop* is distinct from the present case where the crux of the cardinal change pertains to relaxing restrictive terms and conditions under which the services were to be performed. Because the terms that were cardinally changed were the same that prevented Co-Plaintiffs from competing in the first instance—*i.e.*, the restrictive duration for transition and phase-in—it makes no sense to distinguish between "added" contract work and the "original" contract work in crafting the appropriate remedy.

[6] All emphases are added unless otherwise noted.

[7] Only "when an adequate factual predicate exists such that the Court can determine whether the protestor had a substantial chance to receive the award, the general rule applies." *Medline Indus., Inc v. United States*, 155 Fed. Cl. 522, 538 (2021) (internal quotations omitted).

[redacted]

has been described as "something akin to the 'harmless error' rules that courts apply in ordinary civil cases" and that the "protestor must demonstrate a greater-than-insignificant chance that correcting the agency's errors could lead to a different result." *SH Synergy, LLC v. United States*, 165 Fed. Cl. 745, 758 (2023) (quoting *Am. Relocation Connections,* 789 F. App'x at 228).

To be sure, TMM and National rely on the non-trivial competitive injury standard to establish standing. (TMM Complaint at 3; National Complaint at 3; MJAR at 20–21.) But inexplicably, the Government's MJAR altogether ignores the standard, and HomeSafe buries a passing reference in a footnote. (*See* USA MJAR at 14–19; HomeSafe MJAR at 20 n.14.) Under the appropriate interested party standard, there can be no doubt that TMM and National possess standing to protest.

HomeSafe, for its part, assumes its own premise in arguing that Plaintiffs fail the "substantial chance" test because HomeSafe would remain the contract awardee in any new competition. (*See* HomeSafe MJAR at 20.) Yet "*Weeks Marine* [] instructs that a reduced right to compete is sufficient injury." *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 380–81 (2012). For example, several years after *Weeks Marine*, Judge Bruggink in *Electra-Med Corporation* found that suppliers of medical and surgical items had standing to challenge a contract modification "for work admittedly not performed by these protesters" where the protest challenged "the loss of the chance to compete." *Electra-Med Corp. v. United States*, 140 Fed. Cl. 94, 103 (2018), *aff'd and remanded*, 791 F. App'x 179 (Fed. Cir. 2019). Because "[t]he net effect of the modifications [was] the loss of the opportunity by these plaintiffs to sell their products directly to the government," the plaintiffs had suffered non-trivial competitive injury. *Id.* ("[A] new non-trivial competitive harm results from the modifications, which is the loss of competition."). The same applies here.

[redacted]

Indeed, the Court routinely finds that a "deprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing." *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 533 (2010); *see, e.g.*, *Google, Inc. v. United States*, 95 Fed. Cl. 661, 673 (2011) ("Where a claim is made that an agency violated the CICA by failing to comply with the procedures set forth, 'it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals.'") (quoting *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997)); *Distributed Sols.*, 539 F.3d at 1345–46 (finding jurisdiction where the protestor lost the opportunity to compete to provide software to the agency when the agency modified a current contract to give that contractor the responsibility to select the software vendor); *see also Mgmt. & Training Corp. v. United States*, 137 Fed. Cl. 780, 784 (2018) (confirming that "[i]n some procurement scenarios, direct economic interest may be established by the fact that a qualified contractor was 'deprived of the opportunity to compete' for the procured services") (quoting *Distributed Sols.*, 539 F.3d at 1345).

At core, the Agency's out-of-scope modifications to the GHC has caused TMM and National non-trivial competitive harm because the experienced move mangers lost out on the opportunity to compete for a relaxed version of the contract. TMM and National's deprived right to compete for the cardinally changed GHC establishes Co-Plaintiffs' standing to protest. The Defendant's and Defendant-Intervenor's interested party objections must fail.

## III. <u>TRANSCOM's Modifications to the GHC Violate CICA.</u>

"A cardinal change occurs when the government effects an alteration to the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Ian*, 136 Fed. Cl. at 414. "[T]he question turns on whether the

[redacted]

original contract, as modified, calls for 'essentially the same performance.'" *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 106 (2004). To establish that a modification "materially departs" from the scope of the original procurement such that it constitutes an unlawful cardinal change, a protester must show that the modification was substantial and not foreseeable. *See Ian*, 136 Fed. Cl. at 416. TMM and National have made that showing here.

## A. TRANSCOM's Modifications Substantially Changed the GHC.

### 1. <u>TRANSCOM substantially changed the GHC's transition.</u>

#### *a. HomeSafe seeks to impose an impossibly high standard for a cardinal change that is unsupported by precedent.*

HomeSafe defends TRANSCOM's modifications to transition, nearly tripling the Transition Period, because "the nature and purpose of the GHC has remained consistent through each modification." (HomeSafe MJAR at 25.) Essentially, because TRANSCOM solicited for household goods relocation services for DoD, and HomeSafe's Contract as modified is for the same relocation services, TRANSCOM's modifications were within the Contract's scope. (*See id.*) The Court should reject HomeSafe's unduly narrow vision of what can constitute a cardinal change.

In determining whether a modification "materially departs" from the scope of the original procurement, the Court first considers "whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract." *Ian*, 136 Fed. Cl. at 416 (2018) (internal quotations marks and citation omitted). HomeSafe reduces this prong to a simple binary: whether the modification changes the "underlying purpose" of the contract. (HomeSafe MJAR at 23–24; *see also id.* at 25–26). If "yes," there is a cardinal change; and if "no," as HomeSafe argues here, there cannot be a cardinal change. (*See id.*)

[redacted]

HomeSafe's simplified framing is flawed. It is well-established that a modification can be outside the scope of the original contract where the underlying nature and purpose of the contract remain unchanged.[8] *See, e.g.*, *Leupold Stevens, Inc.*, B-417796, Oct. 30, 2019, 2019 CPD ¶ 397 (underlying purpose for riflescope procurement remained unchanged; finding modification to riflescope component was beyond scope of awarded contract); *Western Pilot Serv., et al.*, B-415732, *et al.*, Mar. 6, 2018, 2018 CPD ¶ 104 (underlying purpose for wildfire suppression remained unchanged; finding task order RFP was beyond scope of IDIQ contracts); *Poly-Pacific Techs., Inc.*, B-296029, June 1, 2005, 2005 CPD ¶ 105 (underlying purpose remained the same; finding agency changed scope of work by relaxing recycling portion in contract for plastic media); *Avtron Mfg., Inc.*, B-229972, May 16, 1988, 88-1 CPD ¶ 458 (underlying purpose to procure aircraft generator system test stands remained unchanged; finding agency's modifications to performance specifications were beyond scope of contract).

Indeed, when an agency relaxes a contract's performance requirements or modifies the terms and conditions of the initial Solicitation to create a different service model, this modification can amount to a cardinal change even though the overarching purpose of the contract and nature of the work has not changed. In *Western Pilot Service*, GAO sustained a protest alleging that the task order RFP sought services that were beyond the scope of the underlying multiple-award indefinite-delivery, indefinite quantity ("IDIQ") contract—even though the purpose and nature of the services were effectively identical. *Western Pilot Serv.*, *supra*. In that case, the Department of the Interior issued a task order solicitation for aerial firefighting services on an "exclusive use" basis whereby contractor aircraft must be pre-

[8] COFC "may draw on GAO's opinions for its application of this expertise." *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 270 n.20 (2021) (quotation omitted); *see B.H. Aircraft Co., Inc. v. United States*, 158 Fed. Cl. 750, 770 (2022) (finding GAO's analysis "instructive").

[redacted]

positioned at designated locations and reserved solely for Government use for 75 days at a time. Multiple IDIQ contract holders protested, alleging that this was beyond the scope of the IDIQ contract which contemplated aerial firefighting services on an "on-call" basis, meaning that the aircraft were not committed for any time period and flight taskings could be declined.

GAO agreed that the contemplated task order was outside the scope of the underlying multiple-award IDIQ contract and thus violated CICA's requirement for full and open competition. GAO acknowledged that the underlying aerial firefighting purpose of the task order remained unchanged, but explained that the contractor's obligations were "materially different" and the offerors "could not have anticipated a task order competition for extended, guaranteed periods of performance at the time they submitted proposals." *Id.* In other words, although the underlying purpose and work requirements were identical, the terms and conditions of the procurement had materially changed such that the task order competition relied on "fundamentally different service models." *Id.*

Similarly, here, TRANSCOM has improperly relaxed the transition requirements for the GHC and improperly relieved HomeSafe of the demand to complete phase-in pursuant to a rigid schedule, creating a fundamentally different service model. That TRANSCOM's need for moving and storage services before and after the modifications remains the same does not excuse the cardinal change. TRANSCOM's needs do not afford the Agency "unlimited latitude to modify the way in which it contracts to meet those requirements," including by tripling the period for transition and brushing aside the phase-in schedule. *See Poly-Pacific*, *supra*. And as Co-Plaintiffs previously explained, TRANSCOM limited the field of competition by having offerors compete under arduous Solicitation terms and conditions that were quickly abandoned. (Decl. of [redacted] ¶¶ 7–9; Decl. of [redacted] ¶¶ 9–12.) If TRANSCOM issues a

[redacted]

solicitation with its cardinally changed requirements, both TMM and National [redacted], increasing competition to fulfill TRANSCOM's requirements. (Decl. of [redacted] ¶¶ 10–11; Decl. of [redacted] ¶¶ 13–14.) Thus, although the overarching purpose of fulfilling military moves remains the same since TRANSCOM initially competed the GHC, the Agency substantially changed *how* the GHC contractor would meet the GHC requirements.[9] This qualifies as a cardinal change.[10]

*b. TRANSCOM is not free to circumvent CICA's competition requirements because of "performance difficulties."*

Both the Government and HomeSafe defend the tripling of the Transition Period because it allowed the parties time "to resolve performance difficulties." (USA MJAR at 28; *see* HomeSafe MJAR at 30 (arguing that Agency "aimed the transition modifications at *achieving* rather than altering" the GHC) (emphasis in original).) The Government and HomeSafe invoke *Northrop* to defend the changes because they facilitated continued performance despite delays and impediments to successfully completing transition. (USA MJAR at 28–30; HomeSafe

[9] HomeSafe's related argument that the GHC is "not a transition services procurement" misses the point. (HomeSafe MJAR at 27.) Successfully completing transition, including fulfilling all the IT requirements to integrate TRANSCOM's and the contractor's IT systems, were material requirements that TRANSCOM closely scrutinized during its evaluation. (*See* TMM & NHC MJAR at 7 (discussing deficiency assigned to offeror for failing to meet IT testing required during transition).) That this is not a contract for "transition services," as HomeSafe notes, does not excuse the Agency's improper actions.

[10] The Court should also reject for these same reasons the Government's and HomeSafe's arguments that the modifications are not a cardinal change because they did not extend the GHC's overall period of performance. (USA MJAR at 23–25; HomeSafe MJAR at 29). This, too, is a red herring. TRANSCOM's modifications substantially relaxed the nature of the transition, changing from a demanding 9-month transition period to an incredibly flexible almost 2.5 years. (TMM & NHC MJAR at 24–25.) The fact that TRANSCOM still needs relocation services for the remaining period of performance does not give the Agency latitude to triple the Transition Period.

[redacted]

MJAR at 30–31 (citing *Northrop Grumman Corp*., 50 Fed. Cl. 443).) *Northrop* is distinguishable.

In *Northrop*, the plaintiffs objected to the Air Force's modifications to a contract with Raytheon Company to produce and install airport radar systems. *Northrop Grumman Corp*., 50 Fed. Cl. at 445. The parties complained that the agency had modified the contact to account for schedule slippages and permitted the awardee to deliver a product that deviated from the non-developmental nature of the product originally solicited. *Id*. at 467–68. In weighing the objections, the Court emphasized:

> [W]hen contract language requires very specific products or services, and bids for the contract were keyed primarily to those requirements, changing such requirements after contract award will be deemed outside the scope, even if such a change does not significantly alter the work being performed.

*Id*. at 466. Nevertheless, the Court found that the modifications were unobjectionable because the contract's "specific time period was not crucial to [awardee] Raytheon's obligations pursuant to the solicitation or the contract," *id*. at 467, and the schedule relief was "simply continuing efforts to bring Raytheon's [radar] system up to the specifications of the solicitation and contract." *Id*. at 468. The Court subsequently expounded on the holding in *Northrop*: "Because the post-award modifications were made to bring performance into line with what the contractor promised, the modifications were, almost by definition, within the scope of the original solicitation." *Cardinal Maint. Serv., Inc*., 63 Fed. Cl. at 106.

Judge Futey's holding in *Northrop* cannot control the outcome here. Most notably, in this procurement, the "contract language require[d] very specific . . . services, and bids for the contract were keyed primarily to those requirements." *See* 50 Fed. Cl. at 466. Specifically, the 9-month Transition Period, along with the schedule-based Phase-In Period, were "crucial"

[redacted]

aspects of the procurement, even serving as a gating mechanism to preclude offerors [redacted] from participating in the competition.

Moreover, here, TRANSCOM did not modify the transition so that HomeSafe could deliver the services required by the Solicitation and promised by HomeSafe's proposal. *Cf. Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. at 106 (modifications in *Northrop* were "by definition, within the scope of the original solicitation"). Unlike in *Northrop*, the Defendant and Defendant-Intervenor do not dispute the Solicitation's firm requirement that transition take place in 9 months. (USA MJAR at 8 ("The solicitation anticipated that the transition would take nine months to accomplish."); HomeSafe MJAR at 10 ("The GHC as first awarded contemplated a nine-month transition period.").) Further, HomeSafe promised to complete transition within the timeframe specified in the Solicitation. (AR, Tab 268.251 at 44268 (HomeSafe Final Technical Proposal).) TRANSCOM thus did not triple transition to ensure HomeSafe would commence volume phase-in after a 9-month period; rather, it did so to relax the transition requirements.

The Government and HomeSafe also seem to interpret *Northrop* as sanctioning ***any*** modifications necessary to overcome difficulties in performance. (USA MJAR at 28–32; HomeSafe MJAR at 25–26, 30–31.) Of course, the ends do not justify the means. This view ignores that modifications, regardless of their necessity, still must be within scope; CICA's competition requirements serve as a guardrail to carte blanche corrective actions. (*See id.*) And to be clear, Co-Plaintiffs do not take issue with HomeSafe's performance on the contract or the root cause of the delays that have hindered GHC's implementation. Indeed, the Defendant and Defendant-Intervenor point fingers at each other as the culprit for the performance failings that purportedly necessitated the enormous changes to the Transition Period. (*See* HomeSafe MJAR at 19 (claiming that the "extended transition under the current GHC stemmed principally from

[redacted]

the ***Government's*** delays in adapting and developing its MilMove software, creating cascading effects that delayed HomeSafe from integrating its IT system with the government's"); USA MJAR at 28–29 (describing [redacted] and the emerging need for [redacted] in Modification 13).) Any number of events could lead to changes viewed as necessary to ensure successful performance under the GHC. For instance, changes might be warranted because HomeSafe is performing poorly, TRANSCOM lacks sufficient appropriations, or evolving Government priorities. But the Agency cannot hide behind such excuses to circumvent CICA. Yet that is what happened here.[11]

2. TRANSCOM substantially changed the volume phase-in requirement.

Modification 13 substantially changed the work under the Volume Phase-In Period, shifting from a rigid schedule with specific relocation thresholds to an indefinite schedule with no minimum volume requirements. (*See* AR, Tab 380 at 59281–83.) The wholesale restructuring of this key requirement is a significant aspect of Co-Plaintiffs' case, and yet the Defendant barely engages on the issue. Neither the Government nor HomeSafe meaningfully refute that the new conditions-based phase-in approach in the Contract is a substantial shift from the approach announced in the Solicitation.

HomeSafe falls back on its blanket defense that the underlying purpose of the GHC did not change despite the huge change to phase-in requirements. (HomeSafe MJAR at 27). Maybe so, but HomeSafe fails to engage with the fact that Modification 13 completely changed the risk

[11] As a final note regarding the significance of the transition changes, the Government repeatedly notes that the Agency was allowed to issue modifications to account for stop work periods due to protest activity. (USA MJAR at 27–28.) This is not controversial; Co-Plaintiffs do not contest the modifications that ***shifted*** transition to accommodate protest activity. Instead, Co-Plaintiffs challenge the modifications that ***extended*** the Transition Period beyond the 9 months announced in the Solicitation. (*See* TMM & NHC MJAR at 10–18 (distinguishing Modifications 6 and 8–13 as modifications where TRANSCOM *extended* the Transition Period).)

[redacted]

allocation for phase-in. As solicited, the Volume Phase-In put all risk on the contractor, requiring that the "Contractor shall be operational and able to begin performance [no later than] the specified timelines." (AR, Tab 140 at 21189.) Thus, TRANSCOM specified an unforgiving schedule requiring the GHC contractor to assume responsibility of all 400,000 annual domestic and international shipments in an 8-month period. (*See id.*)

TRANSCOM, however, has completely removed the risk of unsuccessful performance off HomeSafe's plate. Under the new conditions-based approach, HomeSafe will handle only a miniscule volume of moves over an undefined phase-in period (all while having the safety net of the legacy DP3 program to handle the remaining volume). Additionally, TRANSCOM removed entirely requirements for DPM phase-in, taking another obligation off the contractor. (*See* AR, Tab 380 at 59283–87.) At bottom, instead of the certainty provided by the Solicitation, and understood by offerors, that TRANSCOM would phase-in ***all*** moves from DP3 to the GHC in 8 months, there is now no contractual requirement for HomeSafe to complete phase-in by any end date at all. (*See id.* at 59281.) On this record, it is immaterial that the underlying purpose of the GHC has not changed; TRANSCOM's modifications still warrant scrutiny.

TRANSCOM has changed the nature of the bargain of the GHC by completely overhauling how the GHC contractor would fulfill the contract's Transition and Volume Phase-In requirements. CICA does not permit these substantial changes without adequate competition. *Cardinal Maint. Serv. Inc.*, 63 Fed. Cl. at 106–110 (sustaining protest where agency substantially "modified the contract to allow for changes not contemplated in the original contract" and agency did not resolicit the contract).

[redacted]

### B. TRANSCOM's Modifications Were Not Foreseeable by Offerors.

Under the second prong for determining whether a modification materially departs from the scope of the original procurement, the Court asks "whether the modification is of a nature which potential offerors would reasonably have anticipated." *Ian*, 136 Fed. Cl. at 416 (quotation omitted). The answer here is a resounding no. In arguing that this was all predictable, the Government and HomeSafe hide behind the GHC's "broad scope" and miscellaneous Solicitation provisions (other than the Transition and Volume Phase-In requirements). (USA MJAR at 25–32; HomeSafe MJAR at 33–40.) But the Government and HomeSafe ignore the plain language of the Solicitation, as they must to make their case. (*See id.*) The offerors, however, took the Solicitation's language at its face value. TMM and National understood that the GHC contractor was required to complete transition in 9 months and assume responsibility for 400,000 moves over the following 8 months. (*See* AR, Tab 140 at 21184, 21189–90.) Nothing in the Solicitation put offerors on notice that TRANSCOM would abandon these obligations during contract performance.

1. <u>The GHC's changes clause does not allow TRANSCOM to violate CICA.</u>

Both the Government and HomeSafe place outsized importance on the Contract's changes clause to argue that offerors could have anticipated TRANSCOM's extensive modifications. (*See* USA MJAR at 31–32; HomeSafe MJAR at 33–40.) As they point out, the GHC incorporates by reference the commercial items changes clause, FAR 52.212-4, which states that "[c]hanges in the terms and conditions of this contract may be made only by written agreement of the parties." (*See* AR, Tab 272 at 58553.) The Government and HomeSafe reason that because the GHC has this changes clause, offerors should have been on notice that TRANSCOM could extend the Transition Period, make modifications to accommodate delays,

[redacted]

or alter the GHC's performance and phase-in requirements. (*See* USA MJAR at 31–32; HomeSafe MJAR at 33–40.)

This line of argument is wholly unpersuasive. At the outset, every government contract contains a changes clause. *See* FAR 12.301(b) (describing the changes clause contracting officers must insert for commercial products or commercial services acquisitions); FAR 43.205 (describing the appropriate changes clause contracting officers are required to insert for each type of contract); *see also GAI Consultants, Inc.*, ENGBCA No. 6030, Apr. 4, 1995, 95-2 BCA ¶ 27620 (applying the *Christian* doctrine to read the appropriate changes clause into the contract).

Despite their ubiquitousness, HomeSafe characterizes the applicable changes clause as "broad," thereby "alert[ing] potential bidders to the possibility of even significant changes insofar as both parties consent."[12] (HomeSafe MJAR at 35.) Not so. Regardless of TRANSCOM's and HomeSafe's agreement to execute the modifications, the modifications nevertheless must be "within the scope of the competition conducted to achieve the original contract." *AT&T Commc'ns, v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). In other words, parties cannot negotiate around CICA's competition requirements and mutually agree to a cardinal change. *Ian*, 136 Fed. Cl. at 405–06, 425 (finding modification agency and awardee executed under FAR 52.212-4 was "an out-of-scope modification" that "violated CICA's requirement of full and open competition through the use of competitive procedures" (citation

[12] Arguably, the standard changes clauses, *e.g.* FAR 52.243-1, are broader than the one incorporated into the GHC. The commercial items changes clause requires *bilateral* modifications, *i.e.*, the agreement of both parties to modify the contract. *See* FAR 52.212-4. The standard changes clauses, on the other hand, permit the contracting officer to make *unilateral* changes "at any time" and "without notice." *E.g.*, FAR 52.243-1(a). Regardless, changes clauses only cover work that is within the scope of the contract. They are not a shield for TRANSCOM's modifications here.

[redacted]

omitted)). To be sure, the Defendant and Defendant-Intervenor point to no case that permits a cardinal change simply because of the inclusion of a changes clause.

Thus, the mere incorporation of a changes clause in the GHC was not enough of a warning to offerors that TRANSCOM could make substantial changes to Transition or Volume Phase-In, nor does it absolve TRANSCOM of issuing the out-of-scope modifications at issue here. The parties' highlighting of a generic changes clause does little to bolster their case.

2. <u>Other language in the Solicitation did not put offerors on notice of TRANSCOM's out-of-scope modifications.</u>

HomeSafe and the Government next point to the Solicitation's PWS language as proof that offerors should have foreseen that TRANSCOM would nearly triple the Transition Period. Specifically, HomeSafe relies on the PWS's Service Delivery Summary ("SDS"), which, as HomeSafe emphasizes, "represent the most important contract objectives." (HomeSafe MJAR at 38; AR, Tab 7b1 at 479–80.) The SDS listed various performance objectives and the performance thresholds the GHC contractor is expected to meet. (AR, Tab 7b1 at 479–80.) This section of the PWS explained that "[w]hile the contractor is fully ***expected to comply with all requirements of the PWS***, the Government's assessment of contractor performance will focus mainly on the performance objectives listed in the SDS." (*Id.* at 479.)

Once again, this contract language does not save TRANSCOM. Even if the SDS listed the "most important contract objectives," that did not give TRANSCOM free rein to relax transition and abandon volume phase-in—which were likewise contractual requirements stated in the PWS. (*See* AR, Tab 7b1 at 478 (identifying transition requirements in PWS 1.2.9).) The SDS language did not render transition inherently flexible.

Nor did the "broad scope of the procurement and complexity of the solicited work" alert bidders that drastic changes were possible. (HomeSafe MJAR at 38.) True, the PWS required

[redacted]

the GHC contractor to perform a wide variety of moving and storage responsibilities. (*See id.* at 38–39 (citing AR, Tab 416c1 at 59892–98).) But this included the responsibility and expectation that the GHC contractor would complete transition services, including a variety of IT initiatives, in 9 months. (AR, Tab 7b1 at AR 478 (referencing Appendix A, Transition Phase-In Phase-Out).) HomeSafe describes the GHC as an "ambitious undertaking" before listing the various relocation, storage, warehouse, invoicing, and reporting tasks required under the GHC. (HomeSafe MJAR at 38–39.) HomeSafe, however, does not meaningfully explain why the PWS transition requirement was less important than the GHC's other requirements. (*Id.*)

Relatedly, the Government singles out the deadlines for the IT transition tasks as proof that offerors should have expected delays. (USA MJAR at 25–26.) Defendant states that several of the IT tasks were "based on successful testing completed no later than 30 days prior to the contract base period year one (1) start date." (*Id.* at 26 (quoting AR Tab 7a1 at 208).) In other words, Defendant argues that based on this language requiring "*successful* testing," an offeror "could reasonably anticipate that [redacted] – and issues of any kind – could result in extensions to the transition period and correspondingly, to the start of the volume phase-in period." *Id.*

The Government's argument is directly contradictory to the plain language of the Solicitation that offerors must complete transition in 9 months. (AR, Tab 140 at 21187); *see CW Gov't Travel, Inc., v. United States*, 154 Fed. Cl. 721, 733 (2021) ("The Court's interpretation of a solicitation's terms begins with the plain language of the document."). If anything, the importance and complexity of military moves, as emphasized by HomeSafe, and strict testing deadlines, as emphasized by TRANSCOM, signaled to offerors that TRANSCOM expected the GHC contractor to stick to the prescribed deadline even with [redacted]. Indeed, if TRANSCOM was amendable to needing a longer Transition Period, TRANSCOM should have

[redacted]

informed offerors of such in the Solicitation.[13] TRANSCOM did not. Accordingly, offerors could not have reasonably anticipated that TRANSCOM would extend the Transition Period from 9 months to nearly 2.5 years and provide additional compensation.

3. <u>Offerors could not have anticipated that TRANSCOM would switch to a conditions-based phase-in approach.</u>

Nothing in the Solicitation alerted offerors that TRANSCOM would abandon the clearly defined Volume Phase-in schedule. The Solicitation stated the following regarding the Volume Phase-in Period:

> The Government intends to transfer responsibility for complete, global HHG relocation services IAW the phased approach outlined below. The Contractor shall be operational and able to begin performance NLT the specified timelines.

(AR, Tab 140 at 21189.) Defendant argues that this language is unambiguous; Co-Plaintiffs agree. (USA MJAR at 26; TMM & NHC MJAR at 27, 29, 30–33 (arguing that Appendix A requirements were unambiguous, but to the extent "TRANSCOM was permitted to disregard the parameters in Appendix A., then the Solicitation was latently ambiguous").) As Co-Plaintiffs explained in their MJAR, the reference that TRANSCOM "intends" to phase in the relocation services cannot be read to give TRANSCOM carte blanche to fundamentally alter the GHC's phase-in specifications. (TMM & NHC MJAR at 30–32.) At all times, offerors understood that

[13] Indeed, TRANSCOM's amendments to the DPM phase-in requirement showcased its ability to communicate flexibility to offerors. TRANSCOM initially intended the DPM phase-in to follow a strict schedule. (AR, Tab 416b1 at 59748 "[T]he Government intends to transfer responsibility to the Contractor for shipment volume currently covered by various worldwide DPM contracts according to the following schedule."). But in Modification 4, TRANSCOM alerted offerors that the documented schedule could change, now stating "[t]he dates below represent *estimated* dates upon which the DPM contract cease at each location." (AR, Tab 424a at 60263.) TRANSCOM could have similarly alerted offerors here that the length of transition was an estimated time instead of a material solicitation requirement.

[redacted]

TRANSCOM expected the GHC contractor to complete phase-in under the Solicitation's detailed, rigid parameters. (AR, Tab 140 at 21189–90.)

Defendant also suggests that its decision to dismantle the Volume Phase-In Period should be excused because HomeSafe encountered performance difficulties. (*See* USA MJAR at 29.) But the Government cannot credibly argue that TRANSCOM could use out-of-scope modifications to remedy "occurrences and difficulties with contract performance" that were "unexpected" to TRANSCOM but simultaneously should have been "reasonably anticipate[d]" by offerors. (*Id.* at 31.) Again, even if the Agency jettisoned the phase-in schedule to accommodate performance challenges, offerors could not have reasonably anticipated that the Agency would totally alter the manner and time in which the GHC contractor would complete phase-in.

In any event, this argument is not borne out by the record. To the contrary, the record shows that TRANSCOM considered modifying the phase-in ***just a few months into contract performance*** and more than a year before executing Modification 13. (AR, Tab 430 at 60291 ("While we are all very excited to execute moves under GHC, we believe phase-in changes are required as, ultimately, this will impact thousands of Service Members and their families."); *see also* TMM & NHC MJAR at 13–14.) The Agency apparently had cold feet out of the gate, but this did not permit TRANSCOM to overhaul the program. Offerors could not have known that TRANSCOM, after announcing a stringent phase-in schedule, would adopt a conditions-based approach that ultimately changed the expectation for when the GHC contractor would assume full responsibility for all military moves. (*See* AR, Tab 140 at 59281–82 (not specifying an end date for phase-in).) If TRANSCOM preferred the conditions-based approach instead, TRANSCOM should have amended the Solicitation so all offerors could have competed with this understanding. *See Avtron Mfg., Inc.*, *supra* ("We think it entirely unfair to firms that lose a

[redacted]

contract competition because an agency proscribes a conventional, suggested performance approach for the agency to decide, after award, that the same approach is precisely the one needed and then modify the contract accordingly.").

Not be left out, HomeSafe tries to minimize its pre-protest position that TRANSCOM's proposed changes to phase-in were "significant deviations in the contract scope." (HomeSafe MJAR at 36; *see also* AR, Tab 357 at 59126; Tab 358 at 59127 (asserting that "the current Volume Phase-in schedule that USTRANSCOM presented represented a ***significant change*** from the contractual Volume Phase-in schedule").) HomeSafe dismisses the robust disagreement in the record (leading to Modification 13) as merely presenting HomeSafe's view "that the changes clause allows for bilateral changes to the Contract." (HomeSafe MJAR at 37.) But Co-Plaintiffs highlight these negotiations to demonstrate that all offerors, ***including HomeSafe***, had the same common understanding of the Solicitation's phase-in requirements: The GHC contractor "is required to service and TRANSCOM is required to order moves in accordance with Appendix A," and "TRANSCOM never communicated its interpretation during bidding that it could extend the Phase-in period by 12 months and reduce the guaranteed percentage of moves." (AR, Tab 434 at 60325, 60327; *see also* TMM & NHC MJAR at 30–31.) It is unsurprising that HomeSafe relinquished these arguments in exchange for compensation through a bilateral modification. (*See* AR, Tab 383.) But the back and forth between TRANSCOM and HomeSafe shows that no offeror—not even the awardee—anticipated that TRANSCOM would modify the GHC such that the contractor would move less than the volume specified in Appendix A or allow phase-in to span indefinitely. (*See* AR, Tab 434.) TRANSCOM's wholesale restructuring of the GHC's phase-in approach was not reasonably foreseen by offerors, and constitutes a material deviation from the GHC's original scope.

[redacted]

## IV. INJUNCTIVE RELIEF IS WARRANTED

TMM and National have demonstrated entitlement to injunctive relief requiring TRANSCOM to cease performance under its unlawfully modified contract with HomeSafe and to resolicit for its cardinally changed requirements. The Government rejects that the Court can enjoin the entire GHC. (*See* USA MJAR at 40–41.) This Court, however, has granted a plaintiff alleging a cardinal change the exact relief Co-Plaintiffs ask for here: the termination of the contract that violates CICA and an order that the government issue a solicitation that reflects its actual needs. *See Cardinal Maint.*, 63 Fed. Cl. at 110–11. Thus, Defendant's argument that Co-Plaintiffs cannot receive the remedy they seek fails. TMM and National (and Suddath) are entitled to their requested relief because they have satisfied all injunctive relief factors. *See Zolon PCS II, LLC v. United States*, 172 Fed. Cl. 742, 761–62 (2024).

***First***, as detailed above and in Co-Plaintiffs' MJAR, TMM and National have prevailed on the merits by demonstrating that TRANSCOM issued out-of-scope modifications to the GHC that violated CICA's competition requirements.

***Second***, absent injunctive relief, TMM and National will suffer irreparable harm of the lost opportunity to compete and lost profits. (*See* TMM & NHC MJAR at 36–37.) Neither the Government nor HomeSafe refute that TMM and National were irreparably harmed because they were deprived of the opportunity to fairly compete for the altered Contract and its substantially relaxed transition and phase-in requirements. (USA MJAR at 40–41; HomeSafe MJAR at 45–46.) Because there is no remedy at law absent an injunction, this harm is irreparable. *See Electra-Med*, 140 Fed. Cl. at 106.

Instead, HomeSafe questions whether Co-Plaintiffs "will suffer future lost profits" because "the transition delays have benefited Plaintiffs as they continue to profit under DP3

[redacted]

during the transition," and because "Plaintiffs may further profit under the GHC as subcontractors." (HomeSafe MJAR at 45–46.) But "[l]ost profits is not the only way that a protestor can show irreparable injury." *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004). And here, TMM and National have already established that they were irreparably harmed by losing the opportunity to fairly compete for the altered Contract. (TMM & NHC MJAR at 36–37.) Moreover, neither of the alleged sources of revenue HomeSafe points to addresses the potential profits that would flow from the modified GHC. (*See* HomeSafe MJAR at 45–46.) These other sources of alleged, potential revenue have no bearing.[14] Because Co-Plaintiffs have established irreparable harm, this factor weighs in their favor. *See Great Lakes Dredge*, 60 Fed. Cl. at 369–70 (finding plaintiff would suffer irreparable injury without injunctive relief).

***Third***, the hardships Co-Plaintiffs would face without an injunction outweigh any alleged hardships by TRANSCOM or HomeSafe. Because Co-Plaintiffs have established the merits of their protest that TRANSCOM enacted a cardinal change, the Court should weigh this factor in their favor. *See BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 696 (2012) ("This court tends to weigh the balance of hardships factor in favor or the protester who has succeeded on the merits, unless specific facts counsel otherwise.") HomeSafe raises a handful of alleged harms HomeSafe or TRANSCOM may face, but none tip the scales in their direction.

[14] In any event, if TRANSCOM were allowed to continue performance under the modified phase-in approach, presumably, TRANSCOM will eventually transition all moves from DP3 to HomeSafe, extinguishing that source of revenue. Additionally, profits TMM and National may gain if awarded a subcontract from HomeSafe are not an adequate substitute for the potential profits TMM and National lost from the opportunity to fairly compete [redacted] for the altered GHC.

[redacted]

The Government and HomeSafe first implore the Court to allow its unlawful Contract to continue because of the time, effort, and expense that the parties have put into the program. (USA MJAR at 41; HomeSafe MJAR at 46–47.) HomeSafe highlights that TRANSCOM has worked for "[o]ver five years" on the GHC and TRANSCOM and HomeSafe "are over two years into active deployment." (HomeSafe MJAR at 46.) But despite all this time and money, the taxpayer has received very little in return.

Even taking into account the shift in the period of performance to accommodate protest activity, the GHC was supposed to be 100% phased-in and fully functional by May 1, 2024. (*See* AR, Tab 424a at 60263 (Modification 4 lifting final GHC protest stop work order).) The very first shipments under GHC, however, did not even take place until April 2024, right before the GHC was expected to finish international phase-in. (ECF No. 35-11 (April 2, 2024, TRANSCOM Press Release) at 2.) In the eleven months that have passed since HomeSafe performed its first moves in April 2024 to the present, ***HomeSafe has completed only 1,400 relocations***, with TRANSCOM admitting that it has assigned to HomeSafe just over ***1%*** of the approximate volume for 2025.[15] DoD currently cautions that the "transition to GHC is estimated

[15] HomeSafe Alliance, *HomeSafe Alliance Services More than 1,400 Relocations, On Track for Full Phase-In of Modern and Digitized Military Move System*, (Feb. 19, 2025) https://www.homesafealliance.com/newsroom/homesafe-alliance-services-more-1400-relocations-track-full-phase-modern-and-digitized (Feb. 19, 2025); Wyatt Olson, *Late Pickups, Deliveries Plague Startup of DOD's Streamlined Program for Military Moves*, Stars and Stripes (Jan. 31, 2025), https://www.stripes.com/theaters/asia_pacific/2025-01-30/service-member-hhg-moving-complaints-16659927.html.

These publicly available reports and data regarding HomeSafe's performance challenges under the GHC contract are appropriate for judicial notice because they are "accurately and readily discernible from sources whose accuracy cannot reasonably be questioned." *SEKRI, Inc. v. United States*, 166 Fed. Cl. 224, 231 n.2 (2023) (internal citations and quotations omitted); *Global Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 52, 70–71 (2009) (taking judicial notice of internet-published reports); *Clean Team Janitorial Serv., Inc. v. United States*, 171 Fed.

[redacted]

to ***span several years***" and that shipments not selected for GHC will continue to move under the legacy DP3 program.[16] It is apparent that even under the Contract's relaxed standards, TRANSCOM and HomeSafe continue to face significant hurdles implementing the GHC, including as evidenced by a cure notice, discussed below.

The substantial delay in GHC roll-out undermines HomeSafe's argument that TRANSCOM would be harmed by a delay in competing the Agency's changed requirements. (HomeSafe MJAR at 47.) Though it would cost "some money and effort" for TRANSCOM to solicit and compete a version of the GHC that reflects its actual requirements, this pales in comparison to throwing good money after bad for a contract that has been unlawfully modified and poorly performed. Thus, the harm of allowing the flawed GHC to continue outweighs the minimal expense for TRANSCOM to resolicit its changed requirements and get it right. *Cardinal Maint.*, 63 Fed. Cl. at 111 ("In addition, it is even possible that the government will recoup much of its cost of resolicitation if the court grants an injunction; when the contracts are competitively bid, the government might receive a better offer than it now has due to full and open competition."). Further, any of the alleged harms HomeSafe would suffer due to an

---

Cl. 1, 10 n.18 (2024) (taking judicial notice of settlement agreement appended to press release issued by District of Columbia Attorney General).

[16] Military OneSource, *Global Household Goods Contract Moves*, https://www.militaryonesource.mil/resources/millife-guides/ustranscom-global-household-goods-contract/ (last visited Feb. 25, 2025).

That TRANSCOM plans to leverage DP3 as GHC continues to transition for the next several years proves that TRANSCOM has a viable, successful alternative to service military moves while TRANSCOM recompetes some permutation of the GHC. (*See* HomeSafe MJAR at 47; *see also* TMM & NHC MJAR at 37–38.)

[redacted]

injunction "is discounted in the calculation of harms," because HomeSafe "was the beneficiary of a CICA violation and, as such, suffers no harm when the violation is corrected."[17] *Id.*

***Finally***, the public interest weighs in favor of injunctive relief. Co-Plaintiffs agree with the Government and HomeSafe: the public interest is served by service members and their families receiving quality moving services though an improved moving process. (USA MJAR at 41 (citing "the public interest of improving the process for moving servicemembers and their families"); HomeSafe MJAR at 49 ("[T]he public interest is best served by ensuring service members receive quality moving services.").) But this interest is not being fulfilled under HomeSafe's altered Contract. On January 25, 2025, TRANSCOM issued HomeSafe a show-cause notice to address HomeSafe's subpar performance, asking HomeSafe to explain instances of late pick-ups, missed pick-ups, and late deliveries.[18] Somehow, even though HomeSafe has completed a paltry 1,400 moves, TRANSCOM has announced that under the GHC phase-in, "1,000 service members have been impacted either at the pickup-delivery or by poor communication."[19] Quite simply, continued performance under the GHC is not serving the

---

[17] HomeSafe argues that Co-Plaintiffs delayed in filing their complaints and the Court should account for the alleged delay when deciding the balance of the harms. (HomeSafe MJAR at 48–49.) The scenario here is unlike the cases cited in HomeSafe's MJAR, where the contracts at issue were well into performance for 3 and 6 years. *See Aircraft Charter Sols., Inc. v. United States*, 109 Fed. Cl. 398, 407–08 (2013); *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 570, 578 (2004). Here, HomeSafe is still in the midst of transition and performance has barely gotten underway. Also, neither TRANSCOM nor HomeSafe have been economically prejudiced by any perceived delay in Co-Plaintiffs filing their bid protests. Accordingly, this does not tip the balance of harms in TRANSCOM's and HomeSafe's favor.

[18] Jared Serbu, *DoD Raises Formal Performance Concerns on Multibillion Dollar Moving Contract,* Federal New Network (Jan. 30, 2025), https://federalnewsnetwork.com/defense-news/2025/01/dod-raises-formal-performance-concerns-on-multibillion-dollar-moving-contract/.

[19] Wyatt Olson, *supra* note 15.

[redacted]

public's interest; whereas the legacy DP3 program is scoring high satisfaction marks and could be leaned on during a resolicitation of the modified GHC.[20]

Co-Plaintiffs do not contest that TRANSCOM aimed to improve the miliary moving process with the GHC program. (*See* USA MJAR at 41; HomeSafe MJAR at 49–50.) But that goal is not being achieved here, particularly under the modified Contract whose relaxed requirements were never fairly competed. Accordingly, the public interest weighs in favor of enjoining the unlawful Contract and ordering TRANSCOM to issue a solicitation for its changed requirements. *See Cardinal Maint.*, 63 Fed. Cl. at 111.

## V. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Court should GRANT TMM and National's Joint Motion for Judgment on the Administrative Record, DENY the United States' Motion to Dismiss, DENY the United States' and HomeSafe's Cross-Motions for Judgment on the Administrative Record; and enter judgment in Co-Plaintiffs' favor. The Court should declare that TRANSCOM's actions amounted to a cardinal change that violated CICA and were thus arbitrary, capricious, and contrary to law; issue a permanent injunction ordering TRANSCOM to end performance under the unlawful Contract, and remand the matter to TRANSCOM to re-compete its revised requirements using full and open competition, including issuing a revised solicitation that accurately reflects TRANSCOM's needs; and grant such other and further relief as the Court deems just and proper.

---

[20] See *2024 Defense Personal Property Program Metrics*, USTRANSCOM, https://www.ustranscom.mil/dp3/tspinformation.cfm (last accessed Feb. 26, 2025) (showing an 89% customer satisfaction rate and 92% on-time delivery rate).

[redacted]

Dated: February 26, 2025

Respectfully submitted,

*Of Counsel*

Moshe B. Broder
Jennifer Eve Retener
Ginsey V. Kramarczyk
JENNER & BLOCK LLP

/s/ *Noah B. Bleicher*
Noah B. Bleicher (Counsel of Record)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6063
*nbleicher@jenner.com*

*Counsel for Total Military Management, Inc., and National Holding Company, Inc.*

[redacted]